# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: ARIAD Pharmaceuticals, Inc. Securities Litigation | No.  1:13-cv-12544 (WGY) |
| | <u>Class Action</u> |
| | CORRECTED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – **LEAVE TO FILE GRANTED ON MARCH 24, 2014** |
| | <u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................. 1

**PART ONE: THE FRAUD CLAIMS UNDER THE EXCHANGE ACT** ............................. 8

I.   JURISDICTION AND VENUE ...................................................................... 8

II.   THE PARTIES ........................................................................................ 9

    A. Lead Plaintiffs ................................................................................. 9

        1.   Joseph Bradley ......................................................................... 9

        2.   City of Fort Lauderdale Police & Fire Retirement System .................... 9

        3.   The Pension Trust Fund for Operating Engineers and the
            Automotive Industries Pension Trust Fund .................................... 10

        4.   William A. Gaul, D.M.D .......................................................... 10

    B. The Exchange Act Defendants ............................................................ 10

        1.   The Company .......................................................................... 10

        2.   Individual Defendants ............................................................... 11

III.   FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS .......................... 12

    A. ARIAD Business Overview—A Pharmaceutical Company Seeking
       Global Commercialization ................................................................ 12

    B. ARIAD Selects a Drug to Spearhead Its New Strategy: Ponatinib ................ 13

    C. ARIAD Sponsors the Three Phased Clinical Trials Necessary to
       Support Regulatory Approval of Ponatinib ............................................ 15

        1.   Phase 1: the Dose-Finding Trial .................................................. 15

        2.   Phase 2: ARIAD Seeks FDA Approval for Limited Indications ............ 15

        3.   Phase 3: ARIAD Seeks FDA Approval for Lucrative Front-Line
            Use ...................................................................................... 17

    D. The Importance of Front-Line Use of Ponatinib to the Company ................. 18

        1.   Development Costs Put ARIAD at the Brink of Insolvency ................. 18

2. Defendants Recognized the Importance of FDA Approval of Ponatinib for Front-Line Use ............................................................... 19

3. Defendants Tout Ponatinib as a Growth Engine That Will Tap Into the Lucrative Front-line Market........................................................ 21

4. Defendants Represent that Ponatinib Is Safe and Effective................................. 22

E. Defendants Disclose That the FDA-Approved Label for Ponatinib Will Bear a Stringent Black Box Warning........................................................ 24

F. After the Black Box Warning, Defendants Continue to Mislead the Market Concerning the Prospects for ARIAD's Frontline Trial and Downplay Concerns .............................................................................. 29

G. While Reassuring the Market About Ponatinib's Front-line Opportunity, Defendants Unload Millions of Dollars Worth of Company Stock and Options ........................................................................ 30

H. Defendants Change the Enrollment Criteria for ARIAD's Front-Line EPIC Trial to Better Exclude Patients with a History of Heart Disease ..................... 32

I. The Truth About Ponatinib ........................................................................ 34

1. Ponatinib Had a Heightened Risk for Adverse Events at the 45 mg Trial Dose.............................................................................. 34

2. The Black Box Warning Resulted from Serious Adverse Cardiovascular Events Observed in the PACE 2 Trial as of July 23, 2012........................................................................................ 36

3. Defendants Knew, But Concealed, That After the Black Box Warning Was Announced in December 2012, Cardiovascular Events Continued to Increase in ARIAD's PACE 2 Trial .................................. 40

4. After the Black Box Warning Was Announced in December 2012, Dosage Reductions Continued to Be the Norm in ARIAD's PACE 2 Trial, Which Defendants Knew ........................................................ 47

5. Defendants Altered the Enrollment Criteria for the EPIC Trial Specifically in Order to Exclude High-risk Patients............................................. 48

IV. MATERIALLY FALSE AND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD RELATING TO THE EXCHANGE ACT CLAIMS ....................................................................................... 49

A. December 11, 2011 Form 8-K and Press Release...................................................... 49

B.   December 12, 2011 ASH Annual Investor Briefing ................................................. 50

C.   December 13, 2011 Oppenheimer & Co. Healthcare Conference ............................. 52

D.   January 10, 2012 J.P. Morgan Healthcare Conference ................................................. 53

E.   February 13, 2012 Biotechnology Industry Organization CEO and
     Investor Conference ........................................................................................................ 54

F.   The February 28, 2012 Form 8-K and Press Release ................................................. 55

G.   February 29, 2012 Form 10-K for Fiscal Year 2011 ................................................. 56

H.   The May 9, 2012 Form 8-K and Press Release .......................................................... 58

I.   May 9, 2012 Form 10-Q ............................................................................................... 59

J.   May 16, 2012 Bank of America Merrill Lynch Health Care
     Conference ...................................................................................................................... 60

K.   June 4, 2012 Form 8-K and Press Release .................................................................. 60

L.   June 5, 2012 Goldman Sachs Healthcare Conference ................................................. 61

M.   June 19, 2012 Form 8-K and Press Release ................................................................. 61

N.   June 21, 2012 Annual Shareholder Meeting ............................................................... 62

O.   July 13, 2012 JMP Securities Healthcare Conference ................................................. 62

P.   The July 27, 2012 Form 8-K and Press Release .......................................................... 63

Q.   August 9, 2012 Form 10-Q ........................................................................................... 64

R.   September 19, 2012 UBS Global Life Sciences Conference ....................................... 64

S.   October 19, 2012 Analyst and Investor Day ................................................................ 65

T.   November 7, 2012 Q3 2012 Earnings Conference Call ............................................... 66

U.   November 9, 2012 Form 10-Q ...................................................................................... 67

V.   December 11, 2012 Form 8-K and Press Releases ...................................................... 67

W.   December 11, 2012 Cowen and Company Analyst Report ......................................... 68

V.   THE TRUTH BEGINS TO BE REVEALED IN A PARTIAL
     DISCLOSURE .................................................................................................................. 71

    A.  The December 14, 2012 Press Release and Analyst Call ........................................... 71

VI.   AFTER THE DECEMBER 14, 2012 PARTIAL DISCLOSURE,
     DEFENDANTS MAKE FURTHER MISLEADING STATEMENTS ............................ 73

    A.  March 1, 2013 Form 10-K for Fiscal Year 2012 ....................................................... 73

    B.  March 12, 2013 Form 8-K ........................................................................................ 76

    C.  April 4, 2013 ARIAD Investor Conference Call ....................................................... 77

    D.  April 10, 2013 Guggenheim Partners Analyst Report ............................................... 78

    E.  May 9, 2013 Form 10-Q ........................................................................................... 78

    F.  May 20, 2013 UBS Global Healthcare Conference ................................................... 79

    G.  June 11, 2013 Goldman Sachs Healthcare Conference ............................................. 80

    H.  June 20, 2013 Annual Shareholder Meeting .............................................................. 81

    I.  August 9, 2013 Form 10-Q ........................................................................................ 81

VII.  THE TRUTH IS FINALLY REVEALED ................................................................... 82

    A.  PARTIAL DISCLOSURES: The October 9, 2013 Form 8-K and Press
       Release and the October 11, 2013 FDA Press Release ............................................. 82

    B.  PARTIAL DISCLOSURE: The October 18, 2013 Form 8-K and Press
       Release ...................................................................................................................... 85

    C.  The Full Truth Is Revealed: The October 31, 2013 Form 8-K and Press
       Release ...................................................................................................................... 87

VIII. POST-CLASS PERIOD EVENTS ............................................................................... 89

    A.  The December 20, 2013 Form 8-K and Press Release ............................................... 89

    B.  January 2014 *Journal of the American Medical Association* Article
       Confirms "No Safe Duration" and "No Risk Free Users" for Ponatinib ................... 90

IX.   ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL
     DEFENDANTS' SCIENTER ...................................................................................... 92

    A.  Defendants Knew of the Issues Surrounding Ponatinib ............................................ 93

      1.  Ponatinib Was the Company's Most Critical Product During the
         Class Period ...................................................................................................... 93

2. The Individual Defendants Closely Monitored the Company's Clinical Trial Results Relating to Ponatinib ........................................ 94

B. Confidential Witnesses Confirm that Defendants Tracked Ponatinib Clinical Trial Data, Including Adverse Events and Dosage Levels........................... 95

C. Defendants Were Required to Monitor Adverse Events............................................. 97

D. The Individual Defendants Each Profited From Class Period Stock Sales Timed to Precede the October 2013 Disclosures ............................. 97

1. The Amount and Percentage of Shares Defendants Sold During the Class Period Was Extraordinary and Also Inconsistent with Their Prior Trading History........................................................................ 98

2. The Individual Defendants' Stock Sales in Terms of Shares Sold Were Unusual and Inconsistent With Their Prior Trading Practices.................. 102

3. The Individual Defendants' Sales Were Suspiciously Large Compared to their Share Acquisitions ................................................. 102

4. Individual Defendants Generated Enormous Abnormal Profits on Their Sales of ARIAD Stock .............................................................. 103

5. Individual Defendants Suspiciously Exercised Their Employee Stock Options Early, Then Immediately Sold The Shares ................................ 108

6. The Individual Defendants Suspiciously Adopted 10b5-1 Plans During the Class Period; Those Plans Do Not Insulate Individual Defendants' Trading Behavior.......................................................... 110

7. ARIAD's Heavily Incentives-Loaded Executive Compensation Provided Additional Incentives to Withhold Adverse Information .................. 114

X. LOSS CAUSATION............................................................................................... 116

XI. CLASS ACTION ALLEGATIONS—APPLICABLE TO ALL CLAIMS...................... 116

XII. INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................ 119

XIII. PRESUMPTION OF RELIANCE UNDER THE *AFFILIATED UTE* DOCTRINE AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE WITH RESPECT TO THE EXCHANGE ACT CLAIMS ............................................................................................................ 120

XIV. CAUSES OF ACTION UNDER THE EXCHANGE ACT ............................................ 121

COUNT I For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Against ARIAD and the Individual Defendants ............................................. 121

COUNT II For Violation of § 20(a) of the Exchange Act Against the
Individual Defendants .......................................................................................... 125

**PART TWO: THE STRICT LIABILITY AND NEGLIGENCE CLAIMS
UNDER THE SECURITIES ACT** ....................................................................... **126**

I.   JURISDICTION AND VENUE ....................................................................... 127

II.  PARTIES RELATING TO THE SECURITIES ACT CLAIMS ..................... 128

    A. Lead Plaintiffs ............................................................................................ 128

    B. The Securities Act Defendants.................................................................... 128

        1. The Company......................................................................................... 128

        2. The Officer Defendants......................................................................... 128

        3. The Director Defendants........................................................................ 129

        4. The Underwriter Defendants.................................................................. 129

III. FACTUAL ALLEGATIONS RELATING TO THE SECURITIES ACT
     CLAIMS ......................................................................................................... 130

    A. ARIAD and the Development of Ponatinib.................................................. 130

    B. The 2013 Stock Offering ............................................................................ 133

    C. Statements Relating to Cardiovascular Safety Issues, Dosing, and
       Ponatinib's Likelihood to Be Approved for Front-Line Use ...................... 134

IV.  UNTRUE STATEMENTS AND OMISSIONS OF MATERIAL FACT ........ 135

    A. Cardiovascular Safety Issues ...................................................................... 136

        1. The 2011 10-K ...................................................................................... 136

        2. The August 9, 2012 and November 9, 2012 10-Qs ............................. 137

        3. The June 4, 2012 and June 19, 2012 Form 8-Ks and Press Release.... 138

        4. The December 11, 2012 Form 8-K and Press Releases....................... 139

        5. The Prospectus Supplement .................................................................. 140

    B. Dose Reduction ........................................................................................... 142

    C. Material Undisclosed Risk of No FDA Approval for Front-Line Use ......... 144

D.  The Registration and Prospectus Omitted Information Required by
Item 303 of Regulation S-K ...................................................................................... 145

V.    CAUSES OF ACTION UNDER THE SECURITIES ACT ............................................ 146

COUNT III For Violation of § 11 of the Securities Act Against ARIAD, the
Officer Defendants, the Director Defendants and the Underwriter
Defendants In Connection with the 2013 Stock Offering .................................................. 146

COUNT IV For Violation of § 15 of the Securities Act Against the Officer
Defendants In Connection with the 2013 Stock Offering .................................................. 148

**PRAYER FOR RELIEF** ...................................................................................................... **148**

**JURY TRIAL DEMANDED** ................................................................................................... **149**

**APPENDIX A** ........................................................................................................................ **151**

Court-appointed Lead Plaintiffs Joseph Bradley, City of Fort Lauderdale Police & Fire Retirement System, Pension Trust Fund for Operating Engineers and Automotive Industries Pension Trust Fund, and William A. Gaul, D.M.D ("Lead Plaintiffs"), by and through their undersigned counsel, bring this federal securities law class action on behalf of themselves and all other persons and entities, as specified below, who purchased or otherwise acquired (1) any of the publicly-traded securities of ARIAD Pharmaceuticals, Inc. ("ARIAD" or the "Company") between December 12, 2011 and October 30, 2013, inclusive (the "Class Period"), or (2) ARIAD's common stock pursuant or traceable to the secondary offering that occurred on or about January 24, 2013 (the "2013 Stock Offering"), and were damaged thereby (collectively, the "Class").[1]

## NATURE OF THE ACTION

1.      This case is about a pharmaceutical company, ARIAD, which repeatedly misled investors regarding the commercial prospects, safety profile and efficacy of its single most important product—a proprietary cancer drug called "ponatinib."  During the Class Period, ARIAD and its senior executives—its Chief Executive Officer Harvey Berger, Chief Financial Officer Edward Fitzgerald, Chief Medical Officer Frank Haluska, and Chief Scientific Officer Timothy Clackson (collectively, "Defendants")—told investors the Company was developing a revolutionary new cancer medication (ponatinib, later called Iclusig) that was designed to treat chronic myeloid leukemia ("CML"), a form of leukemia that affects white blood cells.

2.      Defendants estimated that there was a $4.5 billion global market for CML drugs. They assured investors that ponatinib would "distinguish" itself from the three other CML drugs

---

[1] A summary of abbreviations used in this Complaint is attached hereto as Appendix A.  Certain allegations are based on information provided by former employees of Ariad and other persons with knowledge of the matters alleged herein.  These confidential witnesses ("CWs") are identified as CW1, CW2, etc.  All emphasis is added unless otherwise indicated.

that were then commercially available and quickly become a "***first-in-class new CML therapy***."

As Defendants knew, it was absolutely critical for ARIAD that ponatinib become successful.

Indeed, the Company was reporting tens of millions of dollars in net losses every quarter and

was forced to conduct two massive stock offerings during the Class Period in order to raise cash.

These stock offerings, one conducted in December 2011 and the other in January 2013,

collectively raised more than $560 million from investors and allowed ARIAD to fund the

research, development and marketing costs for ponatinib.

3. In order to receive approval from the FDA, ARIAD enrolled ponatinib in a series

of clinical tests, including a critical multi-year safety and efficacy test called "PACE 2."

Throughout the Class Period, Defendants repeatedly told investors that ponatinib was

performing extremely well in the PACE 2 trial, that it was "highly likely" the drug would be

approved for widespread use, and that they expected the drug would achieve global sales starting

at $600 million - $800 million annually "growing to ***many several billion dollars a year***." As

set forth below, time and time again during the Class Period, Defendants told the market that

data from the PACE 2 trial was showing that ponatinib was highly effective at treating CML and

that the drug was "safe and well-tolerated."

4. For instance, in June 2012, after the PACE 2 trial had accumulated nearly a year's

worth of data and ARIAD was preparing to submit a critical interim report to the FDA,

Defendants made a presentation at an important medical conference where they publicly touted

the purported success of ponatinib.  At that conference, Defendant Berger stated that the PACE 2

"data provide ***clear evidence of a favorable safety and tolerability profile***" and that ponatinib

had a "very well-tolerated safety profile, with very strong efficacy data across all the

measurements that one can use to really assess how the drug is working."  As late as October

and November 2012, Defendants were telling investors that "all of the feedback and interactions we're having with the FDA are consistent with a very positive response from them on all aspects of our clinical data."

5.     These and similar statements caused the price of ARIAD's common stock to rise from $11.31 on December 12, 2011 to $25.16 by October 2012, an increase of more than 122%. As Defendant Berger himself publicly acknowledged, this increase was "driven by the success of ponatinib and the compelling clinical data" supposedly supporting ponatinib's safety and efficacy.

6.     Unbeknownst to investors, however, these statements were false.  As Defendants knew but deliberately concealed, an alarming number of patients enrolled in the PACE 2 trial were experiencing significant and serious adverse events, including arterial thrombosis and congestive heart failure.  Moreover, doctors overseeing the PACE 2 trial had lowered the ponatinib dosage for an astonishing ***seventy-three percent (73%)*** of the PACE 2 trial participants (reduced from 45 mg to 30 mg or less) because ponatinib at the maximum efficacy dosage of 45 mg was 2-9 times more toxic than at lower levels.  Indeed, as Defendants knew, 45 mg dosages were causing the majority of test patients to experience dangerous "adverse events."

7.     On December 14, 2012, ARIAD announced that, contrary to all prior public statements by the Company, the FDA had determined based on interim results from the PACE 2 trial, that ponatinib was causing a significant number of (previously undisclosed) adverse events. As a result, the FDA ruled that, while ponatinib would be approved for sale, it could be marketed and sold only with a so-called "black box" warning on the label.  A black box warning is the strongest warning that can appear on the packaging for a prescription medication under FDA guidelines.  The label the FDA required for ponatinib was particularly strongly worded and

explicitly warned of serious dangers such as liver failure, and "serious arterial thrombosis." Defendants immediately tried to minimize the impact of this disclosure, which had negative implications for the sales prospects of the drug, stating publicly that the adverse events were likely caused by pre-existing conditions in the patients and not directly due to ponatinib itself.

8.      Despite Defendants' efforts to downplay the impact of the December 14, 2012 disclosure, this news came as a complete shock to analysts and investors.  One analyst noted that "the large number of side effects and the severity of the side effects **_came as a surprise to the investment community_**," stating that "somehow these adverse events were not highlighted, and certainly not presented in aggregate manner as it is now revealed in the FDA label."  In response, ARIAD's stock price plummeted, declining from $23.88 to $18.93, a drop of twenty-one percent (21%) in a single day.

9.      Over the next ten months, rather than honestly concede that ponatinib—now being marketed under the brand name Iclusig—had significant issues that would likely prevent it from ever becoming the "go to" prescription medication for CML patients, Defendants continued to tell the market that ponatinib would eventually be a huge success.  On repeated occasions, Defendants publicly blamed the significant number of adverse events in the interim PACE 2 results on the patient population, claiming that it was "heavily skewed in terms of preexisting multiple cardiovascular risk factors."  In truth, but unknown to investors, the FDA found that there was "no safe duration noted for ponatinib and no risk free users" and that "[adverse e]vents occurred as soon as 2 weeks after starting the drug among patients without cardiovascular risk factors or those in their 20s."

10.     Moreover, even as the PACE 2 trial was continuing, Defendants began to emphasize the fact that ponatinib was now enrolled in a new FDA trial, called EPIC, which was designed to gain approval for ponatinib to be marketed as a "front-line" CML treatment.

11.     Front-line drugs are the first medications that doctors prescribe to newly-diagnosed CML patients.  This is a key market segment because patients usually remain on the first drug that is prescribed to them, and therefore front-line drugs typically outsell second-line treatments by many orders of magnitude.  The EPIC trial that ARIAD had an official trial dose of 45 mg, which was the ponatinib dose that Defendants had determined was the most effective.

12.     According to Defendants, higher doses of ponatinib were more effective than lower doses, and ponatinib needed to show maximum efficacy (in fact, ponatinib needed to show head-to-head superiority over its competitor drug, Gleevec) in order to win FDA approval for use as a front-line drug.  By contrast, admitting that a 45 mg dose was too toxic—that any efficacy gains came at the cost of safety—increased the risk that the FDA would reject ponatinib for front-line use and approve it only for use as a drug of last resort.

13.     Between December 2012 and the end of the Class Period, Defendants were particularly aggressive in touting the expected future success of ponatinib, repeatedly stating that ponatinib was showing "overwhelmingly strong efficacy and [an] *excellent safety profile*." Remarkably, at no point during this period did Defendants disclose the critical fact that the interim PACE 2 trial results had shown that ponatinib administered at 45 mg had a heightened level of toxicity that the FDA had determined was directly contributing to the occurrence of serious adverse events.

14.     Instead of telling the truth to investors, ARIAD's CEO, Harvey Berger, entered into a so-called Rule 10b5-1 plan in order to sell millions of dollars in ARIAD stock as he

continued to claim publicly that ponatinib was going to be a huge success.  These stock sales were enormous—Berger received over *$11 million* in the ten months between December 2012 and the end of the Class Period, representing approximately 50% of his available for sale shares. For their parts, Clackson, Fitzgerald, and Haluska had entered into 10b5-1 plans just ten days after the start of the Class Period, when data had begun to accumulate about ponatinib's adverse events, and thus had already been making millions before the announcement of the black box warning surprised the market and gutted ARIAD's stock.  After the black box warning was announced, Clackson, Fitzgerald, and Haluska entered into new 10b5-1 plans, and made millions more in the ten months leading up to the end of the Class Period.  Moreover, the Class Period sales of all four of these executives were completely out of line with their previous sales.  In the two years prior to the Class Period, Berger, Clackson, Fitzgerald, and Haluska collectively sold $665,000 in stock—as compared to *$28 million* during the Class Period.

15.     When confronted about these massive stock sales, Defendants blatantly lied to investors.  For instance, during an April 4, 2013 conference call, Defendant Berger stated "no one should misinterpret my sales as any lack of confidence . . . I expect the stock price of ARIAD to recover and continue to rise" and "if I could buy more shares today, I would buy all the shares that I sold and 10-fold more."

16.     The full truth began to be revealed to the market on October 9, 2013, when the Company announced that, based on updated PACE 2 data that ARIAD had submitted to the FDA in August 2013, the FDA had determined that no more patients could be enrolled in the trial because the risk of adverse events was too high.  The FDA also required ARIAD to reduce the dosage of ponatinib, and the company finally revealed that at least 70% of PACE 2 test subjects had been receiving less than the 45 mg trial dose because of the risk of adverse events.

Despite Defendants' efforts to assure the market that the concerns about ponatinib's safety and efficacy were overstated (Defendants once again blamed "preexisting conditions" in the PACE 2 patient population), ARIAD's common stock declined by $11.31 per share, a decrease of sixty-six percent (66%) in a single day.

17.     The full truth was revealed to the market just a few weeks later.  First, on October 18, 2013, ARIAD announced that the FDA had terminated the EPIC trial, scuttling ARIAD's chances of obtaining approval for front-line use.  That day, ARIAD's stock lost forty-one percent (41%) of its market value.  Subsequently, on October 31, 2013, ARIAD announced that the FDA was suspending marketing of ponatinib for its approved indication.  On this news, the stock collapsed a further forty-four percent (44%), to close at $2.67—an astonishing **ninety-one percent (91%)** decline from its Class Period high.

18.     Analysts reacted with alarm to these disclosures, which revealed that Defendants had been misleading investors throughout the Class Period.  For instance, an analyst from JP Morgan wrote at the end of October 2013 that "after last week's safety update/implosion . . . we can't in good faith continue to tell people to buy this name [ARIAD]."  Another analyst echoed this sentiment, stating "Given their history of what we feel have been **misleading communications regarding the safety of Iclusig, we believe management credibility represents an outsized risk for investment in ARIA**."  On October 31, 2013, an analyst from RBC Capital Markets remarked that ARIAD was in a "deeper hole" and "each time it seems it is worse than what we are led to believe."

19.     As a result of Defendants' false and misleading statements and omissions of material fact, ARIAD's stock traded at artificially inflated levels during the Class Period and investors who lost hundreds of millions of dollars are entitled to recover for their losses. In this

Complaint, Lead Plaintiffs assert two separate sets of claims.  Counts One and Two, found in Part One of the Complaint, assert fraud claims pursuant to the Securities Exchange Act of 1934 (the "Exchange Act").  These claims are asserted against those defendants who knew about, or were reckless in failing to discover, facts that rendered their public statements materially false and misleading.  These allegations expressly relate to Defendants' false and misleading statements and their omissions of material fact during the Class Period.  Counts Three and Four, found in Part Two of the Complaint, assert strict liability and negligence claims pursuant to the Securities Act of 1933 (the "Securities Act").  These non-fraud claims are asserted against those defendants who are responsible and statutorily liable for the untrue statements in the prospectus and registration statement pursuant to which ARIAD issued shares of its common stock to the public in a stock offering.  Lead Plaintiffs specifically disclaim any allegations of fraud in these non-fraud claims (including any allegations set forth in this introduction).

## PART ONE: THE FRAUD CLAIMS UNDER THE EXCHANGE ACT

### I.    JURISDICTION AND VENUE

20.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

21.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1331 [15 U.S.C. § 78a(a)].

22.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).   Many of the acts that constitute the violations of law complained of herein, including dissemination to the public of materially false and/or misleading information, occurred in and/or were issued from this District.

23.     Defendant ARIAD is a Delaware corporation, with its principal place of business in this District at 26 Landsdowne Street, Cambridge, Massachusetts.

24.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, Internet communications and the facilities of the national securities markets.

## II.     THE PARTIES

### A.     Lead Plaintiffs

25.     On January 9, 2014, this Court appointed (i) Joseph Bradley, (ii) City of Fort Lauderdale Police & Fire Retirement System, (iii) Pension Trust Fund for Operating Engineers and Automotive Industries Pension Trust Fund, and (iv) William A. Gaul, D.M.D as Lead Plaintiffs for this consolidated litigation.  (ECF No. 95).

#### 1.     Joseph Bradley

26.     Joseph Bradley ("Bradley") is a retired medical surgical nurse.  As set forth in his previously-filed PSLRA certification, (ECF No. 35-1, Ex. A, pp. 2-3), Mr. Bradley purchased publicly traded shares of ARIAD common stock on the open market during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

#### 2.     City of Fort Lauderdale Police & Fire Retirement System

27.     City of Fort Lauderdale Police & Fire Retirement System ("Fort Lauderdale") manages approximately $685 million in assets on behalf of over 1,750 participants.  As set forth in its previously-filed PSLRA certification, (ECF No. 35-1, Ex. A, pp. 4-5), Fort Lauderdale purchased publicly traded shares of ARIAD common stock on the open market during the Class

Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

### 3.   The Pension Trust Fund for Operating Engineers and the Automotive Industries Pension Trust Fund

28.     The Pension Trust Fund for Operating Engineers ("Operating Engineers") manages over $3.2 billion in assets on behalf of over 34,000 members.  The Automotive Industries Pension Trust Fund ("Automotive Industries") manages over $1.2 billion in assets and serves approximately 26,500 participants.  As set forth in their previously-filed PSLRA certifications, (ECF No. 35-1, Ex. A, pp. 6-10), Operating Engineers and Automotive Industries both purchased publicly traded shares of ARIAD common stock on the open market during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

### 4.   William A. Gaul, D.M.D

29.     William A. Gaul, D.M.D ("Gaul") is a retired investor.  As set forth in his previously-filed PSLRA certification, (ECF No. 24-1, Ex. A), Gaul purchased or otherwise acquired ARIAD securities on the open market during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

### B.   The Exchange Act Defendants

### 1.   The Company

30.     Defendant ARIAD is a corporation that is organized in Delaware and maintains its principal executive offices at 26 Landsdowne Street, Cambridge, Massachusetts.  ARIAD's common stock trades under the ticker symbol "ARIA" on the NASDAQ Global Select Market (the "NASDAQ"), which is an efficient market.

## 2.   **Individual Defendants**

31.     Harvey J. Berger ("Berger") was, at all relevant times, Chairman and Chief Executive Officer ("CEO") of the Company.  Berger is ARIAD's principal founder and has served as its Chairman of the Board and Chief Executive Officer since April 1991. He served as ARIAD's President from April 1991 to September 2003 and from December 2004 to present. Berger received his A.B. degree in Biology from Colgate University and his M.D. degree from Yale University School of Medicine and did further medical and research training at the Massachusetts General Hospital and Yale-New Haven Hospital.  Berger held executive management positions at Centocor, Inc., a biotechnology company, including Executive Vice President and President, Research and Development Division.  He has also held senior academic and administrative appointments at Emory University, Yale University and the University of Pennsylvania and was an Established Investigator of the American Heart Association, Inc. Berger currently is a member of the Dean's Council of Yale University School of Medicine.

32.     Timothy P. Clackson ("Clackson") was, at all relevant times, the Company's President of Research and Development, Senior Vice President, and Chief Scientific Officer. Prior to joining ARIAD in December 1994, Clackson was a postdoctoral fellow at Genentech, Inc., a biotechnology company, from 1991 to 1994, where he studied the molecular basis for human growth hormone function.  Clackson received his B.A. degree in Biochemistry from the University of Oxford.  He received his Ph.D. degree in Biology from the University of Cambridge, for research conducted at the MRC Laboratory of Molecular Biology into antibody engineering and the development of phage display technology.

33.     Edward M. Fitzgerald ("Fitzgerald") was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of the Company.  From 1998 to April 2002, he

served as Senior Vice President, Chief Financial Officer and Secretary at AltaRex Corp., a biotechnology company.

34.     Frank G. Haluska ("Haluska") was, at all relevant times, the Company's Senior Vice President and Chief Medical Officer.  Prior to joining ARIAD, Defendant Haluska served as a senior faculty member in the departments of medicine and genetics at Tufts University School of Medicine from 2005 to 2007, where he also was Clinical Director and Deputy Director of the Tufts-New England Medical Center Cancer Center.  From 1994 to 2005, he held positions in academia, medical research and clinical oncology, including as assistant professor of medicine at Harvard Medical School, and leader of the melanoma research programs at Dana-Farber Cancer Institute (DFCI) and Massachusetts General Hospital (MGH) Cancer Center. Defendant Haluska completed a post-doctoral fellowship at MIT, fellowship training in medical oncology at DFCI, and his training in internal medicine at MGH. He received his M.D. and Ph.D. from the University of Pennsylvania School of Medicine and A.B. from Harvard University.

35.     Berger, Clackson, Fitzgerald, and Haluska are referred to herein as the "Individual Defendants," and together with ARIAD, "Defendants."

## III.   FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.   ARIAD Business Overview—A Pharmaceutical Company Seeking Global Commercialization

36.     Founded in 1991, ARIAD is a pharmaceutical company that focuses on developing medicines for cancer patients.  Traditionally, ARIAD designed and developed drugs in-house, then licensed them to larger pharmaceutical companies with the capacity to market and distribute them.

37.     Starting in 2007, ARIAD's CEO, Berger, sought to remake ARIAD into what he later termed a "self-sustaining global, commercial drug company."  In practice, that meant that

ARIAD would stop licensing its pharmaceutical creations to large drug companies like Merck, and instead undertake to market the Company's drugs itself.  In that way, ARIAD would retain a full proprietary interest in its drugs, and all of the profits that they generated.  In a January 10, 2012 J.P. Morgan Healthcare Conference, Berger described the new direction as follows:

> I can summarize our strategy clearly -- no more partnerships. We want to move forward with building a commercial business ourselves such that we can control the future, integrate our development programs, and make those the foundation for a broad, global commercialization of the drugs that we discover, we develop, and we commercialize.
>
> So, this -- what I have described to you is a transition from discover to develop to commercialize.

### B.      ARIAD Selects a Drug to Spearhead Its New Strategy: Ponatinib

38.     ARIAD chose to embark on its new strategy with a cancer drug called "ponatinib."  Ponatinib, later trade-named "Iclusig," was designed by ARIAD's research and development team, led by ARIAD's Chief Scientific Officer, Defendant Clackson, using what ARIAD referred to as a "computation and structure-based drug design platform."

39.     Ponatinib is a tyrosine kinase inhibitor ("TKI").  TKIs are a class of drugs developed to treat CML.  In particular, TKIs are designed to inhibit the oncogene BCR-ABL, an abnormal tyrosine kinase that occurs in patients with CML, as well as in persons with a genetically-defined subset of acute lymphoblastic leukemia ("ALL") called Philadelphia chromosome-positive acute lymphoblastic leukemia ("Ph+ ALL").

40.     In 2010, three FDA-approved established drugs already occupied the CML market space.  These were imatinib (approved 2001), dasatinib (approved 2006), and nilotinib (approved 2007).  Of the three, only imatinib and dasatinib were FDA-approved to treat the roughly 10% of CML patients with Ph+ALL.  Importantly, none of the three had labels bearing boxed warnings for serious adverse cardiovascular events.

41.     In developing ponatinib, Defendants recognized that they needed to differentiate it from the established TKIs in order to gain market share and boost sales.  To this end, in a December 5, 2011, appearance at a Deutsche Bank BioFEST conference, Berger said, "the good and the bad of CML is that there are three drugs out there.  So we have an easy target to beat. We know where they failed[.]"

42.     To set ponatinib apart, ARIAD's research and development team designed ponatinib to be a TKI that not only inhibited tyrosine kinases in CML patients, but also addressed a problem shared by the three FDA-approved TKIs—the development of mutagenic resistance to the TKI drugs themselves.

43.     According to Defendants, ponatinib's purported competitive advantage was that it was specifically engineered to prevent the development of TKI resistance, and, further, was capable of eliciting a therapeutic response in CML patients who had already developed TKI-resistant mutations or who had become intolerant to TKIs due to their toxicity.  Summarizing the Company's view of ponatinib's competitive edge, Berger stated:

> Now, let's talk about ponatinib, our pan-BCR-ABL inhibitor. This is a potential *first-in-class new CML therapy*, and we really believe that this is a new class of drugs. Not just another BCR-ABL inhibitor, but rather a potential first-in-class of BCR-ABL inhibitors that can suppress all of the resistant mutants that have been tested.
> ….
> This slide just highlights how to distinguish ponatinib from all three of the drugs that are commercially available today.
>
> (January 10, 2012 J.P. Morgan Healthcare Conference).

C.    **ARIAD Sponsors the Three Phased Clinical Trials Necessary to Support Regulatory Approval of Ponatinib**

1.    **Phase 1: the Dose-Finding Trial**

44.    In 2008, ARIAD's Chief Medical Officer, Defendant Haluska, personally administered the first in-human dose of ponatinib.  In June of that year, ARIAD began to enroll patients in an exploratory clinical trial it dubbed "Ponatinib Ph+ALL and CML Evaluation," or "PACE."  PACE was sponsored by ARIAD and run out of M.D. Anderson Cancer Center in Houston, Texas.

45.    PACE began as a Phase 1 trial ("PACE 1").  As such, it was designed to test the efficacy and safety of several dosage levels of ponatinib in 81 patients with advanced CML and other hematologic malignancies.  TKIs are the most effective known treatment for CML, but they are toxic.  The objective of PACE 1 was to find the dose that best balanced efficacy with safety—referred to as the maximum tolerable dose ("MTD").

46.    PACE 1 trial subjects received six escalating doses of ponatinib:  2 mg, 4 mg, 15 mg, 30 mg, 45 mg and 60 mg.  Adverse reactions in patients taking the 60 mg dose led PACE 1 medical trial investigators to rule it out as overly toxic.  The Company instead settled on a MTD of 45 mg.

2.    **Phase 2: ARIAD Seeks FDA Approval for Limited Indications**

47.    On September 13, 2010, the Company began enrolling patients in the Phase 2 stage of PACE ("PACE 2").  PACE 2 was a "single-arm" trial.  That is, it did not match the patients receiving ponatinib against either a control group or a comparator subject group of patients receiving an approved CML drug.  Instead, the data generated by the study was intended to tease out and highlight the efficacy, durability (*i.e.*, how long the drug remained effective), and safety of the MTD in a larger patient population.

48.     On the commercial front, PACE 2 was designed to produce sufficient data to support approval to market ponatinib for limited indications from the FDA.  The approval target based on PACE 2 results was CML patients who had manifested either resistance or intolerance to prior TKI therapy, and consequently, had run out of treatment options.

49.     PACE 2 ultimately numbered 449 subjects, tested in various medical facilities, and enrollment was completed on September 26, 2011.  Consistent with the data gleaned from PACE 1, the PACE 2 trial protocol submitted by ARIAD to the FDA provided that trial subjects were to receive "once-daily oral administration of ponatinib at a dose of 45 mg."

50.     On June 4, 2012, ARIAD announced supposedly favorable interim results from PACE 2 at an annual medical conference held at the American Society of Clinical Oncology ("ASCO").  In a concurrently-filed press release, ARIAD touted the "robust anti-leukemic activity in CML patients who have become resistant or intolerant to available tyrosine kinase inhibitors."

51.     The same press release quoted Haluska regarding PACE 2's safety results:

> Importantly, these data provide clear evidence of a favorable
> safety and tolerability profile of ponatinib in resistant or intolerant
> CML patients. The adverse event profile is similar to what was
> seen in the earlier Phase 1 study of ponatinib[.]

52.     On July 13, 2012, ARIAD submitted its Full Interim Study Report to the FDA. The data cutoff date for the report was two months prior, on April 27, 2012.  ARIAD later submitted updated data to the FDA, with a cutoff date of ***July 23, 2012***.

53.     From July through September 2012, ARIAD submitted a rolling application to the FDA for approval to market ponatinib to treat TKI-resistant/intolerant CML patients.

54.     In order to obtain FDA approval for ponatinib as soon as possible, ARIAD took advantage of several FDA programs: (a) fast track designation, which provides a rolling or early

review of portions of the application; (b) priority review, which provides for a six-month review schedule; and (c) accelerated approval, which bases approval on a surrogate endpoint or intermediate clinical endpoint, an approach which can shorten approval times and allow more rapid patient access to promising new drugs while confirmatory studies are conducted.

55.     As a result of these programs, ARIAD was able to begin approval discussions with the FDA for ponatinib as a treatment for TKI-resistant/intolerant CML patients in October 2012, a mere three months after submitting the first installment of its application.

**3.      Phase 3: ARIAD Seeks FDA Approval for Lucrative Front-Line Use**

56.     In the Spring of 2012, even as trial investigators at M.D. Anderson collected the interim data from PACE 2 that would support ARIAD's application for accelerated FDA approval of ponatinib for treatment of patients with TKI-resistant/intolerant CML, ARIAD initiated its next, most ambitious clinical trial of ponatinib.  This "Phase 3" study was designed to support approval of ponatinib in "front-line" CML patients, *i.e.*, newly-diagnosed CML patients who had not received prior TKI therapy.

57.     In the Prospectus Supplement filed in connection with ARIAD's January 24, 2013 stock offering, the Company cited third party healthcare providers in estimating that, as of 2011, approximately 13,000 people in the United States, Europe and Japan suffered from newly-diagnosed CML.  The Company noted that Novartis and Bristol-Myers Squibb, the then-leading marketers of TKIs to treat CML and Ph+ALL, had reported combined annual revenues in 2011 of nearly ***$5 billion*** for those drugs.  By contrast, ARIAD estimated that in those same three regions in 2013, the population of TKI-resistant/intolerant patients (*i.e.*, second, third and fourth-line patients) was just 6,900, or roughly ***half*** of the front-line market.

58.     Of the three approved CML drugs, the market leader and gold standard for prescription to front-line CML sufferers was imatinib, trade-named "Gleevec."  As such, it was

the obvious choice for a two-arm, Phase 3 trial comparing ponatinib to an established front-line CML drug.  More importantly, according to Defendants, regulators had encouraged ARIAD to test ponatinib head-to-head with Gleevec: "It became really obvious early that from a regulatory clinical point of view, imatinib is the right comparator."  (Haluska, June 4, 2012 ASCO Investor Event).

59.     Accordingly, on July 27, 2012, ARIAD announced that it was initiating a two-arm, randomized, Phase 3 clinical trial of ponatinib called "Evaluation of Ponatinib versus Imatinib in Chronic Myeloid Leukemia," or "EPIC."  The Company began screening subjects for EPIC in November 2012, with an enrollment goal of 500 subjects at 175 test sites.

**D.      The Importance of Front-Line Use of Ponatinib to the Company**

**1.      Development Costs Put ARIAD at the Brink of Insolvency**

60.     The shift from developmental to "self-sustaining, global, commercial" pharmaceutical company put ARIAD at near-term risk of insolvency.  Over the seven reported quarters of the Class Period, from the first quarter of fiscal year 2012 through the third quarter of fiscal year 2013, the Company lost over $50 million every quarter, with each quarter's losses exceeding those of the prior quarter on a year-over-year basis.  Defendants explained this alarming burn rate as a byproduct of the Company's development and commercialization costs relating to ponatinib.

| Net Income (loss) | FY 2011 | FY 2012 | FY 2013 |
|---|---|---|---|
| Q1 | (37,949) | (55,894) | (64,670) |
| Q2 | (47,762) | (51,312) | (68,985) |
| Q3 | 13,910 | (53,213) | (66,339) |
| Q4 | (51,802) | (60,453) | Unreported |

61.     In order to raise desperately needed cash, Defendants conducted two public stock offerings in two years.  The first occurred on December 15, 2011.  The press release attached to the Form 8-K announcing the offering expressly stated that the proceeds would finance ARIAD's ongoing and anticipated costs relating to ponatinib.  ARIAD said that these costs included building a marketing and distribution network for ponatinib if it were approved for sale to TKI-resistant/intolerant patients (*i.e.*, for second/third/fourth-line use), and funding a Phase 3 study for front-line approval.  ARIAD said that it expected that the offering would fund ponatinib costs for two years.

62.     All told, ARIAD's December 2011 stock offering raised $258 million.  However, notwithstanding the Company's prediction that the offering would "fund ARIAD's operations for at least the next two years," Defendants returned to the well a year later, on January 24, 2013.

63.     On that day, ARIAD conducted a public stock offering of 15.3 million shares of ARIAD stock, raising $310 million from investors.  In the January 24, 2013 press release announcing the offering, the Company stated that the proceeds were once again chiefly earmarked for ponatinib:

> This funding is expected to enable ARIAD to support sales,
> marketing manufacturing and distribution of Iclusig (ponatinib)

64.     The Company later stated in an SEC filing that, even including the added infusion of capital from the January 2013 stock offering, its then-current cash would allow it to remain liquid only into the fourth quarter of 2014.  (ARIAD Form 10-K for the Fiscal Year 2012).

### 2.     Defendants Recognized the Importance of FDA Approval of Ponatinib for Front-Line Use

65.     During the Class Period, there were two other drugs in ARIAD's pipeline aside from ponatinib.  However, neither of these were as critical to the Company as ponatinib.

66.     The first, a non-small cell lung cancer drug called AP26113, or "113," trailed several years behind ponatinib in the phased FDA registration process.  The second, an "mTOR inhibitor" called ridaforolimus, had been licensed by ARIAD to Merck in 2010 (and thus, was more in line with ARIAD's prior partnership development strategy rather than the global commercialization strategy that the Company embarked on in developing ponatinib); even so, in mid-2012 the FDA denied approval to Merck to market ridaforolimus on risk-benefit grounds—thus denying ARIAD an estimated $40 million per year in licensing fees.

67.     Accordingly, it was critical that ARIAD win FDA approval for ponatinib—and not just for treatment of resistant/intolerant CML, but also in the exponentially more lucrative front-line setting.  Throughout the Class Period Defendants acknowledged as much:

- Well, you know, it's not just the [PACE 2] N[ew] D[rug] A[application] and the M[arketing] A[uthorization] A[pplication], but at the same time as the marketing applications that are being filed, we're on track to launch ***one of our most important trials ever***, our Phase 3 trial of ponatinib in patients with newly diagnosed CML also in the third quarter of this year. Obviously, this randomized trial of ponatinib versus imatinib in newly diagnosed patients will have a major impact on the Company long-term.

  (Berger, May 9, 2012 Q1 2012 earnings call)

- **Terence Flynn  - Goldman Sachs Group, Research Division - Biotech Analyst**

  Okay.  And what -- I mean, in terms of just remind us what a win is from EPIC in terms of the primary endpoint. ….

  **Harvey Berger  - ARIAD Pharmaceuticals, Inc. - Chairman and CEO**

  ***How important is an understatement of the year.***  So how important is ***we have to win***.

  (June 11, 2013 Goldman Sachs Healthcare Conference).

### 3. Defendants Tout Ponatinib as a Growth Engine That Will Tap Into the Lucrative Front-line Market

68.     With the Company's fortunes riding on ponatinib, Defendants aggressively promoted it to the market.  On conference calls with analysts and investors, Defendants repeatedly told investors that ponatinib would be successful.  As early as December 5, 2011, a week before the start of the Class Period, Berger hyped the Company's potential earnings from ponatinib to treat the limited resistant/intolerant population enrolled in the PACE Phase 2 trial, but intimated that front-line was a far larger market:

> Well, we think there's a real opportunity to generate commercial success based purely on the label, based purely on the PACE trial.
> ….
> And we've publicly projected that just the PACE label with -- really without any of the off-label upside to that, can generate over **$600 million** in global sales near-term and over **$900 million** in sales a little bit more long-term as the market grows and patients are on drug for longer and longer.
>
> That's without frontline, that's without the true second line…

69.     Defendants forecasted even larger returns from ARIAD's Phase 3 clinical trial EPIC leading the FDA to approve ponatinib in the front-line setting:

> So the market for CML continues to grow. It is expanding. The number of patients worldwide grows the market for the available drugs, $4.5 billion.
> …..
> **The number of patients in the frontline is large in patients with newly diagnosed CML.  As you can see, it is some 16,000, 17,000 patients if you look at the 2017 time frame**, which is a number of years after potential launch in the newly diagnosed patients, obviously based on a randomized trial, which we expect to start later this year.  But the market is large[.]
>
> (Berger, January 10, 2012 J.P. Morgan Healthcare Conference).

70.     A month later, at a biotech industry event, Berger stated:

> The newly diagnosed CML market and clinical opportunity is obviously quite large, about 15,000 patients in the 2016, 2017

range here covering both US -- not only US and Europe but Japan
as well. This represents the market that creates a big part of the
$4.5 billion global market.

We anticipate near term the [*sic*] ponatinib clearly from the
available data should be able to have annual global sales in the
***$600 million range on an annual basis***. We believe as well with
broader use that's highly likely probably around ***$800 million
annually and then growing to many several billion dollars a year***
depending upon the dynamics of the CML market over time.

But clearly a drug that both near-term and long-term has the
potential for well over ***$1 billion a year in annual sales***, a real
opportunity to make a difference in the lives of many, many CML
patients.

(February 13, 2012 Biotechnology Industry Organization CEO and
Investor Conference)

### 4.   Defendants Represent that Ponatinib Is Safe and Effective

71.   Even as Defendants stressed the importance of ponatinib's clinical trial outcomes

and its tremendous upside were it to be approved by the FDA, they assured investors that data

from the PACE trials demonstrated that it was safe and effective.

72.   Regarding safety, Defendants repeatedly asserted that ponatinib was "well

tolerated" by patients, due to its favorable "safety profile."  For instance, on December 5, 2011,

a week prior to the start of the Class Period, at a Deutsche Bank BioFEST conference, Berger

remarked that ponatinib had a "very good safety profile."  He also stressed that ponatinib lacked

certain adverse effects associated with dasatinib and nilotinib, the leading TKIs approved for

second-line CML treatment:

**Unidentified Participant**

…. the safety profile -- is there anything about it that would be a
deterrent to some doctors or physicians, for example the
pancreatitis, some of those issues? Anything that you think in this
space would be a deterrent?

**Harvey Berger**

No, I don't think -- in fact, (inaudible) safety profile of ponatinib is looking, based on data we have through the abstract, better and better, as you point out. Patients -- all drugs in this field produce some thrombocytopenia, low platelet count. Some patients have neutropenia [deficit in the number of white blood cells], but that's how the drug works, it clears the marrow and changes the mix of white blood cells and other cells.

And so those are consistent with what's been seen in essentially all of the CML drugs. The key distinguishing features that I think are very important is with nilotinib there is a black box warning on QTC prolongation.  We have data that will be presented at ASH that shows no QTC effect of ponatinib, none whatsoever.

73.     Further, as PACE 2 progressed, and the trial data kept rolling in, Defendants continued to maintain that ponatinib was well tolerated, and exhibited only routine adverse events that would not impede the drug's marketability:

- "Most importantly, it is clear that ponatinib is well tolerated." (Berger, January 10, 2012 J.P. Morgan Healthcare Conference).

- "It appears certainly from the preliminary data that ponatinib is well tolerated.  Adverse events that are quite manageable[.]" (Berger, February 13, 2012 Biotechnology Industry Organization and Investor Conference).

- "The safety profile, tolerability profile was essentially unchanged from what was shown at ASH in December of last year."  (Berger, June 5, 2012 Goldman Sachs Healthcare Conference).

- "The safety data that were presented at ASCO show that ponatinib was well tolerated. Very common adverse events -- thrombocytopenia, mild rash, some dry skin, some patients with abdominal pain or headache.  Sort of most of these being constitutional symptoms, not really limiting treatment …. Favorable safety profile, even in heavily pre-treated patients." (Berger, September 19, 2012 UBS Global Life Sciences Conference).

- "…certainly the data thus far have shown ponatinib to have a good tolerability profile; we've seen that it's well tolerated by patients who have become resistant or intolerant to the other

> medicines, and so I think that its tolerability is one of its
> highlights." (Berger, video interview with PropThink,
> published October 5, 2012).

74.     Regarding efficacy, Defendants portrayed ponatinib as a highly effective

treatment for CML, stating:

> Bear in mind this was a dose escalation trial, so the first handful of
> patients got homeopathic doses. Ultimately they reached 15 or 30
> milligrams a day, which are the clearly first therapeutic doses, then
> **30, 45 and 60 milligrams, which of course are the doses that are
> the most effective.**
>
> (Berger, December 13, 2011 Oppenheimer & Co. Healthcare
> Conference).

75.     Similarly, ten months later, Haluska cited a Company-run multivariate analysis as

showing that higher doses of ponatinib led to better treatment outcomes:

> What we find that the most important predictor in this analysis,
> statistical significance for response is dose intensity. Patients who
> got the most drug did best. And that's true in essentially all the
> clinical settings of the [PACE 2] study.
>
> (Haluska, October 19, 2012 ARIAD Analyst and Investor Day).

**E.      Defendants Disclose That the FDA-Approved Label for Ponatinib Will Bear
a Stringent Black Box Warning**

76.     On December 14, 2012, the Company filed with the SEC a current report on

Form 8-K with an attached press release. The press release announced that the FDA had

approved ponatinib for treatment of patients with TKI-resistant or intolerant CML that had

progressed to chronic, accelerated or blast phase, and also for treatment of TKI-resistant or

intolerant Ph+ALL.

77.     In the press release, Berger was quoted as stating, "We have now transformed

ARIAD into a commercial oncology company addressing major unmet medical needs for cancer

patients."

78.     The press release also contained a list entitled "Important Safety Information."
The first entry on the list warned of an array of cardiovascular events—including an 8%
occurrence rate of "serious arterial thrombosis":

> Cardiovascular, cerebrovascular, and peripheral vascular
> thrombosis, including fatal myocardial infarction and stroke have
> occurred in Iclusig [ponatinib]-treated patients. ***Serious arterial
> thrombosis occurred in 8% of Iclusig-treated patients.*** Interrupt
> and consider discontinuation of Iclusig [ponatinib] in patients who
> develop arterial thrombotic events.

79.     Later in the same press release, under a sub-heading titled "Warnings and
Precautions," adverse cardiovascular events once again topped the list:

> ***Twenty patients treated with Iclusig [ponatinib] (4%)
> experienced serious congestive heart failure (CHF) or left
> ventricular dysfunction, with 4 fatalities.*** Monitor patients for
> signs or symptoms consistent with CHF and treat as clinically
> indicated, including interruption of Iclusig [ponatinib]. Consider
> discontinuation of Iclusig [ponatinib] in patients who develop
> serious CHF.
>
> Eight patients treated with Iclusig [ponatinib] (2%) experienced
> treatment-emergent symptomatic hypertension as a serious adverse
> reaction, including hypertensive crisis. ***Treatment-emergent
> hypertension occurred in 67% of patients.*** Monitor and manage
> blood pressure elevations.

80.     Notably, just five days previously, ARIAD had issued three press releases
describing twelve-month follow-up data from PACE 2—those press releases were devoid of any
mention of arterial thrombosis.

81.     On a conference call held later that day to discuss the FDA's approval,
Defendants clarified that, per FDA directive, the cardiovascular event-related warnings would
appear on ponatinib's label in a "black box" warning.  The box is shown below:

> **WARNING: ARTERIAL THROMBOSIS and HEPATOTOXICITY**
>
> *See full prescribing information for complete boxed warning*
>
> **Arterial Thrombosis:**
> - Cardiovascular, cerebrovascular, and peripheral vascular thrombosis, including fatal myocardial infarction and stroke have occurred in Iclusig-treated patients.  In clinical trials, serious arterial thrombosis occurred in 8% of Iclusig-treated patients.  Interrupt and consider discontinuation of Iclusig in patients who develop arterial thrombotic events *(2.3) (5.1)*.
>
> **Hepatotoxicity:**
> - Hepatotoxicity, liver failure and death have occurred in Iclusig-treated patients.  Monitor hepatic function prior to and during treatment. Interrupt and then reduce or discontinue Iclusig for hepatotoxicity *(2.3) (5.2)*.

82.     Analysts were shocked.  A black box warning is the strongest warning that can appear on the label for a prescription drug under FDA guidelines.  It is used to highlight that the drug carries adverse effects so serious in proportion to the potential benefit from the drug (*e.g.*, a fatal, life-threatening or permanently disabling adverse reaction) that it is essential that it be considered in assessing the risks and benefits of using the drug.

83.     In the conference call, analysts peppered Defendants with questions about the black box warning, incidence rates of arterial thrombosis in PACE 2, and the risk that the FDA's evident concern about cardiovascular events posed to ARIAD reaching its ultimate goal—front-line approval for ponatinib:

> **Rachel McMinn  - BofA Merrill Lynch - Analyst**
>
> So to get back to this issue, I think everyone understands that the resistant and intolerant population is relatively small and some of the reaction here is concern about what the safety profile will look in the frontline.

84.     In response, Defendants downplayed the significance of the black box warning, and attempted to redirect the discussion to ponatinib's purported efficacy and away from the impact the warning would have on front-line approval:

> - If you look across the labels, there's been a lot of discussion about the boxed warning but take a close look at the efficacy.  I think it is very unusual for the agency to almost completely

- 26 -

accept the efficacy position of the sponsor.

(Haluska).

- While the focus on the safety of Iclusig [ponatinib] is important and highly relevant, let's not lose track of what drives, I think, most of physician behavior, which is extraordinary efficacy results.

(Berger).

85.     In addition, Defendants began to articulate what evolved into Defendants' party line in the coming months—that the PACE 2 patient population was old and had undergone numerous treatments with other TKIs, weakening them and rendering them prone to cardiovascular events.  In this way, Defendants comforted investors that the planned front-line trial, EPIC, would not show such significant cardiovascular results because EPIC's trial subjects would be previously untreated, and thus healthier and younger.

86.     For example, during the December 14, 2012 conference call with analysts, while discussing the "intolerant" cohort of PACE 2 patients, who, unlike the resistant cohort, had not been heavily pre-treated with other drugs, Haluska said, "It suggests that in those patients who have heavier pretreatment, that the contribution of their histories to the side effect profile is substantial."

87.     However, one analyst on the conference call picked up on a reference in ponatinib's approved label and packaging to lower dosage levels, and questioned Defendants regarding the extent of dose reduction that had taken place in the PACE 2 trial due to adverse events.  Haluska revealed that a substantial proportion of PACE 2 patients had received doses of ponatinib that were reduced from the official trial dose—and that as a result, the median dose in roughly 90% of the subjects was 30 mg rather than the designated study dose of 45 mg.  At the same time, Haluska again stressed that PACE 2 subjects were more susceptible to adverse events

due to their pre-histories, and that higher doses, like those that could be used on younger,

previously untreated patients, led to better results.  Accordingly, Haluska suggested, 45 mg was

still the correct dose:

> **Ryan Martins  - Lazard Capital Markets – Analyst**
>
> … I was wondering if you could talk about what proportion of
> patients in the PACE trial had to eventually dose down to 15
> milligrams, based on these -- what's on the label…
>
> **Frank Haluska  - ARIAD Pharmaceuticals, Inc. - SVP of Clinical Research,
> Chief Medical Officer**
>
> ***So Ryan, the dose modification guidelines in the label are
> essentially identical to what was used in the clinical trial.*** So we
> expect that behavior will pretty much mirror how the clinical trial
> was conducted. We know that dose modification was also a
> function of clinical history. So that in the T359 patient population,
> for instance, whose median age was 50 years in the chronic phase,
> their median dose exposure was about 40 milligrams.  In other
> words, about 10% of patients had the dose reduced.
>
> In contrast, in the resistant and intolerant patient population,
> whose median age was 60, and who had a median of three prior
> treatments, their median exposure was in the neighborhood of 30
> milligrams.  So those patients had more cross-intolerance.  They
> had the consequences of their prior treatment and their disease
> working together. So I don't have a number that specifically
> speaks to how many got down to 15 milligrams.
>
> But our overall scientific approach has been to try to ***maximize the
> potential exposure*** in our patient population…
>
> We know the ***long-term outcomes of survival are substantiated
> with the higher doses***. So that has been our approach; that is what
> we're trying to do. That doesn't mean we may not, at some point,
> test lower doses in some additional clinical trial setting so that we
> understand how, perhaps, patients who are more heavily treated
> can be dosed.  But by and large, the dose reductions, we did not
> find to be offputting from using the dose we chose.

88.      Notwithstanding that the FDA had approved ponatinib for virtually the same

resistant/intolerant indication specified in ARIAD's PACE 2 new drug application—and even

though Defendants tempered the news of ponatinib's serious adverse events and widespread

dose reductions with additional materially false and/or misleading statements that those adverse

events actually resulted from trial subjects' age and preconditions, and that 45 mg was still an

appropriate dose—on the day of the announcement, ARIAD's share price fell from $23.88 to

$18.93—a drop of **21%**.

F.   **After the Black Box Warning, Defendants Continue to Mislead the Market
Concerning the Prospects for ARIAD's Frontline Trial and Downplay
Concerns**

89.     During the remainder of the Class Period, Defendants repeatedly attempted to

shore up market confidence concerning the safety profile of ponatinib.  For example, in a June

20, 2013 Annual Shareholders Meeting, Berger stated:

> And I think for medicines like Iclusig [ponatinib], where there's a
> clear, distinguishable benefit to patients, where Iclusig's
> [ponatinib's] efficacy is distinguished from that of any other drug
> in its class, I don't believe that we'll be affected by the pressures
> that are suggested by the questions that have been raised.
> ….
> But, you know, the BSR-ABL inhibitors, in particular a drug like
> Iclusig [ponatinib] with its overwhelmingly strong efficacy and
> **excellent safety profile**, I think the combination of the two speaks
> volumes to the benefit of the medicine for patients.

90.     Defendants also continued to dispute that ponatinib caused cardiovascular events.

For example, in a June 11, 2013 Goldman Sachs Healthcare Conference, Berger said:

> [W]e have certainly felt, from the very beginning, that for reasons
> that are not totally clear but were perfectly obvious in terms of the
> initial analysis, the patients in the PACE trial were heavily skewed
> in terms of preexisting multiple cardiovascular risk factors, like
> hypercholesterolemia and diabetes; preexisting active ischemic
> heart disease; preexisting active cardiac disease and other cardiac
> abnormalities, such as hypertension, for example.
> ….
> And so the events, **the arterial thrombotic events in the 34
> patients that were seen that resulted in the boxed warning were,
> in fact, associated with lots of preexisting risk factors, active**

*cardiovascular disease.* And so this reinforced the initial impressions of what defined this patient population.

91.     Analysts took heart from Defendants' story that the PACE 2 patient population was predisposed to cardiovascular problems and looked forward optimistically to the results of the EPIC trial, the trial which would mirror the population for frontline use and allow ponatinib to receive a front-line indication:

> The reasons we think Phase III EPIC study will be cleaner: 1) it will be in younger patients with less risk of events vs. FDA analysis showing events were in oldest patients; 2) number of patients with both history ischemia and diabetes risk will be small; 3) doesn't allow patients with uncontrolled cardiovascular disease; 4) doesn't allow uncontrolled hypertension; and 5) there will be a Gleevec control arm instead of no control.

> (January 15, 2013, RBC Capital analyst report)

92.     Defendants meanwhile continued to promote the Company's commercial prospects based on expected future sales of ponatinib:

> And [it] should be a very exciting 2013. And, certainly, as I look over the next year with the major scientific meetings coming up and a lot of clinical data, continued success on the commercial side, this will be a year where we really deliver on both of our products and build our pipeline even further and really create a huge amount of value for our shareholders.

> (Berger, June 20, 2013, ARIAD Annual Shareholders Meeting)

**G.     While Reassuring the Market About Ponatinib's Front-line Opportunity, Defendants Unload Millions of Dollars Worth of Company Stock and Options**

93.     As discussed below in Section IX.D, after the announcement of ponatinib's approval and black box warning label, and while in possession of material, adverse information concerning the ongoing drug trials and ponatinib's dwindling prospects for approval as a front-line CML therapy, Defendants began to sell huge portions of their personal shares in ARIAD.

Defendants did so pursuant to Rule 10b5-1 trading plans adopted during the Class Period, netting themselves over *$28 million*.

94.     In late December 2012, Berger adopted a 10b5-1 plan.  Berger's plan, the terms of which are non-public, was purportedly designed to sell 100,000-share blocks of stock at monthly intervals from March through August 2013 whenever ARIAD's share price rose above a pre-determined floor price.  Pursuant to this plan, Berger realized proceeds of over *$16 million* in stock sales.

95.     On an April 4, 2013 ARIAD Investor Conference Call, Berger addressed his hasty post-FDA-approval adoption of a 10b5-1 plan and subsequent stock sales:

> I have absolute and complete confidence in the Company and it's [*sic*] extraordinary prospects going forward.  ***No one should misinterpret my sales as any lack of confidence.***  I expect the stock price of ARIAD to recover and continue to rise as we deliver on our objectives through continued flawless execution by all of our employees.

96.     Later in the same conference call, Berger was asked whether he was precluded from purchasing additional shares of ARIAD on the open market, and "whether that's something that might make sense in the future."  Berger responded with an odd claim:

> If I could buy shares today, I would buy all the shares that I sold and 10-fold more today, but I can't because I know more than everybody else about what's going on in the Company and what to expect.  But there should be no doubt I would buy these shares in a second.

97.     Like Berger, Defendants Haluska, Clackson, and Fitzgerald each adopted 10b5-1 plans following the December 14, 2012 approval/black box warning announcements.  Under the guise of these 10b5-1 plans, the Defendants exercised their option awards, received common stock, and then immediately sold the common stock, netting the Defendants millions of dollars, as discussed in detail below in Section IX.D.  Accordingly, Berger's statements were misleading

because, contrary to his representations, he had adopted his 10b5-1 plan in late December 2012, while knowing material adverse nonpublic information about increasing adverse events in ARIAD's clinical trials of ponatinib, and as a result, made millions in profits before the bottom dropped out of ARIAD's stock in October 2013.

### H.  Defendants Change the Enrollment Criteria for ARIAD's Front-Line EPIC Trial to Better Exclude Patients with a History of Heart Disease

98.     On February 14, 2013, Berger spoke at a conference sponsored by an investment bank.  At the conference, the host asked Berger whether, as a result of the label that the FDA had ultimately approved for ponatinib, the Company had considered limiting the enrollment criteria for EPIC.  He responded:

> You know, we've given thought to that.  And I think we have taken measures to, I would say, ***clean up or refine some of the entry criteria, or it's really the exclusionary criteria***, to be sure there is absolutely no ambiguity on which patients are excluded. Because we don't want lack of clarity on this.
>
> ***So, a modest change, but not really so much in response to the FDA focus on the warnings and precautions***, but rather what we learned in the PACE trial helps inform us about how physicians interpret, and how oncologists utilize criteria definitions related to cardiovascular disease.

99.     A month and a half after Berger publicly downplayed the Company's efforts to limit EPIC subjects who had prior cardiovascular disease, on March 27, 2013, a chart appeared on the government-run ClinicalAffairs.org website reflecting changes to EPIC's enrollment criteria.[2]  This chart, which was buried in a list of links to study logistics, reflected that between March 19, 2013 and March 27, 2013, ARIAD had in fact altered certain of the eligibility criteria for enrollment in EPIC such that patients with a history of cardiovascular disease were less apt to be admitted:

---

[2] Available at http://clinicaltrials.gov/archive/NCT01650805/2013_03_27/changes.

| Enrollment Criteria Prior to Change | Enrollment Criteria Post-Change |
|---|---|
| No incidence of myocardial infarction, within prior *3 months* | No incidence of myocardial infarction, within prior *6 months* |
| No unstable angina within *3 months* prior to randomization | No unstable angina within *6 months* prior to randomization |
| Uncontrolled hypertension (diastolic blood pressure &gt; *100 mm Hg*; systolic &gt; *150 mm Hg*) | Uncontrolled hypertension (diastolic blood pressure &gt; *90 mm Hg*; systolic &gt; *140 mm Hg*).  Patients with hypertension should be under treatment on study entry to effect blood pressure control |

100.    In addition to the above changes to existing eligibility criteria, the website reflected several completely *new* eligibility criteria, which further restricted admission of patients with a history of heart disease.  Specifically, going forward, CML patients were no longer eligible for enrollment in EPIC if they manifested any of the following:

- congestive heart failure within 6 months prior to randomization;

- history of clinically significant (as determined by the treating physician) atrial arrhythmia or any ventricular arrhythmia;

- any history of ventricular arrhythmia;

- cerebrovascular accident or transient ischemic attack within 6 months prior to randomization;

- any history of peripheral arterial occlusive disease requiring revascularization;

- any history of venous thromboembolism including deep venous; or

- thrombosis or pulmonary embolism.

101.    Defendants told the market that these changes would not limit the future sales prospects of ponatinib.  For instance on May 10, 2013, analysts for JMP Securities discussed issued a report stating that Berger had communicated to them that, "recent broadening of CV risk exclusion criteria in EPIC are viewed as a nonimpediment to the front-line opportunity" and

concluding that "these changes should not narrow the addressable target population upon approval expansion to front-line CML, in our opinion."

102.    As discussed below, however, it later emerged that even the healthier, younger trial subjects receiving ponatinib experienced cardiovascular events, belying Defendants' claims that cardiovascular events had occurred in PACE 2 because the subjects, who were older and sicker, were predisposed to such events.

## I.    The Truth About Ponatinib

### 1.    Ponatinib Had a Heightened Risk for Adverse Events at the 45 mg Trial Dose

103.    ARIAD completed its New Drug Application ("NDA") to market ponatinib for limited indications to TKI-resistant/intolerant patients in July 2012.  In connection with its NDA, ARIAD submitted to the FDA a report collecting PACE 2 trial data, with a data cutoff date of July 23, 2012 (the "July 2012 Interim Report").

104.    The PACE 2 data in the July 2012 Interim Report was analyzed by the FDA's Center for Drug Evaluation and Research ("CDER").  CDER is a division of the FDA that evaluates new drugs before they can be sold.  CDER's analysis was ultimately compiled into a series of reports (the "CDER Reports").  The CDER Reports, which are buried on the FDA website, and can be located only by following a series of links, contributed to the inclusion of the black box warning on ponatinib's label, as announced by ARIAD on December 14, 2012.

105.    Importantly, the CDER Reports show that Defendants knew about the concerning cardiovascular side effects and related dosage reductions in the PACE 2 trial long before they were disclosed to the public.  By no later than July 23, 2012, Defendants knew from the PACE 2 data collected into the July 2012 Interim Report that ponatinib was linked to the serious cardiovascular adverse events described in the black box warning.  The CDER Reports also

- 34 -

show that, as of July 23, 2012, Defendants knew from that same PACE 2 data that the 45 mg

PACE 2 trial dose of ponatinib was linked to heightened risk of such events, whereas lower

doses posed a lower risk.

106.     These PACE 2 data led the FDA—unlike Defendants—to scrutinize the use of a

45 mg dose of ponatinib, due to safety concerns.  For example, the CDER Reports include a

question by the FDA to CDER's clinical investigators regarding the safety of a 45 mg dose of

ponatinib relative to lower dosage levels.  The CDER investigator responded that a 45 mg dose

not only led to "a significant increase in safety events" but also that a lower dose would lead to

fewer adverse events.  The CDER investigator also noted that 75% of patients in the PACE 2

trial were dose-reduced from 45 mg, because a 45 mg dose of ponatinib correlated to a higher

adverse event rate:

> *Do the dose intensity-safety relationships support the 45 mg once daily dose?*
> ....
> *No*, dose intensity-safety relationship indicated that there is *significant increase in safety events with increase in dose* and thus a *lower dose than 45 mg will lead to lower adverse event rate.*  This is also supported by the fact that approximately *75% of the patients had dose reductions in the trial.*  Dose intensity-safety analyses of relevant adverse events were conducted for trial 201.  Based on univariate logistic regression analyses, significant dose intensity-response relationship was observed for variety Grade 3 & 4 adverse events (Figure 3).

107.     The CDER Reports also specified that reducing the dose of ponatinib given to

patients from 45 mg to 30 mg decreased the rate of adverse events by *2 to 9 times*.  Further, they

described an on-study rate of dose-reduction of roughly *75%* and specified that dose reductions

had in fact resulted from adverse events.  Finally, the study noted that the median time from

initial dose to a patient's first dose reduction was just 68 days—less than three months.

108.     The executive summary of the CDER report also observed:

The cardiovascular safety profile for Iclusig [ponatinib] is notable for arterial ischemic events and hypertension.  Based on the July 23, 2012 updated data cut-off date, 8% of patients experienced serious ischemic events.  Arterial thromboembolic events and hypertension have been reported with other kinase inhibitors that inhibit VEGF-receptor kinase activity….

***Seventy-three percent of patients required a dose modification due to adverse events***.  The most common adverse events that lead to dose modification include thrombocytopenia, neutropenia, lipase elevation, rash, abdominal pain, pancreatitis, and elevated liver enzymes.

109.    Because PACE 2 was initiated by ARIAD in September 2010, Defendants came to know of the high proportion of adverse event-related dose reductions early on, and certainly by the start of the Class Period:

Furthermore, there is a significant relationship between dose intensity and safety endpoints ( ≥ Grade 3 including thrombocytopenia, ischemia, rash, hypertension, myelosuppression, pancreatitis, lipase elevation, ALT/AST elevation) ***indicating that the rate of these adverse events are 2-9 fold at 45 mg QD compared to 30 mg QD (Figure 3)***.  The rates of adverse events in the 4th quartile of dose intensity were 2 to 10-fold the rates of ≥ Grade 3 AE in the 2nd or 3rd quartiles of dose intensities (Figure 3).  This indicates that ***a lower dose will likely reduce the risk of these adverse events.***
Moreover, about ***75% of patients got dose reduced through the trial due to adverse events.***  Forty nine percent patients required dose reduction to 30 mg while 25% patients required dose reduction to 15 mg.  ***The median time to the first dose reduction was 68 days.***  The median time to dose reduction to 30 mg was 71 days and the median time to dose reduction to 15 mg was 134 days.

### 2.    <u>The Black Box Warning Resulted from Serious Adverse Cardiovascular Events Observed in the PACE 2 Trial as of July 23, 2012</u>

110.    As discussed above, the PACE 2 data analyzed by the FDA in the CDER Reports were current up to July 23, 2012, and were submitted to the FDA by ARIAD in the form of the

July 2012 Interim Report.  As described herein, the PACE 2 data in ARIAD's July 2012 Interim Report also led to the black box warning on ponantinib's label.

111.    In October 2012, the FDA had begun to correspond with ARIAD regarding the FDA's evaluation of ARIAD's NDA for ponatinib.  In these emails, the regulators displayed concern about the drug's safety profile, and in particular, adverse cardiovascular events.

112.    For example, on October 18, 2012, the FDA emailed ARIAD regarding ischemia, restriction in blood supply to tissues, causing a shortage of oxygen and glucose needed for cellular metabolism.  The FDA email instructed ARIAD that "[t]o facilitate our upcoming discussion on November 1, please refer to the attached dataset: ischemia.jmp.  Ischemia.jmp dataset is a subset of the AE.xpt dataset submitted in the 120-day safety update.  Each row in Ischemia.jmp dataset represents a treatment-emergent (TEAE=1) ischemic event that was selected by the clinical team."

113.    A week later, on October 25, 2012, in connection with ARIAD's NDA for ponatinib, the FDA emailed ARIAD a list of observations and questions regarding the data in the July 2012 Interim Report.  ARIAD was instructed to submit a written response to the list of questions in advance of a face-to-face meeting between ARIAD and FDA officials about the NDA.

114.    In its email, the FDA began by rejecting ARIAD's proposed label for Iclusig (ponatinib), citing inadequate description of safety issues in the PACE 2 trial.  The FDA's email specifically cited an 8% occurrence rate of serious arterial occlusive or thromboembolic events.  Further, the FDA pointed out that (1) other TKI drugs were **not** associated with cardiovascular problems; and (2) **73%** of PACE 2 trial subjects had received dose reductions. The FDA also

questioned why ARIAD had failed to disclose those adverse events in the proposed draft label

and packaging materials that it submitted to the FDA.

> **Purpose of Meeting:** The Division requests a face-to-face meeting with ARIAD to discuss the benefit-risk of ponatinib for ARIAD's proposed indication.  Specifically, the Division is concerned regarding the risks including liver failure, arterial occlusive and thromboembolic events observed in the safety population.
> ….
> The Division *rejects your proposed label* for Iclusig® [ponatinib] due to *inadequate description of safety results* observed from a single-arm clinical trial.
>  ….
> The broad spectrum of kinase inhibition (including inhibition of VEGFR kinases) observed with ponatinib may be a possible explanation for the safety signals identified with ponatinib *that were not observed with the other bcr-abl TKIs*…
>
> In [PACE 2] Study 10-201, 51 patients (11%) experienced arterial occlusive or thromboembolic events (AOTE) of any grade. *Thirty-four patients (8%) experienced serious AOTE.* Refer to (1) ISCHEMIA.xpt dataset that was sent to you on October 22, 2012 for a listing of the events, and (2) Section 3.1.5.2.7 Ischemic Vascular Events of Safety Update #1.
>
> From review of the SAE narratives, the Division identified a *safety signal for arterial stenosis in patients who experienced ischemic events.*  Sixteen patients who experienced myocardial ischemia required revascularization (PTCA, CABG, or both).  Four patients who experienced CNS ischemia were documented to have arterial stenosis: bilateral MCA (1 patient); R ICA, R verterbral and basilar (1 patient); carotid artery supraclinoid (1); vertebral and subclavian artery (1 patient).  Four patients who experienced peripheral arterial ischemia required PTCA or bypass surgery. Safety signals for arterial stenosis was also noted from SAE reports in patients treated in your Expanded Access Program.
> ….
> Question 1a.: *Why did you exclude arterial ischemic events and other cardiovascular safety issues in your Warnings and Precautions?*
>
> Question 1b.: Does ARIAD have any comments regarding the attached Highlights Section, specifically with regards to the Agency's recommendations regarding Box Warnings and Warnings and Precautions?

*Seventy-three percent of patients required a dose interruption or dose reduction,* such that patients with CP-CML were on the full dose level (45 mg per day) for 50% of the entire treatment duration. Patients with AP-CML were on the full dose level for 60% of the entire treatment duration.

Question: What are your plans to evaluate lower dose levels or alternative dose schedules in patients with CP-CML or AP-CML?

**Comments:**

1.  The Division recommends that you should *designate arterial thromboembolic events, vascular stenosis, or any requirement for a vascular diagnostic or therapeutic procedure as adverse events of special interest*, which would require enhanced data collection and submission of narratives for ongoing or planned clinical trials with ponatinib.

2.  Revise the informed consent document for 12-301 and investigator's brochure to *emphasize the risk for arterial ischemic events* and hepatic toxicity, and include the safety issues described in #1.

3.  *Regarding the data monitoring plan for [EPIC] Study 12-301, explain how you plan to evaluate and address should you observe an excess cardiovascular safety signal in the ponatinib arm as compared to the imatinib arm.* We recommend that you have stopping rules for excess cardiovascular toxicity. We also recommend there be a formal DMC review of the safety data at prespecified enrollment numbers.

115.    On November 1, 2012, after the above email from the FDA to ARIAD, FDA personnel met with representatives of ARIAD to discuss ARIAD's NDA for ponatinib. A list of attendees reflects that Defendants Haluska and Clackson were present.

116.    Following that face-to-face meeting, on November 6, 2012, the FDA directed ARIAD to "submit a revised label" for Iclusig (ponatinib) with a black box warning describing the risk of arterial thromboembolic events, arterial stenosis, and hepatic toxicity. The email containing this directive stated, in pertinent part:

*The Division rejects your proposed label.* Submit a revised label on or before 9 AM EST on Monday, November 12, 2012 that includes the following changes:

*Box warning for arterial thromboembolic events, arterial stenosis, and hepatic toxicity.* We do not accept your justification. The Division's position regarding the inclusion of box warnings is firm. We refer you to our discussion during our face-to-face meeting on November 1, 2012.

**3.    Defendants Knew, But Concealed, That After the Black Box Warning Was Announced in December 2012, Cardiovascular Events Continued to Increase in ARIAD's PACE 2 Trial**

117.    As a condition of ponatinib's approval for limited indications to TKI-resistant/intolerant patients, as announced by the Company on December 14, 2012, the FDA required the Company to submit a report containing follow-up data from PACE 2 in August 2013 (the "August 2013 Interim Report"). The August 2013 Interim Report collected data from the PACE 2 trial that post-dated the July 2012 Interim Report.

118.    As detailed herein, former employees of the Company contacted by Lead Plaintiffs (referred to as "confidential witnesses" or "CWs") have stated that the August 2013 Interim Report ultimately led the FDA, in October 2013, to impose a number of restrictions on ARIAD's clinical trials and marketing of ponatinib, impairing the Company's financial prospects and its likelihood of ever obtaining front-line approval, as described below in Sections VII.A through VII.C. These CWs have further confirmed that Defendants, and in particular, Defendant Haluska, participated in the creation of the August 2013 Interim Report, and were fully aware of the data that went into the August 2013 Report prior to its creation.

119.    Confidential Witness 1 ("CW1") was a Medical Science Liaison employed by ARIAD from August 2012 through November 2013. CW1 and ARIAD's other medical science liaisons all had either PhDs or degrees in pharmacology. As a Medical Science Liaison, CW1 worked with health care providers at various medical facilities participating in the PACE study,

answering questions about ponatinib.  CW1's territory was New Orleans and Texas.  In Texas,

CW1's territory included M.D. Anderson Cancer Center in Houston, Texas, where PACE 2's

lead medical investigators presided over the trial.  CW1 reported to Mark Turnak (ARIAD's

Senior Director, Medical Science Liaisons), who in turn reported to Jing Marantz (ARIAD's

Vice President of Medical Affairs), who reported to Defendant Haluska.

120.     According to CW1, in August 2013, ARIAD submitted an interim report to the

FDA pursuant to the FDA's "stipulations" related to ponatinib's accelerated approval.  CW1

stated that this report contained approximately 6-9 months of data, and was prepared by Haluska,

as well as ARIAD's biostatisticians, medical affairs department, and others.  According to CW1,

ARIAD's issues in the fall of 2013 were triggered by this August 2013 report to the FDA.

121.     Confidential Witness 2 ("CW2") was employed by ARIAD as a Medical Science

Liaison from October to November 2012.  According to CW2, a PhD, CW2 was one of

approximately 10 Medical Science Liaisons for ARIAD in that timeframe.  Like CW1, CW2

reported to Mark Turnak (ARIAD's Senior Director, Medical Science Liaisons), who in turn

reported to Jing Marantz (ARIAD's Vice President of Medical Affairs), who reported to

Defendant Haluska.  CW2 stated that it was CW2's responsibility to support the study by

explaining the biology to the various medical professionals working on the clinical trials.

122.     In particular, CW2 had regular conversations with Haluska about both the front-

line EPIC and second-line PACE trials.  CW2 stated that CW2 discussed trial data with Haluska

and referred to Haluska as the "keeper of the data" as well as the point of contact between the

scientific team and ARIAD's executives.

123.     Accordingly, Haluska was very familiar with the data emerging from the PACE 2

trial and may be presumed to have learned about the adverse cardiovascular events in the PACE

2 trial as they occurred.  Also, because Haluska prepared the August 2013 Interim Report, which

contained follow-up data from ARIAD's PACE 2 trial, he knew well before the creation and

submission of the August 2013 Interim Report that the number of adverse cardiovascular events

had increased in the PACE 2 trial since the submission of PACE 2 data to the FDA in the July

2012 Interim Report.  Ultimately, as described more fully *infra.* in Sections VII.A through

VII.C, this increase led the FDA in October 2013 to (1) suspend enrollment in ponatinib clinical

trials, (2) terminate the EPIC trial, and (3) suspend marketing of ponatinib.  In short, Haluska

saw the trial data that led to shareholders' October 2013 losses months in advance.

124.    Other CWs corroborated that Defendants, and in particular, Defendant Haluska,

saw the data generated by ARIAD's sponsored clinical trials as it was generated and contributed

to the creation of the August 2013 Interim Report.

125.    For example, Confidential Witness 3 ("CW3") was a Senior SAS

Programmer/Consultant from November 2011 to July 2012.  CW3, who reported to Katherine

Arbour, ARIAD's Data Management Director, worked in the data management department, as a

programmer, supporting the Statistical Analysis System ("SAS"), and worked primarily on the

PACE trial.  CW3 prepared reports, largely consisting of patient profiles generated by clinical

trials, which were used by ARIAD's clinical team in clinical meetings.  CW3 also prepared *ad

hoc* reports, including reports describing protocol variations.

126.    CW3 prepared all of the patient profiles for PACE 2.  According to CW3, the

clinical team for PACE required certain data in "narrative" format.  Such data, which included

adverse events, vital signs and tumor response, all had to be recorded within specific clinical

parameters.  Patient profiles included everything that the clinical investigators were addressing

for each patient, including, for example, the specific dosage administered to the patient, any

changes in dosage, as well as when the data was obtained and when dosages were administered. The data was further broken out according to specific trial, beginning with Phase 1 and proceeding to Phase 2.

127.    Importantly, CW3 stated that the patient profiles stated the particular dose that was being used for each patient at any given time.  In fact, the front page of the report for each patient showed that patient's dosage regimen, and whether there were other doses in that particular patient profile, as reported by each investigator.  It was therefore possible to see at a glance whether a patient's dosage profile had changed and by what amount.

128.    Further, CW3 stated that for each of the 449 PACE 2 patients for whom CW3 had prepared a patient profile, there were approximately thirty to fifty pages of data for each snapshot date.  CW3 said that CW3 provided this snapshot data every two weeks in a separate snapshot presentation to the clinical team—and CW3 specifically stated that the clinical team included Haluska.  CW3 also attended meetings with the clinical team, including Haluska, to discuss the presentation format of the reports.

129.    Confidential Witness 4 ("CW4") was employed by ARIAD as a Clinical Integration and Standards Data Programmer from December 2012 through September 2013. CW4's responsibilities included "building out" the Company's "RAVE" database or "capture system."  CW4 also worked on standardizing the clinical data coming in from the various trial sites.  CW4 reported to Katherine Arbour, Senior Director of Data Management, and then to Elena Davison, Senior Manager of Data Standards and Integration.

130.    CW4 worked on the listings of adverse events at ARIAD.  CW4 confirmed that adverse events were tracked by ARIAD in their "standard RAVE database."  According to CW4, ARIAD's data management team had access to any adverse events that were reported.  Adverse

event data was entered into the Company's "per patient reporting system" and any reports would have come out of the "EDC, data capture system." CW4 recalled adverse event data checks being done regularly during CW4's tenure at ARIAD. Further, CW4 confirmed that all of the clinical sites had databases that "fed into" ARIAD's RAVE database.

131.     Confidential Witness 5 ("CW5") stated that ARIAD additionally tracked adverse events relating to ponatinib via a telephone reporting system. CW5 was a Hematology Oncology Account Manager at ARIAD from October 2012-November 2013. CW5 worked as part of ARIAD's Sales team working in the field. CW5's sales region was Southern New Jersey and Pennsylvania. CW5 also worked with some clinical (PACE) trial patients. CW5 reported to Matthew Hillman, ARIAD's Regional Director in Sales for the Northeast. CW5's role regarding PACE clinical trial patients was to assist them in "maintaining drugs when it came to the insurance companies." CW5 explained that ARIAD tracked adverse events through a "call-in system" where the Sales team was required to immediately report any adverse events or side effects of ponatinib (whether they were "in-label" or off-label).

132.     Confidential Witness 6 ("CW6") was employed by ARIAD from July 2013-November 2013 as Operations Manager for Regulatory Affairs. In that capacity, CW6 was responsible for following all the clinical trials and for putting submissions together for the FDA. In particular, CW6 was responsible for "submitting" and "publishing" the August 2013 Interim Report to the FDA. Further, CW6 confirmed that the team that put the August 2013 report together was led by Haluska as well as by the head of the statistics group at ARIAD and ARIAD's head of regulatory affairs. CW6 added that Haluska led meetings with the FDA concerning the August 2013 Interim Report.

133.    Confidential Witness 7 ("CW7") also corroborated the means by which Defendants tracked data generated by Company-sponsored ponatinib trials.  CW7, who reported to Katherine Arbour, Senior Director, Clinical Data Management, was employed by ARIAD as a Senior Clinical Data Manager at ARIAD from March 2013 to November 2013.  In that capacity, CW7's responsibilities included working with an electronic data collection vendor ("EDC"), which captured the data reported by ARIAD's various ponatinib trial study sites, in order to ensure the accuracy of the data.

134.    CW7 confirmed CW4's account that the EDC company was called Medidata and the software platform system was known as "RAVE Electronic Data Capture."  CW7 stated that the source data from the RAVE software platform system was downloaded to the Data Management team at ARIAD.

135.    CW7 stated that the study site data that the EDC vendor captured included the medications being taken by a particular trial patient and adverse events.

136.    With respect to Defendants' access to such study site data, including adverse event data, CW7 stated that a Data Manager passed the study site data obtained from the EDC to ARIAD's statistics team.  ARIAD's statistics team further reviewed the data and added tables and graphs.  CW7 said that ARIAD's statistics team then passed the study site data on to ARIAD's Chief Medical Officer (Haluska), who, in turn, reported the results to ARIAD's CEO (Berger).

137.    CW7 also had insight into the importance of the EPIC trial to ARIAD and Defendants.  CW7 described EPIC as a "big deal" to ARIAD because it could lead to FDA approval to sell ponatinib as a front-line CML treatment.  CW7 recalled that s/he attended

quarterly meetings in May and August of 2013 at which the EPIC trial was discussed by Haluska and Berger.

138.     CW2 corroborated CW7's assessment of the importance of EPIC to ARIAD and Defendants.  According to CW2, EPIC was supposed to "differentiate" ARIAD from all of its competitors.  CW2 recalled Haluska showing CW2 (and CW2's colleagues) some preliminary efficacy data related to front-line use and explaining the rationale behind EPIC.  When asked how Haluska came to tell CW2 this information, CW2 explained that when CW2 first joined the Company, CW2 (and the other Medical Science Liaisons) traveled to Boston for three days to meet with Haluska.  According to CW2, on each of those days, the Medical Science Liaisons met for at least four hours with Haluska to review various data.  Haluska also reviewed with them information relating to the state of the Company and "the path going forward."  According to CW2, they began by talking about PACE 2, but the more important topic was EPIC.  CW2 explained that while CW2 was at ARIAD, ponatinib was approved only for second or third line use as a "last ditch attempt."   CW2 described ponatinib's approved use (*i.e.*, for sale to treat TKI-resistant/intolerant CML) as being "salvage therapy."   According to CW2, Gleevec, the approved front-line CML drug that ponatinib was being compared to in EPIC, had a significant head start on ponatinib.  CW2 explained that the point of EPIC was that ARIAD wanted ponatinib to be the first drug prescribed to a CML patient rather than the third drug, prescribed only after a CML patient has "failed the other therapies."  CW2 said that EPIC was the Company's "holy grail."  CW2 recalled attending a Company-wide meeting led by CEO Harvey Berger, where the message was clear, the initial FDA approval was great, but it just set the stage for front-line approval.   CW2 confirmed that anything like adverse events would put a "massive hole in the tire" of the EPIC trial.

139.    Discussing the challenge that ARIAD faced in the EPIC trial, and matching

ponatinib head-to-head with Gleevec, CW2 referred to Gleevec as the "gold standard since

2000." According to CW2, ponatinib had a tough road ahead because Gleevec had a 13-year

head start and people were used to it. Additionally, CW2 mentioned that ponatinib was running

up against Gleevec going generic. CW2 continued that ARIAD needed "a pretty big bang" or

else people were going to go with what they were used to.

### 4. After the Black Box Warning Was Announced in December 2012, Dosage Reductions Continued to Be the Norm in ARIAD's PACE 2 Trial, Which Defendants Knew

140.    CW1 confirmed that a majority of the doctors at M.D. Anderson Cancer Center

were continuing to administer 30 mg instead of 45 mg doses of ponatinib to their patients. CW1

learned of the dose reductions from the doctors administering the doses at M.D. Anderson and

communicated that information to ARIAD in roughly May of 2013. According to CW1, even

prior to ARIAD's submission of the August 2013 Interim Report to the FDA, ARIAD and the

FDA began to discuss launching a new trial designed to evaluate a 30 mg dose of ponatinib.

141.    CW4 corroborated CW1's account that dosages of Ponatinib were being reduced.

CW4 additionally stated that dosage data was available within ARIAD's database and that

dosage reports were run regularly, as "dosage reports are very relevant to any clinical trial."

142.    CW5 also corroborated that dose reductions continued to occur after December

2012. CW5 stated that most of the patients that CW5 sold Ponatinib to started at the 45 mg dose

but that many of them were "dose reduced" to 30 mg and sometimes even to 15 mg.

143.    In addition, on October 25, 2013, the *Financial Times* published an article citing

sources who stated that EPIC's trial investigators had asked ARIAD to reduce the EPIC trial

dosage of 45 mg, but were ignored. The *Financial Times* article was provided by *BioPharm*

*Insight*, and was entitled "ARIAD's revised Iclusig [ponatinib] manuscript to be published on 7

November in NEJM [New England Journal of Medicine] – sources." According to the article, one of the sources reported that "Investigators had informed the company about the frequency of C[ardio] V[ascular] events seen in EPIC, but '***ARIAD was not listening***.'"

144.     Regarding ARIAD's dosing practices, the article revealed information from two sources, stating:

> ***Investigators had asked Ariad to reduce Iclusig's [ponatinib's] 45 milligram (mg) dose in EPIC, but the company did not do so until after the FDA began its investigation***, the first and second sources explained. . . All sources interviewed agreed the 45mg dose is likely too high. Ariad should compare Iclusig [ponatinib] 45mg versus 30mg (or even 15mg) in relapsed/refractory CML patients, said PACE investigator Dr Meir Wetzler, chief, division of leukemia, Roswell Park Cancer Institute, Buffalo, New York. The first source suggested a PACE continuation trial to dose-reduce the patients who did well on Iclusig [ponatinib] 45mg down to 30mg.

> **5.     Defendants Altered the Enrollment Criteria for the EPIC Trial Specifically in Order to Exclude High-risk Patients**

145.     CW1 confirmed that ARIAD had "tweaked" the eligibility criteria for the front-line EPIC trial in 2013. CW1 explained that initially ARIAD had included anyone who did not experience a cardiovascular event in the prior 2-3 months, then changed the protocols and only allowed patients who did not have a cardiovascular event in at least 6 months. CW1 stated that regarding prospective clinical trial patients, initially ARIAD wanted "all comers" but then decided to restrict the population for front-line study, becoming more cautious with who would receive ponatinib. CW1 explained that ARIAD ***"wanted to get patients that were not high risk."***

**IV.    MATERIALLY FALSE AND/OR MISLEADING STATEMENTS DURING THE
CLASS PERIOD RELATING TO THE EXCHANGE ACT CLAIMS**

**A.    December 11, 2011 Form 8-K and Press Release**

146.    The Class Period begins on December 12, 2011.  On December 11, 2011, after

the market closed, ARIAD issued a press release titled "Ariad Announces Preliminary Data from

Pivotal PACE Trial of Ponatinib, Its Investigational pan-BCR-ABL Inhibitor," in which the

Company discussed the presentation of PACE 2 data before the annual meeting of the American

Society of Hematology ("ASH").  The press release stated in relevant part:

> ***Initial safety data show ponatinib to be well tolerated.***
>
> The most common adverse events considered related to ponatinib
> included rash (in 32% of patients), thrombocytopenia (31%), dry
> skin (24%), abdominal pain (19%), and headache (17%). Elevated
> serum lipase, nausea, fatigue and myalgia were observed less
> frequently. These effects were mostly grade 1 or 2 and were well
> tolerated by patients in the trial.
>
> The incidence of pancreatitis across the study and including all
> grades was 6%.  No patient discontinued participation in the trial
> due to pancreatitis.  Pancreatitis was previously determined to be
> the dose-limiting toxicity of ponatinib in the Phase 1 trial.
>
> Four on-study deaths were deemed by investigators as possibly or
> probably related to ponatinib treatment; three of these had
> advanced-phase CML or Ph+ ALL.  All four of these patients had
> complex, confounding medical conditions. Based on data entered
> into the clinical database by investigators, the deaths were due to
> pneumonia, fungal pneumonia, gastric hemorrhage and cardiac
> arrest (one each). There was no evidence of any ponatinib-specific
> findings emerging.

147.    Commenting on these results, Haluska stated:

> ***Importantly, this initial assessment of the PACE [2] trial
> provides further evidence of a favorable safety and tolerability
> profile of ponatinib in resistant or intolerant CML patients.***  The
> adverse event profile is similar to what was seen in the earlier
> Phase 1 study of ponatinib, although the incidence of pancreatitis
> is less in the PACE trial.  The four deaths that were deemed to be
> treatment related were likely linked to the advanced nature of their

disease, including the myelosuppressive effects of ponatinib on already badly damaged bone marrows.

148.     These statements regarding the safety and tolerability of ponatinib were materially false and/or misleading when made because they omitted the following facts contemporaneously known to Defendants based on their continuous monitoring of the PACE 2 trial data and safety results (as described *infra.* in Sections IX.A, IX.B, and IX.C):

- there was a developed body of data regarding ponatinib's adverse cardiovascular effects;

- that data led FDA investigators to observe that 8% of PACE 2 trial patients experienced serious ischemic events, including serious arterial thrombosis (*see* CDER Reports, analyzing PACE 2 : "The cardiovascular safety profile for Iclusig [ponatinib] is notable for arterial ischemic events and hypertension.  Based on the July 23, 2012 updated data cut-off date, 8% of patients experienced serious ischemic events."  *See also id.*: "Cardiovascular, cerebrovascular, and peripheral vascular thrombosis, including fatal myocardial infarction and stroke have occurred in Iclusig-treated patients… [S]erious arterial thrombosis occurred in 8% of Iclusig-treated patients.");

- PACE 2 trial subjects were experiencing liver failure, arterial occlusive and thromboembolic events (*see id.*, analyzing PACE 2 data: "Specifically, the Division is concerned regarding the risks including liver failure, arterial occlusive and thromboembolic events observed in the safety population.");

- 4% of PACE 2 subjects experienced serious congestive heart failure (CHF) or left ventricular dysfunction, with 4 fatalities. *Id.*; and

- 2% of PACE 2 subjects experienced treatment-emergent symptomatic hypertension as a serious adverse reaction, including hypertensive crisis.  Treatment-emergent hypertension occurred in 67% of patients.  *Id.*

**B.     December 12, 2011 ASH Annual Investor Briefing**

149.     The next day, on December 12, 2011, ARIAD hosted an annual investor briefing at the American Society of Hematology, participated in by Berger and Haluska.

150.    In the briefing, Haluska responded to a question from the audience about dose interruption and reduction in PACE 2:

**Unidentified Audience Member**

… Can you talk about how many patients required dose interruption, the average duration, what the criteria are for reintroducing drug, whether you reduced the dose?

….

**Frank Haluska  - ARIAD Pharmaceuticals – CMO**

Typically, there's a standard approach to this. You typically hold drug until the severity of the adverse event drops to Grade I or below, and then you reintroduce it, either based on clinical judgment or based on the criteria. In some cases, you can reintroduce at the same dose. In some cases, you go down to the next lowest level. So, we basically had three steps -- 45, 30, and 15 milligrams in this study.

*The exposure data are good. They vary a little bit with treatment history, as we've alluded to a moment ago, across the study -- we haven't quantified yet the number of dose interruptions or dose reductions, but we have an overall quantitative statistic that suggests that the exposure is very good.  It's essentially near 100% in the advanced phases because those patients require that.* In the chronic phase, there seems to be a correlation with duration of prior treatments and the time since diagnosis, as Moshe has alluded to.

151.    These statements were materially false and/or misleading when made because they omitted, among other things, the following facts contemporaneously known to Haluska:

- there was a developed body of data regarding widespread reductions to the official 45 mg dose of ponatinib administered to PACE 2 patients;

- that data later led FDA investigators to observe that, 73% of patients required a dose interruption or dose reduction, such that patients with CP-CML were on the full dose level (45 mg per day) for just 50% of the entire treatment duration.  Patients with AP-CML were on the full dose level for just 60% of the entire treatment duration.  (CDER Reports, analyzing PACE 2 data in ARIAD's July 2012 Interim Report).

- Dosage reductions resulted from adverse events. (*Id.*)

- The high dose reduction rates in PACE 2 made it more likely that patients in the EPIC trial studies would also be dose-reduced due to adverse reactions, and that EPIC would accordingly not support FDA approval for front-line use.

152.    Following these statements and after reviewing the ASH presentation on the interim data from PACE, on December 13, 2011, Summer Street Research Partners reiterated its buy rating and price target of $16.

**C.    December 13, 2011 Oppenheimer & Co. Healthcare Conference**

153.    On December 13, 2011, ARIAD participated in an Oppenheimer & Co. Healthcare Conference.  Defendant Berger spoke at the conference.  Discussing PACE 2, Berger said:

> We enrolled approximately 450 patients with CML or Philadelphia-positive ALL, so similar to the Phase I trial—once-day dosing, *a tablet 45 milligrams a day*, so the same dose as the one that was identified in the Phase I trial.

154.    Berger's statement that patients were administered one 45 mg tablet a day in the PACE 2 trial was materially false and/or misleading when made, which Berger knew, or was reckless in not knowing, for all of the reasons discussed above in ¶151.

155.    In the Conference, Berger also addressed PACE 2 safety data:

> So in summary, and this is directly from Professor Cortez's comments, *initial safety data show ponatinib to be well tolerated*.
> ….
> As we have highlighted in the past, there were four on-study deaths that the investigators indicated as possibly or probably treatment related.
> ….
> I think the way to look at these is there were no ponatinib-specific findings emerging.  It turns out its two patients with pneumonia, one patient with a GI bleed and one patient found with a cardiac arrest.  So these are in very sick patients with very long-standing, heavy treatment histories, very badly damaged marrow, the sort of

thing you see in these trials…. This is common in these sort of
trials, and the investigators are unfazed by these findings.

156.   Berger's statement that "initial safety data show ponatinib to be well tolerated"

was materially false and/or misleading when made, which Berger knew, or was reckless in not

knowing, for all of the reasons discussed above in ¶148.

**D.   January 10, 2012 J.P. Morgan Healthcare Conference**

157.   On January 10, 2012, ARIAD attended a J.P. Morgan Healthcare Conference.

Berger spoke at the conference about the Company's PACE 2 trial:

> So let's now focused [*sic*] on the PACE trial.  I think most
> everybody knows this is our pivotal registrational trial.  It is a
> single-arm trial in about 450 patients ***using ponatinib at 45
> milligrams a day, once-daily dosing*** in patients who are resistant
> or intolerant to either dasatinib or nilotinib, the two second-
> generation drugs, or both; or those patients who specifically have
> the T315I mutation.

158.   Berger's statement that PACE 2 trial patients received "ponatinib at 45

milligrams a day, once-daily dosing" was materially false and/or misleading when made, which

Berger knew, or was reckless in not knowing, for all of the reasons discussed above in ¶151.

159.   Berger also stated:

> it is clear that ponatinib is well tolerated…
>
> ***So the drug is well tolerated with a safety profile that is clearly
> consistent with its use both in the resistant/intolerant patients as
> well, we believe, in the newly diagnosed patients as well.***

160.   Berger's statement that PACE 2 data showed that ponatinib was "well tolerated"

and had a "safety profile that is clearly consistent with its use both in the resistant/intolerant

patients as well, we believe, in the newly diagnosed patients as well" was materially false and/or

misleading when made, which Berger knew, or was reckless in not knowing, for all of the

reasons discussed above in ¶148.

E.      **February 13, 2012 Biotechnology Industry Organization CEO and Investor Conference**

161.    On February 13, 2012, ARIAD attended a Biotechnology Industry Organization CEO and Investor Conference.  Defendant Berger spoke at the conference about PACE 2:

> So let's talk about the PACE trial.  This is our pivotal registration trial, a global trial of about 450 patients with CML or Philadelphia-positive ALL.  ***Once-daily dosing of ponatinib 45 milligram dose.***

162.    The statement that PACE 2 treated patients with a "once-daily dosing of ponatinib 45 milligram dose" was materially false and/or misleading when made, which Berger knew, or was reckless in not knowing, for all of the reasons discussed above in ¶151.

163.    Berger also discussed safety:

> ***It appears certainly from the preliminary data that ponatinib is well tolerated.   Adverse events that are quite manageable*** and importantly pancreatitis, one that has been highlighted and talked about by many, no patient discontinued treatment due to pancreatitis.  Very manageable, not something the physicians are concerned about and only 6% in the total population.  So really not something to focus on going forward.

164.    The statement that "It appears certainly from the preliminary data that ponatinib is well tolerated" was materially false and/or misleading when made, which Berger knew, or were reckless in not knowing, for all of the reasons discussed above in ¶148.

165.    On February 14, 2012, following the false and misleading statements made at the February 13, 2012 Biotechnology Industry Organization CEO and Investor Conference, Clackson exercised approximately 93,000 options to purchase ARIAD shares, and sold all of those shares for a profit in excess of $1 million.

F.     **The February 28, 2012 Form 8-K and Press Release**

166.    On February 28, 2012, ARIAD issued a Form 8-K and appended press release reporting the Company's operating results for the fourth quarter and full year ended December 31, 2011.  The Form 8-K was signed by Defendant Fitzgerald.

167.    The Company reported, in relevant part, that it had "completed patient enrollment in the pivotal PACE trial of ponatinib," and that its "investigators presented positive preliminary data on ponatinib from the PACE trial at the Annual Meeting of the American Society of Hematology," and "showed that ponatinib can be administered with or without a meal (*i.e.*, no food effect) and has no effect on cardiac repolarization (*i.e.*, no QT prolongation) in patients – both important differentiators, especially in the newly diagnosed CML setting."

168.    Commenting on these results, Defendant Berger stated:

> The past year was an extraordinary one for ARIAD.  We advanced our ponatinib and AP26113 development programs, established the leadership team of our commercial operations, elected to retain all global rights to our product candidates with no plans for any future partnerships and raised $258 million in a public offering that we believe was overwhelmingly supported by our shareholders.  We now have the resources to become a global oncology company that will discover, develop and commercialize its own targeted therapies for cancer patients with the greatest medical need.

169.    The Form 8-K and press release offered no information on (1) the developing body of information regarding ponatinib's adverse cardiovascular effects, or (2) that those adverse effects had led PACE 2 trial investigators to dose-reduce trial subjects at a rate approaching 75%.  Highlighting the commercial plans for ponatinib without providing this context was a material omission, which Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in ¶148 and ¶151.

170.    Following the press release, on February 28, 2012, analysts at Oppenheimer increased their price target for ARIAD from $17 to $20 per share.

**G.    February 29, 2012 Form 10-K for Fiscal Year 2011**

171.    On February 29, 2012, ARIAD filed its Annual Report on Form 10-K with the SEC (the "2011 10-K").  The 2011 10-K was signed by Defendants Berger and Fitzgerald.

172.    As part of the description of ARIAD's operations, the Company included a description of ponatinib, which stated in relevant part:

> We believe that the data from this trial demonstrate strong clinical evidence of durable, hematologic, cytogenic and molecular anti-cancer activity in patients who had failed prior tyrosine kinase inhibitor therapy for CML, including patients with the T315I mutation.  ***The data also show that ponatinib continues to be well-tolerated by patients in the study***.
>
> \*        \*        \*
>
> ***Initial safety data showed ponatinib to be well tolerated.***

173.    The statements that the data show that "ponatinib continues to be well-tolerated by patients in the study" and "Initial safety data showed ponatinib to be well tolerated" were materially false and/or misleading when made, which Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in ¶148.

174.    Under Item 1.A. "Risk Factors," the 2011 10-K included a section titled "Risks Relating to Regulatory Approvals, Pricing and Reimbursement."  This section stated, in relevant part:

> We, the FDA or other foreign governmental agencies could delay, suspend or halt our clinical trials of a product candidate for numerous reasons, including:
> ….
> ***the product candidate <u>may</u> have unforeseen adverse side effects,*** including fatalities, or a determination may be made that a clinical trial presents unacceptable health risks;
> ….

> ***Our failure, or the failure of our collaborators, to adequately
> demonstrate the safety and efficacy of a product candidate in
> clinical development <u>could</u> delay or prevent obtaining marketing
> approval of the product candidate*** and, after obtaining marketing
> approval, ***data from post-approval studies <u>could</u> result in the
> product being withdrawn from the market***, either of which would
> likely have a material adverse effect on our business.

175.    These statements were materially false and/or misleading when made, which

Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in

¶148.  These statements were, moreover, misleading because use of the words "may" and

"could" suggested that the described scenarios had not already graduated in likelihood from a

risk to a certainty, which they had, and which Defendants knew or were reckless in not knowing,

and in making statements that indicated otherwise.

176.    In addition, Defendants violated SEC Regulation S–K, Item 303 ("Item 303").

Item 303 requires issuers to "describe any known trends or uncertainties that have had or that the

registrant reasonably expects will have a material favorable or unfavorable impact on net sales or

revenues or income from continuing operations[.]"  Thus, "material forward-looking information

regarding known material trends and uncertainties is required to be disclosed as part of the

required discussion of those matters and the analysis of their effects."  *See* Commission

Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results

of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

177.    First, as set forth above in Section III.I, developing clinical trial data, including

the eleven months of safety data that was later collected into the July 2012 Interim Report,

showed that PACE 2 patients were experiencing adverse events relating to use of the drug—

including serious adverse cardiovascular events—and that these events were known to

management.  Second, ponatinib's centrality to ARIAD's business and commercial prospects, as

further discussed below in Section IX.A, establishes that this trend was "reasonably likely to have material effects on [ARIAD's] financial condition or results of operations."

178.   Accordingly, pursuant to Item 303, Defendants were required to disclose: (i) that the incidence of adverse cardiovascular events in PACE 2 had or was reasonably expected to have a "material … unfavorable impact on … revenues," and (ii) to what extent that trend had impacted or was reasonably expected to impact ARIAD's revenue.  Nevertheless, Defendants failed to disclose any of this information in the 2011 10-K.

179.   Included with the 2011 10-K as Exhibit 31.1 was a certification, signed by Defendant CEO Berger, which stated, in relevant part, that the 2011 "10-K did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to [fiscal year 2011]."

180.   A substantially identical certification, signed by Defendant CFO Fitzgerald, was included as Exhibit 31.2 to the 2011 10-K.

181.   Upon the release of the 2012 10-K, on February 29, 2012, Jefferies increased its price target for ARIAD from $16 to $17 per share.

**H.   The May 9, 2012 Form 8-K and Press Release**

182.   On May 9, 2012, ARIAD issued a Form 8-K and appended press release setting forth the Company's operating results for the first quarter of 2012.  The Form 8-K was signed by Defendant Fitzgerald.  As part of the press release, the Company reported on its plans for advancing ponatinib toward commercialization.  Commenting on these results, Defendant Berger stated:

> We had a very productive start to the year with uniform progress
> taking place throughout our organization.  Our clinical
> development programs and preparations for the global

> commercialization of ponatinib are advancing on schedule, and
> AP26113 is moving through the dose-escalation portion of the
> Phase 1/2 clinical trial.  Initial data from this clinical study of
> AP26113 are being submitted this month for presentation at a
> major medical meeting early in the fall.

183.    The press release and Form 8-K offered no information on (1) the developing

body of information regarding ponatinib's adverse cardiovascular effects, or (2) that those

adverse effects had led PACE 2 trial investigators to dose-reduce trial subjects at a rate

approaching 75%.  Highlighting ARIAD's commercial plans for ponatinib without providing

this context was a material omission, which Defendants knew, or were reckless in not knowing,

for all of the reasons discussed above in ¶148 and ¶151.

## I.    May 9, 2012 Form 10-Q

184.    Also on May 9, 2012, ARIAD filed its quarterly report on Form 10-Q with the

SEC for the quarterly period ended March 31, 2012 (the "Q1 2012 10-Q").   The Q1 2012 10-Q

stated: "There have been no material changes to the risk factors included in our Annual Report

on Form 10-K for the fiscal year ended December 31, 2011."  As set forth above in ¶174, the

2011 10-K included a Risk Factor titled "Risks Relating to Regulatory Approvals, Pricing and

Reimbursement," which contained statements warning of risk due to (1) regulatory action to halt

clinical trials of ARIAD's developmental drugs due to the emergence of unexpected side effects,

and (ii) post-approval regulatory action based on adverse findings in follow-up studies.  This risk

factor was materially false and/or misleading when made, which Defendants knew, or were

reckless in not knowing, for all of the reasons discussed above in ¶148 and ¶175.

185.    Following the results communicated by the Company in its May 9, 2012 8-K and

attached press release, and in its May 9, 2012 Form 10-Q, several analysts raised their price

targets for ARIAD, on May 9, 2012:

(a)    Jefferies increased its price target from $17 to $18 per share;

(b)      Barclays increased its price target from $19 to $20 per share; and

(c)      Rodman & Renshaw Equity Research increased its price target from $17 to $18 per share.

**J.      May 16, 2012 Bank of America Merrill Lynch Health Care Conference**

186.     On May 16, 2012, ARIAD attended a Bank of America Merrill Lynch Health Care Conference.  Defendant Berger spoke at the conference, making the following statement:

> So, clearly, the safety profile, at least based on these preliminary data early on, truly support the broad use of ponatinib in patients with chronic myeloid leukemia.

187.     The foregoing statement was materially false and/or misleading when made, which Berger knew, or was reckless in not knowing, for all of the reasons discussed above in ¶148.

**K.      June 4, 2012 Form 8-K and Press Release**

188.     On June 4, 2012, ARIAD filed a Form 8-K and attached Press Release with the SEC.  The Form 8-K was signed by Defendant Fitzgerald.

189.     The attached press release, titled "ARIAD Announces Updated Data from Pivotal PACE Trial of Ponatinib, Its Investigational pan-BCR-ABL Inhibitor," contained the following statement:

> "Efficacy data were reported at ASCO on 444 treated patients in six pre-specified cohorts at ***45 mg of ponatinib administered orally once daily***."

190.     The above-emphasized statement was materially false and/or misleading when made, which Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in ¶151.

191.     The press release also stated:

- Updated safety data show ponatinib to have a favorable profile in these heavily pretreated patients;

- The most common adverse events considered related to ponatinib included thrombocytopenia (in 35% of patients), rash (32%), dry skin (30%), abdominal pain (22%), and headache (18%). Elevated serum lipase, fatigue and arthralgia were observed less frequently.

192.     These statements were materially false and/or misleading when made, which

Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in

¶148.

**L.      June 5, 2012 Goldman Sachs Healthcare Conference**

193.     On June 5, 2012, ARIAD attended a Goldman Sachs Healthcare Conference.

Defendant Berger spoke at the conference.

194.     At the conference, Berger made the following statements:

So all of that, coupled with a clear durability of response; patients not coming off therapy once they have a response; really just highlighted the breadth of the activity that was seen -- ***the safety profile, tolerability profile was essentially unchanged from what was shown at ASH in December of last year…***

***So a very well-tolerated safety profile***, with very strong efficacy data across all the measurements that one can use to really assess how the drug is working.

195.     These statements were materially false and/or misleading when made, which

Berger knew, or was reckless in not knowing, for all of the reasons discussed above in ¶148.

**M.      June 19, 2012 Form 8-K and Press Release**

196.     On June 19, 2012 ARIAD filed a Form 8-K and attached Press Release with the

SEC.  The Form 8-K was signed by Defendant Fitzgerald.

197.     In the press release, the Company made further positive statements regarding

PACE 2's safety results.  In addition to touting ponatinib's "robust anti-leukemic activity," the

press release claimed that ponatinib had a "favorable [safety] profile in . . . heavily pretreated patients."  The release also repeated the statement from Defendant Haluska that the Company included in its June 4, 2012 press release, claiming that "these data provide clear evidence of a favorable safety and tolerability profile of ponatinib . . . similar to what was seen in the earlier Phase 1 study of ponatinib[.]"

198.    The above-emphasized statements were materially false and/or misleading when made, which Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in ¶148.

### N.    June 21, 2012 Annual Shareholder Meeting

199.    On June 21, 2012, ARIAD hosted an Annual Shareholder Meeting.  Defendants Berger, Haluska and Clackson participated in the meeting.

200.    At the meeting, Berger spoke about ponatinib, stating that:

> So a drug that appears based on our initial analysis of safety to be well tolerated by patients, very important as patients are in the advanced stages, but also tolerability becomes particularly important as you move the drug back in clinical trials, and ultimately commercially if approved for newly diagnosed patients.

201.    The foregoing statement was materially false and/or misleading when made, which Berger, Haluska, and Clackson knew, or were reckless in not knowing, for all of the reasons discussed above in ¶148.

### O.    July 13, 2012 JMP Securities Healthcare Conference

202.    On July 13, 2012, ARIAD attended a JMP Securities Healthcare Conference. Defendant Clackson spoke at the conference.

203.    At the conference, Clackson discussed ponatinib, noting that "the safety profile is certainly, we believe, favorable, considering the patient population."

204.    The foregoing statement was materially false and/or misleading when made, which Clackson knew, or was reckless in not knowing, for all of the reasons discussed above in ¶148.

**P.      The July 27, 2012 Form 8-K and Press Release**

205.    On Friday, July 27, 2012, ARIAD filed its Form 8-K and Press Release.  The Form 8-K was signed by Defendant Fitzgerald.

206.    The press release announced the initiation of EPIC, ARIAD's randomized Phase 3 trial of ponatinib in adult patients with newly-diagnosed, a.k.a., front-line CML.

207.    Defendant Berger was quoted in the press release as saying: "The start of the EPIC trial represents an important milestone in the development of ponatinib in CML and builds on the strong clinical data that we have obtained to date in patients with more advanced disease."

208.    The press release also stated that "Approximately 500 patients will be randomized 1:1 to ***standard doses of ponatinib (45 mg given orally once daily)*** or imatinib (400 mg given orally once daily) "

209.    This statement was materially false and/or misleading when made, which Berger knew, or was reckless in not knowing, because, as discussed above in ¶151:

- Adverse events, including cardiovascular events, caused by the trial dose of 45 mg were so prevalent in PACE 2 that trial investigators reduced 73% of the trial subjects from the 45 mg trial dose to trial doses of 30 mg or 15 mg.

210.    In response to this announcement, the share price of ARIAD's stock jumped 6.23%, to close at $18.92 per share that day.

211.    Following this news, on Monday, July 30, 2012, Clackson exercised 23,234 options at $5.23 per share and sold all 23,234 shares for an approximately $19.00 per share—for profit of $319,932.18 ($441,446 less exercise cost of $121,513.82).

### Q.      August 9, 2012 Form 10-Q

212.     On August 9, 2012, ARIAD filed its quarterly report on Form 10-Q with the SEC

for the quarterly period ended June 30, 2012 (the "Q2 2012 10-Q").  The Q2 2012 10-Q was

signed by Defendants Berger and Fitzgerald.  The Q2 2012 10-Q stated, in relevant part:

> There have been no material changes to the risk factors included in
> our Annual Report on Form 10-K for the fiscal year ended
> December 31, 2011[.]

213.     As set forth above in ¶174, the 2011 10-K included a Risk Factor titled "Risks

Relating to Regulatory Approvals, Pricing and Reimbursement," which contained statements

warning of risk due to (1) regulatory action to halt clinical trials of ARIAD's developmental

drugs due to the emergence of unexpected side effects, and (ii) post-approval regulatory action

based on adverse findings in follow-up studies.  This risk factor was materially false and/or

misleading when made, which Defendants knew, or were reckless in not knowing, for all of the

reasons discussed above in ¶148 and ¶175.

### R.      September 19, 2012 UBS Global Life Sciences Conference

214.     On September 19, 2012, ARIAD attended a UBS Global Life Sciences

Conference.  Defendant Berger spoke at the conference.

215.     At the conference, Berger made the following statements:

> The safety data that were presented at ASCO show that ***ponatinib
> was well tolerated***.  Very common adverse events --
> thrombocytopenia, mild rash, some dry skin, some patients with
> abdominal pain or headache.  Sort of most of these being
> constitutional symptoms, not really limiting treatment.
> ….
> Favorable safety profile, even in heavily pre-treated patients.

216.     These statements were materially false and/or misleading when made, which

Berger knew, or was reckless in not knowing, for all of the reasons discussed above in ¶148.

217.    Following Berger's appearance at the UBS Global Life Sciences Conference, on September 21, 2012, RBC Capital Markets increased its price target for ARIAD from $23 to $28 per share.

### S.    October 19, 2012 Analyst and Investor Day

218.    On October 19, 2012, ARIAD hosted an Analyst and Investor Day.  Defendants Berger, Clackson and Haluska attended the Investor Day.

219.    At the Investor Day, Haluska stated, "We think that the risk benefit for this patient population is strong in favor of the use of PACE and the patient -- of ponatinib."

220.    This statement was materially false and/or misleading when made, which Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in ¶148.

221.    Also at the Investor Day, Berger stated:

> And Joel, in terms of the regulatory timeline, we're still guiding to the first quarter of next year. We have high confidence that US approval in the first quarter is highly likely and we're going to be ready to launch, whether its January 1st or March, we'd be ready earlier.  ***And all of the feedback and interactions we're having with the FDA are consistent with a very positive response from them on all aspects of our clinical data.***

222.    The above-emphasized statement was materially false and/or misleading when made, which Defendants knew, or were reckless in not knowing, because by the date of the Investor Day the FDA had begun to correspond with ARIAD regarding results of the PACE 2 trial, as discussed above in Sections III.I.1 and III.I.2.

223.    Following the Analyst and Investor Day, on October 22, 2012, two analysts increased their price targets, specifically citing news updates from the Analyst and Investor Day:

        (a)     William Blair increased its price target from $25 to $28; and

        (b)     Barclays increased its price target from $25 to $30.

T.     **November 7, 2012 Q3 2012 Earnings Conference Call**

224.    On November 7, 2012, ARIAD hosted its Q3 2012 Earnings Conference Call.

Defendants Berger and Fitzgerald participated in the call.

225.    On the call, Berger responded to an analyst's question regarding the forthcoming

label for ponatinib:

> ***I can't speak to what the label is going to look like***, but I can talk
> about the general issue. There are patients as you know who
> develop resistance or become intolerant to one or more of the other
> drugs at different phases or different stages of sequential treatment
> from one prior TKI to more.  I think what the PACE trial clearly
> documented is that ponatinib had very good activity, in fact best
> activity earlier in the course of those -- the course of the disease.
> But all through the resistant intolerant population, whether almost
> independent of the patients failing one or more of the TKIs, you
> had strong activity and high response rates.
>
> Obviously more of the patients had failed multiple TKIs than had
> failed one TKI ***but I think the message of the PACE trial is that
> ponatinib works across that entire spectrum of patients*** and we
> will see when we get to the label -- final label negotiations with
> the agency what the label looks like.

226.    The first of the two statements emphasized above was materially false and/or

misleading when made, which Berger and Fitzgerald knew, or were reckless in not knowing,

because, as discussed above in ¶116, on November 6, 2012, the day prior to the earnings call, the

FDA had informed ARIAD that it rejected ARIAD's proposed label, and required ARIAD to

submit a label featuring a "Box warning for arterial thromboembolic events, arterial stenosis,

and hepatic toxicity… The Division's position regarding the inclusion of box warnings is firm.

We refer you to our discussion during our face-to-face meeting on November 1, 2012."

227.    The second of the two statements emphasized above was materially false and/or

misleading when made, which Defendants knew, or were reckless in not knowing, because

roughly 75% of patients had been dose-reduced due to adverse effects of ponatinib, as discussed above in paragraph ¶151.

**U.**      **November 9, 2012 Form 10-Q**

228.      On November 9, 2012, ARIAD filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended September 30, 2012 (the "Q3 2012 10-Q").  The Q3 2012 10-Q was signed by Defendants Berger and Fitzgerald.  The Q3 2012 10-Q stated, in relevant part:

> There have been no material changes to the risk factors included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2011[.]

229.      As set forth above in ¶174, the 2011 10-K included a Risk Factor titled "Risks Relating to Regulatory Approvals, Pricing and Reimbursement," which contained statements warning of risk due to (1) regulatory action to halt clinical trials of ARIAD's developmental drugs due to the emergence of unexpected side effects, and (ii) post-approval regulatory action based on adverse findings in follow-up studies.  This risk factor was materially false and/or misleading when made, which Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in ¶148 and ¶175.

**V.**      **December 11, 2012 Form 8-K and Press Releases**

230.      On December 11, 2012, ARIAD filed a Form 8-K and three press releases. Defendant Fitzgerald signed the Form 8-K.

231.      The third press release, attached to the Form 8-K as Exhibit 99.3, was entitled "ARIAD Announces 12-Month Data from Pivotal PACE Trial of Ponatinib in Heavily Pretreated Patients with Advanced-Phase CML and Ph+ ALL."  This press release contained the following statements:

**Safety profile (N=449)**

- The most common non-hematologic treatment-emergent adverse events in the PACE trial included rash (in 38% of patients), abdominal pain (38%), headache (35%), dry skin (35%), and constipation (34%), with the majority of these being grades 1 or 2 in severity.

- The most common hematologic treatment-emergent adverse events were thrombocytopenia (42%), neutropenia (24%), and anemia (20%), which were primarily grades 3 or 4 in severity.

- Pancreatitis and pneumonia were the most common non-hematologic treatment-emergent serious adverse events (5% each), followed by abdominal pain (4%), myocardial infarction (3%), congestive heart failure (3%), atrial fibrillation (3%), and pyrexia (3%).  The most common hematologic serious adverse events were anemia, febrile neutropenia, and thrombocytopenia (3% each).

232.    These statements were materially false and/or misleading when made, which Defendants knew, or were reckless in not knowing, because they disclosed only the above-listed adverse and serious adverse events while omitting any mention of the serious adverse events discussed in ¶148, including that, as revealed just three days later, on December 14, 2012, serious arterial thrombosis occurred in 8% of PACE 2 patients, leading to the inclusion of a black box warning on ponatinib's FDA-approved label.  As discussed above in Section III.I, "The Truth About Ponatinib," Defendants knew that the statements in the foregoing December 11, 2012 press release were misleading when made because, among other things, they tracked the PACE 2 safety results on an ongoing basis, and also because Defendant Haluska participated in the creation of the July 2012 Interim Report containing the PACE 2 data that led to the black box warning on ponatinib's label.

### W.    December 11, 2012 Cowen and Company Analyst Report

233.    On December 11, 2012 the investment bank Cowen and Company published an analyst report discussing ARIAD.  The report stated the following:

Yesterday we hosted a breakfast meeting with Ariad senior management and a group of investors. Attending from Ariad were Chairman and CEO Harvey Berger, President of R&D and Chief Scientific Officer Tim Clackson, Senior VP of Clinical R&D and Chief Medical Officer Frank Haluska, Senior VP of Commercial Operations Martin Duvall, Senior VP of Corporate Affairs Maria Cantor, and Director of Investor Relations Kendra Adams. Overall management continues to be optimistic about ponatinib's prospects for approval in the U.S. during Q1:13 with a favorable label. [M]anagement thinks the evidence continues to mount that ponatinib is the most effective TKI for CML, and therefore that ponatinib has a very good chance of moving into the first line once the initial interim data from the EPIC trial are available…. Sunday's presentation was the first in which ponatinib's SAE's were disclosed. Management noted that the SAE profile is important for the regulators, as PACE was a single arm study, the Agency is likely to examine the profile closely to look for signs of possible toxicity. Ponatinib's profile continues to look very benign, with few worrisome signals. ***While pancreatitis is the most prevalent, the number of cases remains very low (5%)*** and has not increased appreciably since the ASCO presentation, corroborating management's claims that most occurs early in therapy. Just as important, only one patient discontinued therapy because of pancreatitis. Management thinks most of the other SAEs are related to the patient population – since they are sick and heavily pretreated, ***once [sic] would expect to see low rates of cardiovascular issues in particular.*** Management is confident the side effect profile will not impede regulatory approval or uptake.

234.     According to the Cowen and Company report quoted above, the above-emphasized information was communicated at a breakfast meeting with investors on December 10, 2012. Cowen attributed the information to ARIAD "management" attending the meeting. According to Cowen, Defendants Berger, Haluska and Clackson attended the meeting, along with three other senior executives from the Company.

235.     The information Defendants gave to the market was materially false and/or misleading when made, as attendees Berger, Haluska and Clackson knew, or were reckless in not knowing for the following reasons.

236.    First, Berger's, Haluska's, and Clackson's representation to Cowen and Company that ponatinib's "most prevalent" serious adverse event ("SAE") was pancreatitis, with a *5%* incidence rate—leading Cowen to conclude that "Ponatinib's profile continues to look very benign, with few worrisome signals"—was materially false and/or misleading because it omitted that as of July 23, 2012, the PACE 2 study data collected by ARIAD and submitted to the FDA in the July 2012 Interim Report reflected an *8%* incidence rate of serious adverse cardiovascular events.

237.    Second, as discussed above in Section III.I.2, over a month prior to the Cowen meeting, in October 2012, ARIAD had corresponded with the FDA about this 8% incidence rate, and why ARIAD had not included it among the list of warnings on its proposed label for ponatinib.  Additionally, on November 1, 2012, following that October correspondence with the FDA, and one month prior to the Cowen meeting, ARIAD executives—including Haluska and Clackson—had met face-to-face with the FDA.  At that meeting, the FDA had stated its position that a black box warning describing this 8% incidence rate should be included on ponatinib's approved label.

238.    Additional evidence that these statements were materially false and/or misleading when made, which Berger, Haluska, and Clackson knew, or were reckless in not knowing, includes the following:

- On November 6, 2012, the FDA directed ARIAD to "submit a revised label" with a boxed warning regarding arterial thromboembolic events, arterial stenosis, and hepatic toxicity;

- On October 25, 2012, The FDA had asked ARIAD, "Why did you exclude arterial ischemic events and other cardiovascular safety issues in your Warnings and Precautions?"; and

- On October 25, 2012, the FDA corresponded with the Company regarding the fact that 11% of the PACE 2 trial subjects had experienced arterial occlusive or thromboembolic

events ("AOTE") of any grade and that thirty-four patients (8%) experienced serious AOTE.

239.    For the foregoing reasons, the information disseminated to the market by Berger, Haluska, and Clackson through Cowen and Company that "once [sic] would expect to see low rates of cardiovascular issues in particular" was similarly materially false and/or misleading when made, which Berger, Haluska, and Clackson knew, or were reckless in not knowing, because it omitted to state the material information that such "low rates of cardiovascular issues" included an 8% rate of serious adverse cardiovascular events, which these Defendants knew by this time would lead to the inclusion of a black box warning on ponatinib's approved label—as announced just three days later on December 14, 2012.

## V.    THE TRUTH BEGINS TO BE REVEALED IN A PARTIAL DISCLOSURE

### A.    The December 14, 2012 Press Release and Analyst Call

240.    As discussed above in Section III.E, after the markets closed on December 14, 2012, ARIAD issued a press release announcing that the FDA had approved ARIAD's application to market ponatinib.  The press release was also attached to a Form 8-K filed with the SEC and signed by Defendant Fitzgerald.

241.    In the press release, Defendant Berger proclaimed, "We have now transformed ARIAD into a commercial oncology company addressing major unmet medical needs for cancer patients."

242.    The press release also contained a list entitled "Important Safety Information" that included an 8% occurrence rate of "serious arterial thrombosis":

> Cardiovascular, cerebrovascular, and peripheral vascular thrombosis, including fatal myocardial infarction and stroke have occurred in Iclusig [ponatinib]-treated patients.  Serious arterial thrombosis occurred in 8% of Iclusig-treated patients.  Interrupt and consider discontinuation of Iclusig [ponatinib] in patients who develop arterial thrombotic events.

243.    The press release also listed, under "Warnings and Precautions," the following

adverse cardiovascular events from PACE 2:

> Twenty patients treated with Iclusig [ponatinib] (4%) experienced serious congestive heart failure (CHF) or left ventricular dysfunction, with 4 fatalities.  Monitor patients for signs or symptoms consistent with CHF and treat as clinically indicated, including interruption of Iclusig. Consider discontinuation of Iclusig [ponatinib] in patients who develop serious CHF.

> Eight patients treated with Iclusig [ponatinib] (2%) experienced treatment-emergent symptomatic hypertension as a serious adverse reaction, including hypertensive crisis.  Treatment-emergent hypertension occurred in 67% of patients.  Monitor and manage blood pressure elevations.

244.    Despite the FDA approval, following the revelations of the black box warning,

ARIAD's share price dropped $4.95 per share to close at $18.93—a single day drop of *21%*.

245.    Analysts displayed concern upon learning that ponatinib had been associated with

serious adverse cardiovascular events to a degree that warranted inclusion of a black box

warning on the label.

246.    For example, on December 17, 2012, Cross Current Research issued an analyst

report which questioned why the data had not been highlighted by the Company before the

announcement of the black box warning:

> *It is probably fair to say that the large number of side effects and the severity of the side effects came as a surprise to the investment community, us included.*  Even though the ponatinib trials have been presented at various scientific conferences, *somehow these adverse events were not highlighted, and certainly not presented in aggregate manner as it is now revealed in the FDA label.*

> Some of the side effects are irreversible, such as congestive heart failure, MI, stroke. Since CML is now a chronic disease, patients are expected to have long life expectancy and some can even be cured, and yet the patient is expected to be on ponatinib for at least

> 3 years if the drug works, such irreversible side effects will give
> doctors pause before they put patients on the drug.

247.     Nevertheless, analysts were comforted by the Company's assurances that the

reported cardiovascular events were linked to the age and predisposition of the PACE 2 patient

population for heart disease.  For example, on December 17, 2012, Summer Street Research

Partners published an analyst report mirroring Defendants' assurances regarding the PACE 2

trial subjects' susceptibility to cardiovascular events:

> During the post-approval conference call, management indicated
> that the AE event rates were lower in the T315I patients who are
> generally less pre-heavily treated despite higher drug exposure,
> which suggests that some of A[dverse]E[vents]s are likely due to
> the underlying disease and pre-existing condition of the patients.

## VI.   AFTER THE DECEMBER 14, 2012 PARTIAL DISCLOSURE, DEFENDANTS MAKE FURTHER MISLEADING STATEMENTS

248.     Defendants blunted the impact of the disclosure that ponatinib would bear a black

box warning by subsequently transmitting further misinformation to the market.

### A.     March 1, 2013 Form 10-K for Fiscal Year 2012

249.     On March 1, 2013, ARIAD filed its Annual Report on Form 10-K with the SEC

for the fiscal year ended December 31, 2012 (the "2012 10-K").  The 2012 10-K was signed by

Defendants Berger and Fitzgerald.

250.     Under Item 1.A. "Risk Factors," the 2012 10-K included a section titled "Risks

relating to the development and commercialization of our products and product candidates."

This section stated, in relevant part:

> Our future sales of Iclusig [ponatinib] depend on numerous
> factors, including:
> ….
> the safety profile of Iclusig [ponatinib], including whether
> previously unknown side-effects or increased incidence or severity
> of known side-effects as compared to those seen during
> development are identified with the increased use of Iclusig

[ponatinib] after approval;

251.    The statements were materially false and/or omitted to state material facts required to be stated or necessary to make them not misleading when made, which Defendants knew, or were reckless in not knowing, because the described scenarios had already graduated in likelihood from a risk to a certainty, as demonstrated by the following facts:

- as discussed above in Sections III.I.3 and III.I.4, after the submission of the July 2012 Interim Report, Defendants, including Haluska and Berger, continued to track safety data in ARIAD's clinical trials, and would have been aware that serious cardiovascular events were increasing in ARIAD's clinical trials, causing doctors to continue to reduce dosage levels of ponatinib administered to patients;

- as set forth below in Sections VII.A through VII.C, the increasing incidence of adverse and serious adverse events that occurred during the period July 2012 to August 2013 ultimately led the FDA, in October 2013, to (1) suspend enrollment of clinical trials of ponatinib, (2) terminate the EPIC trial, and (3) suspend marketing of ponatinib, because the rate of serious arterial thrombosis in test subjects had increased from 8% (documented in the initial 11-month data set submitted to the FDA in July 2012 in connection with ARIAD's new drug application for ponatinib), to *11.8%*.  In addition, the twenty-four month safety data for PACE 2 that ARIAD collected and submitted to the FDA in August 2013 reflected that there was a *20%* combined rate of non-serious and serious arterial and venous adverse events; and

- as further set forth below in ¶301, the FDA reported that approximately *24 percent* of patients (nearly 1 out of 4) in the Phase 2 clinical trial (median treatment duration 1.3 years) and approximately *48 percent* of patients in the Phase 1 clinical trial (median treatment duration 2.7 years) experienced serious adverse vascular events, including fatal and life-threatening heart attack, stroke, loss of blood flow to the extremities resulting in tissue death, and severe narrowing of blood vessels in the extremities, heart, and brain requiring urgent surgical procedures to restore blood flow; and fatal and serious adverse events had occurred as early as *2 weeks* after starting Iclusig [ponatinib] therapy.

252.     Item 1.a., "Risk Factors" also included a sub-section titled "We may not succeed in developing expanded or additional marketable products, receiving regulatory approval or generating product revenues."  This sub-section stated, in relevant part:

> Factors that could affect the timing and the ability to obtain regulatory approval and to achieve market acceptance and gain market share for Iclusig… include, among others… dose, dosage regimen… the risk of occurrence of adverse events and other side effects in patients participating in clinical trials[.]

253.     The above statement was materially false and/or misleading when made, which Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in ¶251.

254.     In addition, Defendants violated SEC Regulation S–K, Item 303 ("Item 303"), which is described above in ¶ 176.

255.     First, as set forth above in Section III.I, developing clinical trial data, including the eleven months of safety data that was later collected into the August 2013 Interim Report, showed that PACE 2 patients were experiencing adverse events relating to use of the drug— including serious adverse cardiovascular events—and that these events were known to management.  Second, ponatinib's centrality to ARIAD's business and commercial prospects, as further discussed below in Section IX.A, establishes that this trend was "reasonably likely to have material effects on [ARIAD's] financial condition or results of operations."

256.     Accordingly, pursuant to Item 303, Defendants were required to disclose: (i) that the incidence of adverse cardiovascular events in PACE 2 had or was reasonably expected to have a "material … unfavorable impact on … revenues," and (ii) to what extent that trend had impacted or was reasonably expected to impact ARIAD's revenue.  Nevertheless, Defendants failed to disclose any of this information in the 2012 10-K.

257.    Included with the 2012 10-K as Exhibit 31.1 was a certification, signed by

Defendant CEO Berger, which stated, in relevant part, that the 2012 10-K did not contain any

untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not

misleading with respect to fiscal year 2012.

258.    A substantially identical certification, signed by Defendant CFO Fitzgerald, was

included as Exhibit 31.2 to the 2012 10-K.

**B.    March 12, 2013 Form 8-K**

259.    On March 12, 2013 ARIAD filed a Form 8-K with the SEC.  The Form 8-K was

signed by Defendant Fitzgerald.  Under Item 8.01 "Other Events," the Press Release stated:

> On March 12 and 13, 2013, Harvey J. Berger, M.D., Chairman and
> Chief Executive Officer of ARIAD Pharmaceuticals, Inc. (the
> "Company"), sold an aggregate of 100,000 shares of the
> Company's common stock, par value $.001 per share (the
> "Common Stock"), held directly by him and 5,400 shares of
> Common Stock held indirectly by him as trustee of a family trust.
> The shares were sold pursuant to two prearranged trading plans
> adopted by Dr. Berger and a brokerage firm after the approval of
> Iclusig™ in late December 2012 pursuant to Rule 10b5-1 under
> the Securities Exchange Act of 1934, as amended. The plans
> provide for sales of 100,000 shares held directly by Dr. Berger and
> approximately 5,400 shares held indirectly by Dr. Berger each
> month on pre-determined dates for six months, from March
> through August 2013, so long as the Company's Common Stock is
> trading above a certain price on such dates, as detailed in the plans.
> Accordingly, up to 600,000 shares of Common Stock held directly
> by Dr. Berger and approximately 32,800 shares held indirectly by
> him are eligible to be sold under the plans. This represents
> approximately 11% of the shares of Common Stock owned by
> him, directly or indirectly as trustee, and shares which may be
> acquired by him pursuant to outstanding stock options and other
> equity-based awards.
>
> ***Both trading plans were entered into at a time when Dr. Berger
> held no material non-public information about the Company.***

260.     This statement was materially false and/or misleading when made, which

Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in

¶251.

**C.     April 4, 2013 ARIAD Investor Conference Call**

261.     On April 4, 2013, ARIAD hosted an Investor Conference Call.  Defendant Berger

participated in the call.

262.     On the call, Berger addressed the report that he had begun to unload hundreds of

thousands of shares of ARIAD pursuant to two 10b5-1 plans that he entered into in late

December 2012, following ARIAD's announcement that the FDA had approved ponatinib with a

black box warning on the label:

> I'd like to end by making a few personal comments regarding the
> 10b5 plan that I put in place in late December 2012, representing
> about 10% of my holdings. I have never sold any shares of
> ARIAD stock, and in fact, have invested well over $7 million in
> acquiring ARIAD shares over the 21 years since I founded the
> Company.  Given my active involvement with our Leadership
> team, not only in R&D activities, but also as of January in our
> ongoing commercial launch of Iclusig [ponatinib], the only
> window for me to put a 10b5 plan into effect was prior to having
> any commercial Iclusig [ponatinib] sales, thus the choice of late
> December.
>
> I also felt that the Company had achieved a major event.  The
> transformation from an R&D focused science driven Company to
> a fully integrated, still science driven, oncology Company. I have
> absolute and complete confidence in the Company and it's [*sic*]
> extraordinary prospects going forward.  ***No one should
> misinterpret my sales as any lack of confidence.***  I expect the
> stock price of ARIAD to recover and continue to rise as we deliver
> on our objectives through continued flawless execution by all of
> our employees.

263.     Later in the call, Berger was asked whether purchasing shares of ARIAD on the

open market, was "something that might make sense in the future."  Berger responded:

10b5 plans are plans for selling shares.  What determines or limits my ability or any insiders ability to acquire shares in the open market is our insider trading policy because you can [*sic*] either buy shares or sell shares possessing material inside information.  ***If I could buy shares today, I would buy all the shares that I sold and 10-fold more today, but I can't because I know more than everybody else about what's going on in the Company and what to expect.  But there should be no doubt I would buy these shares in a second.***

264.   The above-emphasized statements were materially false and/or misleading when made, which Berger knew, or was reckless in not knowing, for all of the reasons discussed above in ¶251.

**D.   April 10, 2013 Guggenheim Partners Analyst Report**

265.   An April 10, 2013 analyst report published by Guggenheim Partners stated:

We recently hosted investor meetings with ARIA management, including CEO Harvey Berger and COO Marty Duvall.  We believe ***ARIA offered a very credible defense of Iclusig's [ponatinib's] safety profile, in both advanced and front-line CML.***  Overall, the meetings increased our conviction that the recent downside in ARIA presents an excellent buying opportunity.
….
***ARIA noted no major hurdles to Iclusig [ponatinib] adoption in the estimated 2,500 CML patients switching from alternative TKIs***, which we believe is illustrated by the early use of the drug in the 2nd-line setting***.***

266.   This information, which was disseminated to the market through the conduit of Guggenheim Partners at investor meetings, was materially false and/or misleading when made, which Berger knew, or was reckless in not knowing, for all the reasons discussed above in ¶251.

**E.   May 9, 2013 Form 10-Q**

267.   ARIAD filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended March 31, 2013 (the "Q1 2013 10-Q").  The Q1 2013 10-Q was signed by Defendants Berger and Fitzgerald.  The Q1 2013 10-Q stated, in relevant part: "There have been

no material changes to the risk factors included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2012."

268.    As set forth above in ¶250, the 2012 10-K included a Risk Factor titled "Risks relating to the development and commercialization of our products and product candidates" which contained a statement warning of risk due to "the safety profile of Iclusig [ponatinib], including whether previously unknown side-effects or increased incidence or severity of known side-effects as compared to those seen during development are identified with the increased use of Iclusig [ponatinib] after approval."  This risk factor, which was incorporated by reference into the Q1 2013 10-Q, was materially false and/or misleading when made, which Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in ¶251.

F.    **May 20, 2013 UBS Global Healthcare Conference**

269.    On May 20, 2013, ARIAD attended a UBS Global Healthcare Conference. Berger spoke at the conference.

270.    At the conference, Berger made the following statements:

> In the United States a broad label was approved which really covers all of the resistant/intolerant Philadelphia-positive leukemia patients. A very important clinical setting where patients have failed others of the second-generation tyrosine kinase inhibitors and need a better, stronger, broader activity new medicine, one that really is agnostic to the presence of individual mutations, covers the entire spectrum of mutations that exist, and has broad activity.  ***And the efficacy and safety data for Iclusig [ponatinib] support that broad use.***

271.    This statement was materially false and/or misleading when made, which Berger knew, or was reckless in not knowing, for all of the reasons discussed above in ¶251.

272.    Analysts continued to believe the Company's explanation that the serious adverse cardiovascular events observed in PACE 2 resulted from patients with prior cardiovascular risk

rather than ponatinib.  For example, an analyst report published on June 3, 2013 by BMO

Capital Markets noted:

> We hosted a dinner with Ariad Pharmaceuticals (ARIA) management and a prominent lung cancer investigator at the ASCO annual meeting.  The dinner included CEO Dr. Harvey Berger, CSO and President of R&D Dr. Tim Clackson, and CMO, Dr. Frank Haluska, as well as AP26113 Principal Investigator Dr. Ross Camidge from University of Colorado…  ARIA highlighted detailed data from the PACE study confirming that patients with CV events had substantial prior CV risk and that attribution of ICLUSIG [ponatinib] is difficult.

**G.     June 11, 2013 Goldman Sachs Healthcare Conference**

273.    On June 11, 2013, ARIAD attended the Goldman Sachs Healthcare Conference.

Berger spoke at the conference.

274.    Responding to an analyst's question about updated safety data from the PACE 2

trial, Berger said the following:

> The long and the short of the presentation was they presented data that reaffirmed what they have felt, and we have certainly felt, from the very beginning, that for reasons that are not totally clear but were perfectly obvious in terms of the initial analysis, the patients in the PACE trial were heavily skewed in terms of preexisting multiple cardiovascular risk factors, like hypercholesterolemia and diabetes; preexisting active ischemic heart disease; preexisting active cardiac disease and other cardiac abnormalities, such as hypertension, for example.
> ….
> So, this is not your average population.
>
> ***And so the events, the arterial thrombotic events in the 34 patients that were seen that resulted in the boxed warning were, in fact, associated with lots of preexisting risk factors, active cardiovascular disease.  And so this reinforced the initial impressions of what defined this patient population.***

275.    These statements were materially false and/or misleading when made, which

Berger knew, or was reckless in not knowing, for all of the reasons discussed above in ¶251.

### H.   June 20, 2013 Annual Shareholder Meeting

276.   On June 20, 2013, ARIAD hosted its Annual Shareholder Meeting.  Defendants Berger and Haluska participated in the meeting.

277.   In the meeting, an analyst questioned Berger about the high prices charged for ponatinib and other TKIs.  Berger justified the price on the basis of ponatinib's "overwhelmingly strong efficacy and excellent safety profile."

278.   Berger's description of ponatinib's safety profile as excellent was materially false and/or misleading when made, which Defendants Berger and Haluska knew, or were reckless in not knowing, for all of the reasons discussed above in ¶251.

### I.   August 9, 2013 Form 10-Q

279.   On August 9, 2013, ARIAD filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended August 9, 2013 (the "Q2 2013 10-Q").  The Q2 2013 10-Q was signed by Defendants Berger and Fitzgerald.  The Q2 2013 10-Q stated, in relevant part: "There have been no material changes to the risk factors included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2012."

280.   As set forth above in ¶250, the 2012 10-K included a Risk Factor titled "Risks relating to the development and commercialization of our products and product candidates" which contained a statement warning of risk due to "the safety profile of Iclusig [ponatinib], including whether previously unknown side-effects or increased incidence or severity of known side-effects as compared to those seen during development are identified with the increased use of Iclusig [ponatinib] after approval."  This risk factor, which was incorporated by reference into the Q2 2013 10-Q, was materially false and/or misleading when made, which Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in ¶251.

281.    As also set forth above, the "Risk Factors" in the 2012 10-K included a sub-section titled "We may not succeed in developing expanded or additional marketable products, receiving regulatory approval or generating product revenues" which stated:

> Factors that could affect the timing and the ability to obtain regulatory approval and to achieve market acceptance and gain market share for Iclusig… include, among others… dose, dosage regimen… the risk of occurrence of adverse events and other side effects in patients participating in clinical trials[.]

282.    This risk factor, which was incorporated by reference into the Q2 2013 10-Q, was materially false and/or misleading when made, which Defendants knew, or were reckless in not knowing, for all of the reasons discussed above in ¶251.

## VII.    THE TRUTH IS FINALLY REVEALED

### A.    PARTIAL DISCLOSURES: The October 9, 2013 Form 8-K and Press Release and the October 11, 2013 FDA Press Release

283.    On October 9, 2013, ARIAD issued a current report on Form 8-K with attached press release announcing, in relevant part, that:

- ARIAD was ***pausing enrollment*** in all clinical studies of ponatinib, with enrollment to resume ***upon agreement with the FDA***, and with ***anticipated changes in dose and other modifications***;

- the FDA had placed a ***partial clinical hold*** on all new patient enrollment in clinical trials of ponatinib;

- patients already enrolled in clinical trials of ponatinib would receive reduced doses on a trial-by-trial basis;

- the dose of ponatinib in patients who were currently enrolled in ARIAD's EPIC trial would be reduced to ***30 mg daily***, unless they had already reached a major molecular response or reached one in the future, in which case the dose would be further reduced to ***15 mg daily***; and

- eligibility criteria for ponatinib clinical trials would be modified to ***exclude patients who had experienced prior arterial thrombosis resulting in heart attack or stroke***.

284.    In the same October 9 press release, the Company also announced 24 month follow up results from the PACE 2 trial, including the following:

- ***serious arterial thrombosis in 11.8%*** of trial subjects;

- serious venous occlusion in 2.9% of subjects; and

- ***a 20% combined rate of non-serious and serious arterial and venous adverse events***.

285.    On this news, ARIAD's share price collapsed $11.31 to close at ***$5.83*** per share, for a one-day drop of ***66%***, on the largest trading volume in the Company's history to date.

286.    On a conference call held to discuss the news, analysts displayed concern.

**Michael Yee  - RBC Capital Markets – Analyst**

[O]bviously, we have been in discussion with the Street; you've been in discussion. What has changed between today and what's been going on at investor meetings and what was said on the last conference call where you had high confidence about the ongoing EPIC study?  What's actually changed between now and then?

287.    In response, Defendants continued to mislead the market and once again assured analysts on the call that the cardiovascular events were attributable to a high-risk trial population.  For example, Haluska stated:

The analysis that we presented first at ASCO that characterizes the population whose [*sic*] experienced these adverse events has continued and the findings remained essentially commensurate with what we found back in June. That is, patients who have these events have a number of risk factors.

Those include duration of therapy, exposure to prior TKIs, age, cardiac risk factors, and particularly a history of the events in question. For instance, patients who have had a myocardial infarction are significantly overrepresented in the population.

There are a few patients who don't have those risk factors.  There are a few patients who are outside of the essential epidemiology of that risk group, but ***by and large, this is happening to patients who are overrepresented from the population who have increased risk***.

- 83 -

288.     During this same call, Defendant Berger reassured investors that ponatinib would

likely still receive front-line approval, stating:

> I think, clearly, it's going to take longer to accrue an expanded
> EPIC trial and follow those patients.  **But we are very confident
> that at the end of the day, with the dose reduction scheme that we
> have and the high circulating levels that can be achieved with
> lower doses than 45 milligrams, that the EPIC trial has an
> excellent likelihood of being a positive trial with an appropriate
> benefit/risk balance.**

289.     Nonetheless, analysts began to question the viability of ponatinib.

290.     For example, in an October 11, 2013 report, Credit Suisse noted the disconnect

between Defendants' current and past statements:

> Importantly, **ARIA is now reporting that there was a dose-related
> increase in thrombotic events in PACE** based on multivariate
> analysis.  **This is different from their earlier claim that the events
> were a result of the patient population being tested and were not
> related to Iclusig [ponatinib] treatment.**

291.     Credit Suisse also observed that excluding test subjects from EPIC based on a

history of arterial thrombotic events would cut into ARIAD's revenue if ponatinib were

eventually approved for use as a front-line treatment:

> **Change in the enrollment criteria will limit the market
> opportunity if EPIC is successful**
>
> Exclusion criteria for the EPIC study will now prevent patients
> that have experienced an arterial thrombosis event that caused a
> heart attack or stroke from enrolling in the study.  This will likely
> reduce the market opportunity for the drug even if EPIC is positive
> given that the median age of diagnosis is 67 for CML,

292.     Two days after the October 9 disclosure, on October 11, 2013, the FDA issued a

press release announcing that it had launched an investigation into ponatinib.  Specifically, the

release stated that the FDA was "investigating an increasing frequency of reports of serious and

life-threatening blood clots and severe narrowing of blood vessels (arteries and veins) of patients

taking the leukemia chemotherapy drug Iclusig (ponatinib)."  The press release added that

"Newly identified serious adverse reactions have also been reported involving the eyes,

including decreased vision and clots in blood vessels of the eye. These adverse events were seen

in all age groups treated and in those with and without cardiovascular risk factors."  On this

news, ARIAD's share price dropped a further $1.15 per share to close at $4.26 per share, a

decline of 21%.

> **B.**    **PARTIAL DISCLOSURE: The October 18, 2013 Form 8-K and Press Release**

293.    On October 18, 2013, before the market opened, the Company issued a Form 8-K

and Press Release that continued to partially disclose the truth regarding ponatinib.  The press

release, issued nine days after Defendants told the market that ponatinib was still viable as a

front-line treatment for CML, revealed that ARIAD and the FDA had "mutually agreed" that the

EPIC trial should be terminated, on the basis that:

> arterial thrombotic events were observed in patients treated with
> Iclusig [ponatinib].  The decision was made in the interest of
> patient safety based on a recent assessment of data in the clinical
> trial.

294.    In a conference call held with analysts that morning to discuss the news,

Defendant Clackson mentioned that the Company was "contemplate[ing] a narrower label" for

ponatinib.  Clackson also admitted for the first time that "vascular events" had occurred in the

EPIC trial:

> ***So we have seen events in the Iclusig [ponatinib] arm of the trial.***
> I think it is almost -- it doesn't really matter how many events that
> we have seen.  I think the situation is now that ***we have a higher
> concern about those events, vascular events in particular, now
> that we are in the new regulatory situation that we sit in.*** We
> have a visibility on those events that has grown. The events can
> accumulate over time and I think in the context of that, that makes

it a clear decision from the patient safety and also development point of view to terminate the trial. It is really difficult to think about a rate and obviously, the PACE trial is a much more mature trial than the EPIC trial was.

295.     Additionally, Berger confirmed that the reduction in the official trial dose in the EPIC study from 45 mg to 30 mg, which the Company had announced a week earlier on October 9, 2012, had ultimately contributed to the termination of the EPIC trial:

> Let me start, if I could, to address part of it and then I will let the team respond because I think it is very important that we address this.  ***The EPIC trial -- as of last week, once it became clear that 45 milligrams was not going to be the going-forward dose, certainly in the newly diagnosed patients, the EPIC trial from that moment on could not be used as the basis of approval.***

296.     In other words, the Defendants' decision to use 45 mg as the official trial dose in its EPIC trial had backfired.  Defendants had selected the 45 mg dose for EPIC knowing that PACE 2 data collected by ARIAD and submitted to the FDA reflected an incidence rate of adverse events that was 2 to 9 times higher than the incidence rate of adverse events observed with a 30 mg dose.  On the other hand, Defendants also knew and stated that a "win" against Gleevec on an efficacy basis in the two-arm EPIC trial was very important to ARIAD—or, as Berger said in June 2013, "How important is the understatement of the year…. And yes, we do have to win at that trial."  Furthermore, in advance of the October 2013 disclosures, Defendants had publicly stated their belief that higher dosage levels of ponatinib led to increased efficacy. For example, Haluska had stated a year earlier, in October 2012: "What we find that the most important predictor in this analysis, statistical significance for response is dose intensity. Patients who got the most drug did best."

297.     J.P. Morgan's October 18, 2013 report stated, "*After last week's safety*

*update/implosion, and now this, we can't in good faith continue to tell people to buy this name*

*and are stepping to the sidelines until we can get more clarity on the future of this drug.*"

298.     Oppenheimer's October 20, 2013 report expressed broad frustration with

Defendants:

> No faith in management.  *Management had repeatedly asserted*
> *safety concerns for Iclusig [ponatinib] were a Wall Street*
> *misconception.  Given their history of what we feel have been*
> *misleading communications regarding the safety of Iclusig*
> *[ponatinib], we believe management credibility represents an*
> *outsized risk for investment in ARIA.*

299.     On the October 18, 2013 disclosures, ARIAD's share price again plummeted,

from a prior day close of $4.50 to close at $2.67—wiping out *41%* of ARIAD's equity value.

**C.     The Full Truth Is Revealed: The October 31, 2013 Form 8-K and Press**
**Release**

300.     On October 31, 2013, before the market opened, the Company issued a Form 8-K

and appended press release.  The press release announced that in response to a request by the

FDA, ARIAD was "temporarily suspending the marketing and commercial distribution" of

ponatinib.

301.     The FDA separately issued its own press release, which included new, dire

statistics:

> approximately *24 percent* of patients (nearly 1 out of 4) in the
> Phase 2 clinical trial (median treatment duration 1.3 years) and
> approximately *48 percent* of patients in the Phase 1 clinical trial
> (median treatment duration 2.7 years) have experienced serious
> adverse vascular events, including fatal and life-threatening heart
> attack, stroke, loss of blood flow to the extremities resulting in
> tissue death, and severe narrowing of blood vessels in the
> extremities, heart, and brain requiring urgent surgical procedures
> to restore blood flow.  In some patients, fatal and serious adverse
> events have occurred as early as *2 weeks* after starting Iclusig
> [ponatinib] therapy… *At this time, FDA cannot identify a dose*

> *level or exposure duration that is safe.*
>
> In the Phase 2 clinical trial, adverse events affecting the blood vessels that supply the heart, brain, and extremities were observed in 12 percent, 6 percent, and 8 percent of patients, respectively. ***Patients with and without cardiovascular risk factors, including patients in their 20s, have experienced these events.*** Serious adverse reactions involving the eyes, which led to blindness or blurred vision, occurred in Iclusig [ponatinib] treated patients. High blood pressure occurred in ***67 percent*** of patients treated with Iclusig [ponatinib] in the clinical trials. Heart failure, including fatalities, occurred in 8 percent of patients treated with the drug.

302.   The FDA safety announcement further warned: "Health care professionals should not start treating new patients with Iclusig [ponatinib] unless no other treatment options are available and all other available therapies have failed." From a drug that Defendants had touted as "first-in-class" and a prime contender for front-line approval, ponatinib was now relegated to a drug of last resort.

303.   Analysts were blunt in their negative assessments.

304.   An October 31, 2013 report issued by RBC Capital Markets remarked, "Today's development continues to put ARIA into a deeper hole and ***each time it seems it is worse than what we are led to believe***."

305.   RBC Capital then focused on the FDA letter, and the FDA's "very negative" stance, which suggested to the analyst that the FDA thought that a safe dose might never be found. RBC remarked that the suspension "will be a 'spooky' surprise to investors as most were just expecting a quick label change."

306.   William Butler, in its analyst report published on October 31, 2013, picked up on the suggestion of a causal link between ponatinib and serious adverse cardiovascular events in the FDA letter ("the increasing rate and pattern of events 'strongly suggest' that they are drug-

related"), and that the FDA had stated that it could not identify a dose level or exposure duration that was safe.

307.    In response to this ultimate disclosure, the Company's stock price tumbled once again, sliding from its prior day closing price of $3.96 per share down to a Class Period low of $2.20—representing a *44%* single-day loss of value to shareholders.

308.    In sum, Defendants' false and misleading statements and omissions caused ARIAD's common stock to trade at artificially-inflated prices during the Class Period. However, after the revelations described above became known to the market on December 14, 2012, October 9, 2013, October 11, 2013, October 18, 2013, and October 31, 2013, the Company's share price fell $22.96—or *91%*—from its Class Period-high closing price of $25.16 per share on October 5, 2012.

## VIII.   POST-CLASS PERIOD EVENTS

### A.      The December 20, 2013 Form 8-K and Press Release

309.    On Friday, December 20, 2013, ARIAD issued a Form 8-K and appended press release announcing that the FDA was allowing the Company to resume marketing and distribution of ponatinib under a revised label. The label included additional language on the risks of vascular occlusive events, and a new warning for heart failure.

310.    A warning labeled "Vascular Occlusion" topped the list of revisions:

> Arterial and venous thrombosis have occurred in at least *27%* of Iclusig [ponatinib] treated patients, including fatal myocardial infarction, stroke, stenosis of large arterial vessels of the brain, severe peripheral vascular disease, and the need for urgent revascularization procedures. ***Patients with and without cardiovascular risk factors, including patients less than 50 years old experienced these events.***

311.    The FDA also required the Company to establish a Risk Evaluation and

Mitigation Strategy ("REMS") program, which the FDA institutes for drugs with significant

toxicity levels and/or demonstrable risk factors.

312.    The revised label also narrowed substantially the population of CML patients

who could use ponatinib.  During a conference call with analysts that day to discuss the new

label, Marty Duvall, ARIAD's Executive Vice President and Chief Commercial Officer,

admitted that the label was in fact narrower than the one approved in December 2012.  Duvall

also confirmed that the drug could no longer be marketed for second line use, and that instead its

use would be relegated to the third and fourth lines of a very narrow and specific population.

313.    Contemporaneous with ARIAD's announcement, the FDA documented the

results of its independent safety analysis in a clinical trial memorandum.  The memorandum,

dated December 18, 2013, found "differences with [ARIAD's] approach to describing the

frequency and severity of the vascular occlusion events."  In particular, the memorandum noted

that, "some of the serious events, including stroke, had been characterized in PACE 2 as grade 1

(mild)."  The memorandum also noted "limitations on the use of investigator's attribution of

'drug-relatedness,' in a setting where there was no control arm or masking/blinding of the

treatment assignments."  Finally, the memorandum concluded that "similar rates of serious

vascular events have not been observed in several other drugs of this class."

      **B.**      **January 2014 *Journal of the American Medical Association* Article Confirms "No Safe Duration" and "No Risk Free Users" for Ponatinib**

314.    The January 22, 2014 issue of the *Journal of the American Medical Association*

published an article entitled "The Accelerated Approval of Oncologic Drugs: Lessons From

Ponatinib."  The article, authored by two doctors with the Medical Oncology Service of the

National Cancer Institute (part of the National Institutes of Health, the world's largest medical

research institution, operated by the U.S. government), noted that ponatinib's Phase 1 trial

results, which were published just one month before ponatinib's FDA approval and reported data

with a median follow-up of 56 weeks, "reported little evidence of vascular adverse events and

did not mention thrombosis or stroke."  But the withdrawal of ponatinib from the market, based

on a slightly longer median follow-up of 1.3 years in the Phase 2 study, showed that 24% of

patients experienced "myocardial infarction, stroke, limb ischemia, and stenosis of vessels to the

heart, extremities, and brain, prompting urgent revascularization."  Moreover, "[w]ith a median

follow-up of 2.7 years, the phase 1 study reported adverse vascular events in approximately 39

participants (48%)."

315.    The article disputed Defendants' contentions that underlying pre-existing

cardiovascular risk factors were to blame for ponatinib's side effects, and pointed out that

adverse effects started soon after patients started taking the drug, stating:

> Although it has been suggested that underlying cardiovascular risk
> factors were responsible for these events, this is unlikely because
> these vascular events were not apparent in late phase trials of other
> TKIs in similar patients. Moreover, there was **no safe duration
> noted for ponatinib and no risk free users.  Events occurred as
> soon as 2 weeks after starting the drug among patients without
> cardiovascular risk factors or those in their 20s.**

316.    While the Phase 1 study of ponatinib reported *no* arterial thrombosis adverse side

effects at approximately 1.1 years, the Phase 2 trial reported a 24% rate of significant vascular

adverse effects at just 1.3 years, and the Phase 1 trial ultimately reported a 48% rate of adverse

vascular events at a median follow-up of 2.7 years.  Regarding this dramatic difference, the

JAMA article stated:

> [P]onatinib raises the issue of appropriate adverse event reporting.
> The most important aspect of the phase 1 study of ponatinib was
> that there were no reports of arterial thrombosis with a median
> follow-up of 56 weeks.  At 2.7 years, this complication affected an

estimated 39 patients (48%). This difference is unlikely to have a biological basis but is more likely a consequence of failure to link thrombosis to the study medication and the possibility that adverse events increase over time. Failing to see a pattern generally is unusual in medicine. However, with the increasingly fragmented and multicenter nature of commercial phase 1 testing, almost no physician participating in these studies would have the opportunity to detect a pattern, because individual physicians provide care for just a few patients in a trial before it is closed to accrual. This places a greater burden on the investigators to examine the data closely for adverse events.

317.    Of course, as discussed above in Section III.I.3, Defendants received study-wide data through constantly-updated reports and databases that they tracked closely, and consequently, had no excuse for not seeing a pattern of cardiovascular events.

## IX.    ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER

318.    At all relevant times, the Individual Defendants acted with scienter in making materially false and misleading statements during the Class Period. Each of the Individual Defendants had actual knowledge that the statements made by him were false and misleading, or with respect to statements of present or historical fact, acted at least with deliberate reckless disregard for the truth or falsity of those statements. Each of the Individual Defendant's intent to deceive, or deliberately reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter. As alleged herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding ARIAD, their control over, and/or receipt and/or modification of ARIAD's allegedly materially false and/or misleading misstatements participated in the wrongful scheme alleged herein.

A. **Defendants Knew of the Issues Surrounding Ponatinib**

1. **Ponatinib Was the Company's Most Critical Product During the Class Period**

319.    During the Class Period, ARIAD's core business consisted of designing and sponsoring clinical trials to support FDA registration to commercially market ponatinib. As discussed in Section III.D.2, *supra*, there were only two drugs aside from ponatinib in ARIAD's pipeline. One of the two, ridaforolimus, was denied FDA approval on risk-benefit grounds. The other, "113," was promising, but substantially lagged ponatinib in the clinical trial process, and thus could provide no near-term revenue stream.

320.    Further evidencing the centrality of ponatinib to ARIAD's business, ARIAD had undertaken to raise half a billion dollars in just over a year via two stock offerings. The Company stated in filings with the SEC that it had earmarked the proceeds expressly for funding clinical trial studies and post-approval marketing of ponatinib.

321.    Indeed, Defendant Berger himself confirmed that ponatinib was the core of the Company. When asked in an October 2012 interview what events had "driven the success" of the increase in ARIAD's share price from $1.50 in 2009 to over $20 in October 2012, Berger responded, in part: "Most of that has been driven by the success of ponatinib and the compelling clinical data that we presented earlier this year at the American Society of Clinical Oncology. . ." (Interview with PropThink published October 5, 2012).

322.    Further, analysts who followed the Company ascribed ARIAD's market valuation principally to ponatinib:

- "Ponatinib – nearly 80% of the company's value – is more likely to meet primary endpoints of response rates among CML patients." (Feb. 24, 2012 Maxim Group analyst report).

- "Our price target is based on a probability-adjusted net present value (NPV) analysis. We assume $2.3bn peak sales for Iclusig

> [ponatinib] and 86% probability of success in Iclusig's
> [ponatinib's] front-line EPIC trial. We assume ~$260mn peak
> sales for '113 and 53% probability of success.  Applying a 10%
> discount rate, we arrive at fair value of $25 per share."
> (June 10, 2013 Barclay's analyst report)

- "We believe the main driver of the stock is still ponatinib."
  (Oct. 1, 2012 Maxim Group analyst report).

### 2.    The Individual Defendants Closely Monitored the Company's Clinical Trial Results Relating to Ponatinib

323.    The Individual Defendants closely monitored data from the Company-sponsored

trials and data from who purchased ponatinib subsequent to its limited approval in December

2012, as shown by the following facts:

(a)    In ARIAD's May 9, 2012, Q1 2012 Earnings Call, an analyst asked

whether ARIAD yet had the interim trial results for PACE 2.  Clackson responded that "we're in

the process of collecting, QCing, processing the data ready for that final analysis."

(b)    In ARIAD's June 11, 2013 appearance at the Goldman Sachs Healthcare

Conference, Berger stated that he and Haluska received safety data "recurrently" from the data

safety monitoring board ("DSMB") tasked with overseeing safety data in EPIC:

> We get reports from the DSMB and we get blinded serious adverse
> event reporting, so we have a handle on what's really important.
> And the highly detailed analysis comes recurrently from the
> DSMB.
> ….
> Which I see and Frank Haluska, our Chief Medical Officer, sees.
> The rest of the Company doesn't, but we do.

(c)    In ARIAD's August 7, 2013, Q2 2013 earnings call, Clackson responded

to a question regarding safety data in the EPIC trial: "Safety is monitored on an ongoing basis."

(d)    In ARIAD's June 20, 2013 Annual Shareholder Meeting, in which

Defendants Berger and Haluska participated, ARIAD's Senior Vice President of Commercial

Operations Martin Duvall stated that the Company tracked number of pills dispensed per

prescription, as well as prescription size: "[w]e actually have fractional bottles that we track each and every day… So we have a very, very high degree of awareness of those facts."

(e)    Regarding the ponatinib trial data, CW2 described Haluska as "keeper of the data."

324.    Analysts corroborated that the Individual Defendants tracked the data on a continual, daily basis.

(a)    In an analyst report published on March 27, 2013, BMO Capital Markets stated:

> We had the opportunity to talk with Ariad's CEO Dr. Harvey Berger late yesterday to review recent concerns regarding IMS prescription data for ICLUSIG [ponatinib], breadth of proposed ICLUSIG [ponatinib] labeling in the EU, and expectations for ALK/EGFR inhibitor AP26113 in NSCLC. Importantly, while the shares have been under pressure on this week's IMS TRX data, ***Dr. Berger highlighted good visibility on ICLUSIG [ponatinib] daily data to the patient level***, confidence in continued launch momentum, and breadth of ICLUSIG [ponatinib] use across community and academic centers, by line of therapy and independent of mutation status.

(b)    In an analyst report published on April 8, 2013, JP Morgan stated:

> Efficacy may trump all, but Iclusig's [ponatinib's] safety appears relatively benign so far. Safety does indeed remain a key point of contention. ***Importantly, management noted that they have real time access to everything that their field force is seeing and remain very comfortable with Iclusig's [ponatinib's] safety profile.*** Similar to the drug's clinical experience, nothing particularly disconcerting has stood out in the commercial setting.

### B.    Confidential Witnesses Confirm that Defendants Tracked Ponatinib Clinical Trial Data, Including Adverse Events and Dosage Levels

325.    As set forth above in Sections III.I.3 and III.I.4, former employees of the Company stated that Defendants tracked the data from clinical trials of ponatinib as it was generated, including data regarding both adverse events and dosage levels:

(a)      CW6 stated that the team that put the August 2013 report together was led by Haluska, among others.  CW6 added that Haluska led meetings with the FDA concerning the August 2013 Interim Report.

(b)      CW3 prepared patient profiles for each of the 449 PACE 2 patients.  CW3 stated that one could determine from the patient profiles the particular dose that was being used for each patient at any given time, and whether a patient's dosage profile had changed and by what amount.  CW3 said that CW3 provided snapshot data for each patient with a profile every two weeks in a separate snapshot presentation to the clinical team, which CW3 stated included Haluska.

(c)      CW7 stated that the study site data that ARIAD's Electronic Data Capture vendor captured included the medications being taken by a particular trial patient and adverse events.  With respect to Defendants' access to such study site data, including adverse event data, CW7 stated that a Data Manager passed the study site data obtained from the Electronic Data Capture vendor to ARIAD's statistics team.  ARIAD's statistics team further reviewed the data and added tables and graphs.  CW7 said that ARIAD's statistics team then passed the study site data on to ARIAD's Chief Medical Officer (Haluska), who, in turn, reported the results to ARIAD's CEO (Berger).

(d)      CW4 confirmed that adverse events were tracked by ARIAD in their RAVE database, and that all of the clinical sites had databases that "fed into" ARIAD's RAVE database.

(e)      CW4 additionally stated that dosage data was available within ARIAD's database and that dosage reports were run regularly, as "dosage reports are very relevant to any clinical trial."

(f)     CW1 stated that, in August 2013, Defendant Haluska, among others, prepared the interim report to the FDA.  According to CW1, ARIAD's issues in the fall of 2013 were triggered by this August 2013 report to the FDA.  CW1 also stated that a majority of the doctors at M.D. Anderson Cancer Center were continuing to administer 30 mg instead of 45 mg doses of ponatinib to their patients.  CW1 stated that CW1 learned of the dose reductions from the doctors administering the doses at M.D. Anderson and communicated what s/he learned to ARIAD in roughly May of 2013.  According to CW1, even prior to ARIAD's submission of the August 2013 Interim Report to the FDA, ARIAD and the FDA began to discuss launching a new trial designed to evaluate a 30 mg dose of ponatinib.

(g)     CW5 stated that ARIAD additionally tracked adverse events relating to ponatinib via a telephone reporting system.

### C.     Defendants Were Required to Monitor Adverse Events

326.     Federal regulations further stipulated the following with respect to safety reporting responsibilities for clinical trial sponsors such as ARIAD of investigational new drugs ("INDs") such as ponatinib:

> The sponsor must notify FDA and all participating investigators (*i.e.*, all investigators to whom the sponsor is providing drug under its INDs or under any investigator's IND) in an IND safety report of potential serious risks, from clinical trials or any other source, as soon as possible, but in no case later than 15 calendar days after the sponsor determines that the information qualifies for reporting under paragraph (c)(1)(i), (c)(1)(ii), (c)(1)(iii), or (c)(1)(iv) of this section.

> 21 C.F.R. § 312.32 (c)(1).

### D.     The Individual Defendants Each Profited From Class Period Stock Sales Timed to Precede the October 2013 Disclosures

327.     During the Class Period, the Individual Defendants engaged in stock sales that were suspiciously-timed and dramatically out of line with their prior trading practices.  Indeed,

the four Individual Defendants Class period stock sales amount to an excess of **$28 million** compared to pre Class Period sales of just $666,000 – an increase of 4,100%.

> ### 1. The Amount and Percentage of Shares Defendants Sold During the Class Period Was Extraordinary and Also Inconsistent with Their Prior Trading History

328.    To evaluate the Individual Defendants' selling activity, Plaintiffs used the publicly-available trading data that is required to be reported to the SEC on Form 4s.  In collaboration with a university professor of finance with an expertise in insider trading, Plaintiffs analyzed the trading by insiders that occurred during the Class Period (689 days) and during the period immediately preceding the Class Period (also 689 days) beginning January 21, 2010 and ending December 11, 2011 (the "Control Period").  The ARIAD Form 4s filed during the Class Period and Control Period are hereby incorporated herein by reference.

329.    To analyze the Individual Defendants' sales, Lead Plaintiffs calculated the total sales by each of the Individual Defendants, together with the cash proceeds from such sales, during the Control Period and Class Period.  Those totals were then compared, to identify whether the Individual Defendants' sales during the Class Period were consistent with their sales during the Control Period.  These analyses reveal that Individual Defendants' Class Period sales were extremely large and highly unusual.

330.    The Individual Defendants' Class Period stock sales were not only large in absolute terms, but also inconsistent with the Individual Defendants' own prior selling activity during the Control Period.

331.    Lead Plaintiffs calculated the Individual Defendants' sales measured against their shareholdings during both Control and Class periods.  To provide a more detailed and complete picture, Individual Defendants' shareholdings are computed both at the beginning as well as the end of each period.

332.     Berger's sales during the Class Period totaled $16,964,700,[3] which represented between 46%[4] (based on beginning the Class Period) and 89% (based on end of Class Period) of the total common shares he had available.[5]  During the Control Period, Berger did not sell a single share of Company stock.  Thus, Berger's sales during the Class Period are unusual both in dollar and percentage terms, and also out of line with prior selling activity.

333.     Clackson's sales during the Class Period totaled $6,360,528, which represented between 191% (based on beginning of Class Period) and 101% (based on end of Class Period) of the total shares he had available.[6]  Thus, Clackson's sales during the Class Period are unusual both in dollar and percentage terms relative to shares held.  Clackson's trading also increased dramatically relative to Control Period, increasing more than *1,036%* from $560,123 during the Control Period to over $6.3 million during the Class Period.  Therefore, Clackson's Class Period sales are also out of line with prior selling activity.

334.     Fitzgerald's sales during the Class Period totaled $4,083,153, which represented between 241% (based on beginning of Class Period) and 99% (based on end of Class Period) of the total shares he had available.[7]  Thus, Fitzgerald's sales during the Class Period are unusual

---

[3] This number does not include sales by Berger where the beneficial recipient was a third party, *i.e.*, his wife or daughter ("indirect transactions").  Berger's Class Period sales including indirect transactions were $17,592,898.  These numbers include sales for tax purposes.

[4] Percentages are rounded up to the nearest whole number for values great than 0.51% and rounded down to the nearest whole number for values below 0.50%.

[5] Berger sold 906,848 shares during the Class Period.  His shareholdings amounted to 1,938,140 shares at the beginning of the Class Period and 1,017,760 shares at the end of the Class Period.  Thus, his sale of 906,848 shares corresponds to 46% (906,848 / 1,938,140) of his holdings at the beginning of the Class Period, and 89% (906,848 / 1,017,760) of his holdings at the end of the Class Period.

[6] Clackson sold a total of 374,981 shares during the Class Period, while his shareholdings amounted to 196,318 shares at the beginning of the Class Period and 370,451 shares at the end of the Class Period.  Thus, his sale of 374,981 shares corresponds to 191% (374,981 / 196,318) of his holdings at the beginning of the Class Period, and 101% (374,981 / 370, 451) of his holdings at the end of the Class Period.

[7] Fitzgerald sold a total of 225,902 shares during the Class Period, while his shareholdings amounted to 93,880 shares at the beginning of the Class Period and 228,243 shares at the end of the Class Period.

both in dollar and percentage terms relative to shares held. Fitzgerald's trading also increased dramatically, increasing more than *5,100%* from $78,120 during the Control Period to over $4 million during the Class Period. Therefore, Fitzgerald's Class Period sales are also out of line with prior selling activity.

335.    Finally, Haluska's sales during the Class Period totaled $1,003,787, which represented between 248% (based on beginning of Class Period) and 71% (based on end of Class Period) of the total shares he had available.[8] Thus, Haluska's sales during the Class Period are unusual both in dollar and percentage terms relative to shares held. Haluska's individual sales increased dramatically during the Class Period, from less than $30,000 during the Control Period to over $1 million during the Class Period, an increase of more than *3,400%*. Therefore, Haluska's Class Period sales are also out of line with prior his selling activity.

336.    Lead Plaintiffs also computed Defendants percentage sales after taking into account their vested restricted stock and vested options positions. The results once again demonstrate dramatic contrast between the Class Period and the Control Period, and they are strongly supportive of scienter.

337.    Berger's sales during the Class Period totaled between 34% (based on the beginning of the Class Period) and 49% (based on the end of the Class Period) of all equity held, including vested options. Berger did not have any sales in the Control Period. Thus, Berger's sales during the Class Period are unusual in percentage terms relative to equity held.

---

Thus, his sale of 225,902 shares corresponds to 241% (225,902 / 93,880) of his holdings at the beginning of the Class Period, and 99% (225,902 / 228,243) of his holdings at the end of the Class Period.

[8] Haluska sold a total of 59,274 shares during the Class Period, while his shareholdings amounted to 23,865 shares at the beginning of the Class Period and 83,507 shares at the end of the Class Period. Thus, his sale of 59,274 shares corresponds to 248% (59,274 / 23,865) of his holdings at the beginning of the Class Period, and 71% (59,274 / 83,507) of his holdings at the end of the Class Period.

338.    Clackson's sales during the Class Period totaled between 74% (based on the beginning of the Class Period) and 61% (based on the end of the Class Period) of all equity held including vested options.  In stark contrast, Clackson's sales during the Control Period totaled only between 19% (at the beginning of the Control Period) and 14% (at the end of the Control Period) of all equity held including vested options.  Comparing these percentages, Clackson's sales increased about **_4-fold_** from the Control Period to the Class Period.

339.    Fitzgerald's sales during the Class Period totaled between 51% (based on the beginning of the Class Period) and 41% (based on the end of the Class Period) of all equity held, including vested options.  In stark contrast, Fitzgerald's sales during the Control Period only totaled between 2.9% (based on the beginning of the Control Period) and 2.3% (based on the end of the Control Period) of all equity held including vested options.  Comparing these percentages, Fitzgerald's sales increased between **_17-fold to 18-fold_** from the Control Period to the Class Period.  This is a whopping increase by any measure.

340.    Haluska's sales during the Class Period totaled between 156% (based on the beginning of the Class Period) and 35% (based on the end of the Class Period) of all equity held, including vested options.  In stark contrast, Haluska's sales during the Control Period only totaled between 17% (based on the beginning of the Control Period) and 12% (based on the end of the Control Period) of all equity held including vested options.  Comparing these percentages, Haluska's sales increased between **_3-fold to 9-fold_** from the Control Period to the Class Period.  Once again, these are whopping increases by any measure.

341.    Stock sales by the Individual Defendants were not only large in absolute terms as well as percentage terms, during the Class Period, but also extraordinary when compared to the Defendants' own prior selling activity.  Collectively, the Individual Defendants' sales increased

by more than **4,100%** during the Class Period, from approximately $666,000 during the Control

Period to over **$28 million** during the Class Period.

2.      **The Individual Defendants' Stock Sales in Terms of Shares Sold**
        **Were Unusual and Inconsistent With Their Prior Trading Practices**

342.    The contrast between the Individual Defendants' sales during the Control Period

and the Class Period is also striking when measured in shares, rather than dollars.  Collectively,

the Individual Defendants increased their stock sales 19-fold, from 83,795 shares to more than

1.5 million shares.  By this measure, the Individual Defendants collectively increased their sales

by more than 1,700%.  Berger sold more than 900,000 shares, after having failed to sell a single

share during the Control Period.  Defendants Clackson, Fitzgerald and Haluska increased their

shares sold by more than 400%, 2,100%, and 1,200%, respectively.

3.      **The Individual Defendants' Sales Were Suspiciously Large**
        **Compared to their Share Acquisitions**

343.    Plaintiffs also analyzed what proportion of their ARIAD stock acquisitions the

Individual Defendants sold during the Control Period and the Class Period.  First, none of these

Defendants purchased even a single share using their personal funds during the Class Period.

However, at various times they were either given stock awards, or they exercised their option

awards to acquire shares.  This is what the term "acquisitions" refers to, as used below.

344.    Berger "acquired" 441,254 shares during the Control Period, yet he did not sell a

single one of those shares during the Control Period.  In sharp contrast, during the Class Period,

Berger acquired 658,457 shares, yet he sold 906,848 shares, or 138% of his acquisitions.  This

complete reversal of selling pattern provides strong support for scienter.

345.    Clackson acquired 160,334 shares and sold 69,328 shares during the Control

Period, or 43% of his share acquisitions.  In sharp contrast, during the Class Period, Clackson

acquired 545,017 shares and sold 374,981 of them, or 69% of his acquisitions—a jump of 60%

from the Control Period.  Once again, the sharp rise in selling pattern provides strong support for scienter.

346.    Fitzgerald acquired 84,334 shares and sold 10,067 shares during the Control Period, or 12% of his acquisitions.  In sharp contrast, during the Class Period, Fitzgerald acquired 357,500 shares and sold 225,902 shares during the Class Period, or 63% of his acquisitions, a jump of more than five-fold.  Once again, the sharp rise in selling pattern provides strong support for scienter.

347.    Haluska acquired 13,334 shares and sold 4,400 shares during the Control Period, or 33% of his acquisitions.  In sharp contrast, during the Class Period, Haluska acquired 118,916 shares and sold 59,274 shares during the Class Period, or 50% of his acquisitions, a jump of more than 50%.  Once again, the sharp rise in selling pattern provides strong support for scienter.

### 4.  Individual Defendants Generated Enormous Abnormal Profits on Their Sales of ARIAD Stock

348.    Plaintiffs further analyzed whether the Individual Defendants' sales of ARIAD stock during the Class Period generated abnormal (above-average) profits.

349.    Abnormal profits were evaluated using a commonly-used event study methodology called the "market-model method," which computes cumulative shareholder returns not explained by market factors.  Under this approach, first, two parameters (called alpha and beta) are estimated using ordinary least squares regression during a time period prior to the period of interest (typically using one year of daily data).  For the purpose of illustration, suppose alpha is estimated as zero and beta as one.  If an insider buys a share of stock which then increases in price from $100 to $120 (up 20%), and the benchmark market index for companies similar to ARIAD increases from 1000 to 1010 (up 1%) during the same period, then

the abnormal profit would be 19%.  In this case 1% of the total return is due to market factor,

while 19% of the total return is considered unusual or abnormal.  Similarly, if a company's stock

price declines 20% subsequent to an insider sale by a greater amount than the relevant

benchmark index (say down 5%), then the sale enabled the insider to generate an abnormal profit

of 15% by avoiding this decline.  This methodology is widely-accepted, having been used

extensively in academic literature studying the stock price reaction to any news announcements

as well as profitability of insider trading.[9]  Abnormal profits were calculated using the Standard

and Poor's 500 index as the market index.  Exactly 250 days of daily data (approximately one

calendar year) immediately preceding the period of interest (Control and Class) were used to

estimate the market model parameters.

350.    Using this methodology, the Individual Defendants each generated extremely

large abnormal profits on their transactions in ARIAD stock during the Class Period. The timing

and extent of the abnormal profits, as well as the contrast between Control Period and Class

Period trades, are reflected graphically in the charts below.  The charts compare trades for the

Control Period and Class Period for each of the Individual Defendants, and depict cumulative

abnormal profit (or loss) on all trades occurring during each period, calculated daily for one to

250 days following the day of trade.  As reflected in the charts below, trades during the Class

Period immediately generated abnormal profits, demonstrating them to be extraordinarily well-

timed from a profitability standpoint and therefore highly suspicious, particularly when

compared to the lack of abnormal profits generated during the Control Period.[10]

---

[9] Exhibit 1, attached hereto, shows a list of 40 academic studies that use the market-model to estimate abnormal returns published in the last three years (2011-2013) in either *Journal of Finance* or *Journal of Financial Economics*.

[10] Berger did not have any Control Period trading, and therefore there is no Control Period depiction in his chart.  His Class Period profitability, therefore, is extremely abnormal as his cumulative abnormal profit during the Class Period is off the charts, while his Control Period sales are zero.  Berger's direct



**Event Days Relative to the Insider Trading Day (0)**

and indirect transactions were considered when calculating his abnormal profitability as he still benefitted from these abnormal returns, albeit indirectly.



Event Days Relative to the Insider Trading Day (0)



Event Days Relative to the Insider Trading Day (0)





351.    As is clear from the charts, the Individual Defendants' Class Period trades were, for them, well-timed.  Collectively, the four Defendants have earned abnormal returns of 6.2%, 10.0%, 15.5%, 23.5%, and 30.0% after 10, 20, 30, 40 and 50 days respectively, immediately following the insider trading days.  For the Individual Defendants, abnormal profits earned in this manner exceeded 16% for Berger, 13% for Fitzgerald, 11% for Haluska and 18% for Clackson during the 30 days immediately following the insider trading day.  During 50 days following the insider trading days, abnormal profits exceeded 39%, 26%, 17%, and 25% for Berger, Fitzgerald, Haluska and Clackson, respectively.  In contrast, there was no abnormal profitability for the four Individual Defendants during the Control Period.

352.    To determine whether these unusual profits were the result of random chance, Plaintiffs used a robust estimation method, clustering abnormal returns for each trader.  The abnormal returns from the market-model for the 250 trading days before and up to 250 trading days after the day of the trade were averaged across each event day for each Defendant.  This data was then used to compute a t-statistic to infer the probability that the observed cumulative abnormal profits were due to random chance.  Using this robust method, it is clear that the possibility that these abnormal profits resulted from random chance is less than 1 percent.

### 5.    Individual Defendants Suspiciously Exercised Their Employee Stock Options Early, Then Immediately Sold The Shares

353.    Under normal circumstances (absent material and adverse inside information), it does not make any economic sense for anyone to early-exercise their executive compensation options for a stock that does not pay any dividends such as ARIAD stock.  This is because at the time of grant, exercise price equals the current stock price, intrinsic value is zero, and 100% of the value of the option comes from so-called time-value, namely the possibility that the stock price might increase during the long-life of the option, typically ten years.  Over time, if the

stock price rises, some of the value comes from immediate exercise value (intrinsic value) and some or most of will still be time-value.  At the time of maturity, when the options expire, the situation will completely reverse, 100% of the value will be intrinsic value (if any), and time-value will be zero.

354.    For executive compensation options (on non-dividend paying stocks such as ARIAD), it is always better for executives to hold on to their options until maturity.  However, there is one big exception to this rule: ***Material adverse inside information***.  Suppose that insiders expect the stock price to collapse by the end of the year because of adverse inside information.  In this case, it might be better to sacrifice the time value of the option, exercise the option early, receive the stock, and then immediately sell the stock before the stock price collapses.

355.    During the Class Period, two Individual Defendants early-exercised their options by sacrificing time value, received the ARIAD stock and then immediately sold the stock to get out before the stock prices collapsed.   Haluska early exercised 10,500 options (and then immediately sold the stock acquired) even though these options still had more than 6 years of life in them.  By exercising early, Haluska avoided a potential loss of between 80% and 90% of the value of his options.  In contrast, Haluska did not early-exercise any of his options during the Control Period.

356.    During the Class Period, Clackson also early-exercised 232,577 options (and then immediately sold the stock acquired) even though these options still had between three months and 7 years of life in them.  By exercising early, Clackson avoided a potential loss of between 80% and 90% of the value of his options.  In contrast, Clackson did not early-exercise any of his options during the Control Period.

**6.     The Individual Defendants Suspiciously Adopted 10b5-1 Plans During the Class Period; Those Plans Do Not Insulate Individual Defendants' Trading Behavior**

357.    In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade.

358.    The SEC also created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 plans"). *See id*. at 51,727-28. Pursuant to SEC Rule 10b5-1(c), a 10b5-1 plan is a potential defense to accusations of insider trading *only* if it is entered into by an insider "*before becoming aware*" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

359.    Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith." Thomson West, Corporate Counsel's Guide to Insider Trading and Reporting § 12:26 (2006). Conversely, the adoption and/or modification of these plans while in possession of material, non-public information is highly suspicious and supportive of scienter.

360.    As discussed below, while some of the Individual Defendants' stock sales were made pursuant to 10b5-1 plans, in each case the circumstances of those sales are sufficiently suspicious to overwhelm any inference that they were made in good faith.

361.    Sales pursuant to a trading plan should occur with a prescribed, regular pattern of stock sales—for example, 500 shares a month on the 10th day of the month. First, Clackson did not sell a single share under any 10b5-1 plan during the Control Period. Second, Clackson initially adopted a 10b5-1 plan on December 22, 2011, exactly 10 days into the Class Period and at a time when Clackson was already in possession of material, non-public information, as

alleged herein.  In these circumstances, even trades according to a 10b5-1 plan are highly suspicious and indicative of insider trading behavior.

362.    Furthermore, Clackson sold irregular amounts of shares at irregular intervals under this "plan," including 92,936 shares on February 14, 2012; 15,333 shares 38 days later on March 23, 2012; 33,561 shares just three days later on March 26, 2012; 5,200 shares just eight days later on April 3, 2012; 31,600 shares just 10 days later on April 13, 2012; 20,000 shares 19 days later on May 2, 2012; 23,234 shares 89 days later on July 30, 2012; and 36,843 shares just 16 days later on August 15, 2012.

363.    Then, on December 20, 2012, only days after the FDA approved ponatinib with a black box warning, Clackson entered a new 10b5-1 plan.  Clackson continued with irregular sales at irregular intervals under the "new plan" with 9,838 shares 74 days later on March 4, 2013; 14,000 shares 136 days later on July 18, 2013; and 8,449 shares 50 days later on September 6, 2013.

364.    Similarly, Fitzgerald did not sell a single share under any 10b5-1 plan during the Control Period.  Like Clackson, however, Fitzgerald adopted 10b5-1 plan on December 22, 2011, ten days into the Class Period, at a time when Fitzgerald was already in possession of material, non-public information.  In these circumstances, even trades according to this 10b5-1 plan are highly suspicious and indicative of insider trading behavior.

365.    As if the enactment of a 10b5-1 plan *after* the start of the Class Period were not suspicious enough, Fitzgerald's trading evidences two other peculiarities.  First, every sale not under the plan is arbitrarily labeled as a sale to satisfy tax requirements.  Despite the sale being for "tax purposes" Fitzgerald still chooses to execute such sales and reaps the benefits therefrom at opportune times and while in possession of material, adverse non-public information.  Second,

Fitzgerald sold irregular amounts of shares at irregular intervals, including the following: 12,933 shares on March 23, 2012, 92 days after adopting the plan; 5,200 shares just 11 days later on April 3, 2012; 40,000 shares 14 days later on April 17, 2012; 25,000 shares 76 days later on July 2, 2012; and 25,000 shares 91 days later on October 1, 2012.

366.    Berger's trading suffers from similar irregularities to that of Defendants Clackson and Fitzgerald.  While Berger did not trade a single share under any 10b5-1 plan during the Control Period, Berger reported a number of sales pursuant to a 10b5-1 plan that he entered into during the last part of December 2012, when as alleged herein, Berger was already in possession of material, non-public information.  Additionally, Berger's sales pursuant to that plan are irregular in amount.  Specifically, Berger reported sales of directly-held stock pursuant to his late-December 2012 10b5-1 plan on the following dates and in the following amounts: 50,000 shares on March 12, 2013; 50,000 shares on March 13, 2013; 100,000 shares on April 17, 2013; 50,000 shares on May 14, 2013; 37,098 shares on May 15, 2013; 5,800 shares on June 19, 2013; 144,000 shares on July 16, 2013; and 50,000 shares on July 17, 2013, 50,000 shares on August 13, 2013; and 62,902 shares on August 14, 2013.  Thus, the amounts traded under Berger's plan are irregular and do not appear to follow a pattern, ranging from several 50,000-share trades, to a 37,098-share trade, to a 144,000-share trade.  In these circumstances, even trades according to a 10b5-1 plan are highly suspicious and indicative of insider trading behavior.

367.    Similar to Clackson and Fitzgerald, Haluska adopted two 10b5-1 plans during the Class Period, both at times when he was in possession of material nonpublic adverse information, as alleged herein.  Specifically, Haluska adopted the first 10b5-1 plan on December 22, 2011, ten days into the Class Period, and the second on December 20, 2012, 374 days into the Class Period.  Further, like Clackson and Fitzgerald, Haluska traded irregular amounts of

shares at irregular intervals pursuant to these plans.  For example, Haluska reported a "plan" sale of 3,000 shares 95 days after he adopted his December 22, 2011 plan on March 26, 2012.  He then reported a sale of 4,250 shares eight days later on April 3, 2012 and 3,000 shares 29 days later on May 2, 2012.   On December 20, 2012, 232 days later, Haluska filed a new plan, pursuant to which he sold 6,400 shares 210 days later on July 18, 2013.

368.    10b5-1 plans are under heavy scrutiny from the SEC in light of a recent *Wall Street Journal* investigation that found that insiders who were trading pursuant to 10b5-1 plans were still trading at opportune times and reaping better-than-expected results.  According to the November 27, 2012 *Wall Street Journal* article entitled "Executives' Good Luck in Trading Own Stock," executives trading pursuant to 10b5-1 plans are still able to time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.

369.    With regard to such trading plans, a December 13, 2012 *Wall Street Journal* article entitled "SEC Draws Fire Over Executive Trading Plans," notes "[i]n building this 'safe harbor' for executives, the SEC has unwittingly given them a defense for unethical behavior." According to one source cited in the article, "[c]ompanies are using these plans as a tool . . . that allows executives to do insider trading."

370.    Indeed, according to a report issued by Wilson Sonsini in March 2013, "[t]he floodlights now aimed at such plans are the result of recent *Wall Street Journal* articles showing that corporate insiders, even those executing trades pursuant to Rule 10b5-1 plans, have generated significant profits – or avoided significant losses – by trading company stock in the days just before their companies issued market-moving news."

371.    The report recommends that clients avoid multiple trading plans, as well as frequent modifications, and suggests clients adopt "[s]imple plans with a prescribed, regular pattern of stock sales (*e.g.*, 1,000 shares a month on the 15th day of the month)."

372.    Further, though the Individual Defendants filed Forms 4 disclosing their trades and indicating that certain of them were made pursuant to 10b5-1 plans, no further information is available on the plans.  Without discovery, investors cannot understand the details pertaining to the plans' creation and amendments, whether any trades pursuant to the plans were canceled, or what criteria, such as share price, may have triggered sales pursuant to the plans.

### 7.    ARIAD's Heavily Incentives-Loaded Executive Compensation Provided Additional Incentives to Withhold Adverse Information

373.    The Individual Defendants' compensation structure emphasizes incentives based payoffs.  Total compensation consists of three components, 1) base salary, 2) annual performance awards (with a one-year lag), and 3) long-term equity incentives awards (again with a one-year lag).  ARIAD used "performance multipliers" which provide additional payoff ranging from 0-160% for base salary and 0-200% for incentive based component to help meet and exceed performance targets.  An example of these performance targets is regulatory approval as soon as possible.

374.    Specifically, ARIAD in their 2012 proxy stated[11]:

> The long-term equity incentive awards to our executive officers made in March 2012 for 2011 performance and in March 2011 for 2010 performance were in the form of stock options, restricted stock units and performance shares, divided approximately equally in terms of value among the three.  The stock options and restricted stock units vest ratably over three years.  The performance shares will vest only if we achieve the specific performance objective stated in the awards.  For the awards made in March 2011, the performance objective is regulatory approval

---

[11] ARIAD 2012 Schedule 14-A, filed with the SEC on April 30, 2012, at 29.

by the U.S. Food and Drug Administration (FDA), prior to the end of 2016, to market ponatinib, with the vesting schedule dependent on when prior to the end of 2016 such approval is obtained.  For the awards made in March 2012, the performance objective is regulatory approval by the EMA, prior to the end of 2016, to market ponatinib in the European Union, with the number of shares and vesting schedule dependent on when prior to the end of 2016 such approval is obtained.  As no amount was recorded on our financial statements for these awards as per ASC Topic 718, the Summary Compensation Table does not reflect the value of these equity awards.  If approvals from the FDA or the EMA are not obtained prior to the end of 2016, ***these awards will terminate and have no value***."

375.     In 2013, based on 2012 performance, including FDA approval of ponatinib[12] for sale to limited indications in December 2012,[13] all named Defendants received performance based equity awards multiple times their base salary; Berger received more than $7 million, while his base compensation was $751,000, Clackson received $2.3 million in equity grants against a base salary of $493,000, Fitzgerald received $2.2 million in equity grants against a base salary of $466,000, and Haluska received $1.3 million in equity grants against a base salary of $427,000.  Consequently, it is in their personal interest for the Individual Defendants to ensure that maximum levels of the performance targets were met.

376.     The Individual Defendants also knew that releasing adverse information promptly would have led to regulatory reviews, lost sales and reduced stock prices immediately, thus impairing their incentive compensation component where they made most of their money.  Instead, the longer they withheld the adverse information, sales and stock prices would remain high, thereby providing them with additional years of high level compensation.  This evidence provides additional support for a strong inference of scienter.

---

[12] ARIAD 2013 Schedule 14-A, filed with the SEC on April 29, 2013, pp.28.
[13] EMA approved Iclusig in March 2013.

## X.     LOSS CAUSATION

377.    The market price of ARIAD common stock was artificially inflated by the false and misleading statements and material omissions complained of herein, including ARIAD's misleading statements and omissions about the safety profile, dosing levels and commercial prospects of ponatinib.

378.    The Class Period inflation in ARIAD's stock price was removed when the conditions and risks concealed by Defendants' scheme were revealed or otherwise materialized to the market.  The information was disseminated through partial disclosures on December 14, 2012, October 9, 2013, October 11, 2013, and October 18, 2013, that revealed *some* of the true nature of ARIAD's developing troubles with ponatinib.  These disclosures, more particularly described above, reduced the price of ARIAD common stock, causing economic injury to Lead Plaintiffs and other members of the Class.

379.    However, the corrective impact of the disclosures on December 14, 2012, October 9, 2013, October 11, 2013, and October 18, 2013 was tempered by Defendants' continued false and misleading statements about their confidence in ponatinib's safety and ARIAD's ability to meet FDA expectations and gain front-line approval.  These continued misrepresentations maintained the price of ARIAD stock at a level that was inflated by the fraud, inducing Class members to continue purchasing shares in ARIAD even after the December 14, 2012, October 9, 2013, October 11, 2013, and October 18, 2013 disclosures.

380.    The full truth was finally revealed on October 31, 2013, when the market learned that ARIAD had suspended marketing of ponatinib for its approved limited indications.

## XI.    <u>CLASS ACTION ALLEGATIONS—APPLICABLE TO ALL CLAIMS</u>

381.    Lead Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class of

all persons and entities who purchased or otherwise acquired: (1) ARIAD's securities during the Class Period; and (2) ARIAD's common stock issued on or about January 24, 2013 under the Registration Statement for the Secondary Offering (the "2013 Stock Offering"), and were damaged thereby.

382.    Excluded from the Class are: (1) Defendants; (2) members of the immediate families of the Defendants; (3) the subsidiaries and affiliates of Defendants and ARIAD; (4) any person or entity who is a partner, executive officer, director or controlling person of ARIAD, or any of its subsidiaries or affiliates, or any Defendant; (5) any entity in which any Defendant or ARIAD has a controlling interest; (6) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (7) the legal representatives, heirs, successors and assigns of any such excluded party.

383.    The members of the Class are so numerous that joinder of all members is impracticable.  As of October 31, 2013, ARIAD had 185 million shares of common stock issued and outstanding.  Throughout the Class Period, ARIAD's common stock was actively traded on the NASDAQ.  While the exact number of purchasers of ARIAD's common stock is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that Class members number in the thousands.

384.    Lead Plaintiffs' claims are typical of the claims of the members of the Class. Lead Plaintiffs and members of the Class acquired ARIAD securities in the market, and sustained damages as a result of Defendants' conduct complained of herein.

385.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that are adverse or antagonistic to the Class.

386.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

387.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the Federal securities laws were violated by Defendants' conduct as alleged herein;

(b)    Whether the Registration Statement and prospectuses for the 2013 Stock Offering, and the documents incorporated therein, contained material misstatements or omitted to state material information;

(c)    Whether Defendants' SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

(d)    Whether and to what extent the market prices of ARIAD stock was artificially inflated during the Class Period due to the non-disclosures and misstatements complained of herein;

(e)    Whether, with respect to Lead Plaintiffs' claims under the Securities Act, the Defendants named in those claims can sustain their burden of establishing an affirmative defense under the applicable statute;

(f)    Whether, with respect to Lead Plaintiffs' claims under the Exchange Act, the Defendants named in those claims acted with scienter;

(g)    Whether, with respect to Lead Plaintiffs' claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act, the Defendants named in those claims were controlling persons of ARIAD during the Class Period;

(h)    Whether, with respect to Lead Plaintiffs' claims under the Exchange Act, reliance may be presumed under the fraud-on-the-market doctrine or the Affiliated Ute doctrine; and

(i)    Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

388.    The names and addresses of those persons and entities that purchased or acquired ARIAD's common stock during the Class Period and in the 2013 Stock Offering are available from the Company's transfer agent(s) or from the Underwriter Defendants.  Notice may be provided to such purchasers and record owners via first-class mail and otherwise, including electronic forms of communication via the internet, using techniques and a form of notice similar to those customarily used and/or approved by courts in securities class actions.

## XII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

389.    The PSLRA's safe harbor provisions for forward-looking statements are only applicable under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

390.    First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact.

391.    Second, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  For example, all of Defendants' statements made during the Class Period regarding regulatory approval for ponatinib were not accompanied by *meaningful* cautionary language because the "risk" they warned of had *already materialized*, as Defendants knew, at the time they made these statements.

392.    Third, such false and misleading statements regarding ponatinib were not accompanied by cautionary language that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings calls, analyst conference or other public statements described herein were general, "boilerplate" statements of risk that would affect any developmental drug company, and

misleadingly contained no factual disclosure of any of the *specific* problems currently affecting the Company during the Class Period or similar important factors that would give investors adequate notice of such risks.

393.     Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of ARIAD who actually knew that each such statement was false and/or misleading when made.  For example, at the time such statements were made, Defendants knew that ponatinib presented a substantial risk for serious ischemic events and venous occlusions because Defendants were aware of the undisclosed, adverse, material facts detailed above in ¶¶ 148 and 271 among others.

## XIII.   PRESUMPTION OF RELIANCE UNDER THE *AFFILIATED UTE* DOCTRINE AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE WITH RESPECT TO THE EXCHANGE ACT CLAIMS

394.     Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

395.     In the alternative, Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because:

(a)     ARIAD's common stock was actively traded on the NASDAQ, an open, well developed, and efficient market, throughout the Class Period;

(b)      ARIAD's common stock traded at high weekly volumes during the Class Period;

(c)      As a regulated issuer, ARIAD filed periodic public reports with the SEC;

(d)      According to the Company's Class Period SEC filings, the Company was considered a "well-known seasoned issuer" as defined in Rule 405 of the Securities Act of 1933 and meets the registration requirements of SEC Form S-3;

(e)      ARIAD regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(f)      The market reacted promptly to public information disseminated by ARIAD; and

(g)      ARIAD securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms, including RBC Capital Markets (Canada), UBS Research, William Blair & Co., Cowen & Co., Oppenheimer & Co., JP Morgan, Credit Suisse North America, Barclays, Banc of America Merrill Lynch, and Citi. Each of these reports was publicly available and entered the public marketplace.

## XIV.   CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I

#### For Violation of § 10(b) of the Exchange Act
#### and Rule 10b-5 Against ARIAD and the Individual Defendants

396.     Lead Plaintiffs incorporate by reference and reallege each and every allegation

contained above as if fully set forth herein.

397.     During the Class Period, ARIAD and the Individual Defendants carried out a

plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:

(i) deceive the investing public regarding ARIAD's business, operations, management and the

intrinsic value of ARIAD's securities; (ii) enable ARIAD and the Individual Defendants to

artificially inflate the price of ARIAD's securities; and (iii) cause Lead Plaintiffs and other

members of the Class to purchase ARIAD's securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, ARIAD and the Individual Defendants took the actions set forth herein.

398.    ARIAD and the Individual Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ARIAD's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  ARIAD and the Individual Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

399.    ARIAD and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the truth about data being generated by ARIAD's clinical trials of ponatinib, as specified herein.

400.    ARIAD and the Individual Defendants are liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above.

401.    ARIAD is further liable for the false and misleading statements made by the Individual Defendants, as well as by ARIAD's officers, management, and agents in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the maker of such statements and under the principle of respondeat superior.

402.    In addition to the duties of full disclosure imposed on ARIAD and the Individual Defendants as a result of the affirmative statements and reports made by the Individual

Defendants, or participation in the making of their affirmative statements and reports to the investing public, ARIAD had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations, including truthful, complete, and accurate information with respect to the Company's operations and financial condition so that the Company's share price would be based on truthful, complete and accurate information.

403.    In particular, In addition, Defendants violated Item 303, which is described above in ¶ 176.

404.    First, as set forth above in Section III.I, developing clinical trial data, including the eleven months of safety data that was later collected into the August 2013 Interim Report, showed that PACE 2 patients were experiencing adverse events relating to use of the drug— including serious adverse cardiovascular events—and that these events were known to management.  Second, ponatinib's centrality to ARIAD's business and commercial prospects, as further discussed above in Section IX.A, establishes that this trend was "reasonably likely to have material effects on [ARIAD's] financial condition or results of operations."

405.    Accordingly, pursuant to Item 303, Defendants were required to disclose: (i) that the incidence of adverse cardiovascular events in PACE 2 had or was reasonably expected to have a "material … unfavorable impact on … revenues," and (ii) to what extent that trend had impacted or was reasonably expected to impact ARIAD's revenue.  Nevertheless, Defendants failed to disclose any of this information in the 2011 10-K, 2012 10-K, or any of ARIAD's other Class Period public filings or statements.

406.    The allegations above establish a strong inference that ARIAD, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management, and agents had

actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis. By concealing these material facts from investors, ARIAD maintained its artificially inflated share price throughout the Class Period.

407.    In ignorance of the fact that ARIAD's share price was artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by ARIAD and the Individual Defendants, or upon the integrity of the market in which the stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by ARIAD and the Individual Defendants but not disclosed in public statements by ARIAD and the Individual Defendants during the Class Period, Lead Plaintiffs and the other members of the Class purchased or acquired ARIAD securities during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of ARIAD stock as the truth about the Company's practices was revealed.

408.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs, the other members of the Class, and the marketplace known the truth about ponatinib, Lead Plaintiffs and other members of the Class would not have purchased or acquired their ARIAD securities, or, if they had purchased or acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

409.    By virtue of the foregoing, ARIAD and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

410.     As a direct and proximate result of ARIAD's and the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of ARIAD securities during the Class Period.

## COUNT II
### For Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

411.     Lead Plaintiffs incorporate paragraphs 1 through 410 by reference.

412.     The Individual Defendants acted as controlling persons of ARIAD within the meaning of Section 20(a) of the Exchange Act.

413.     During the Class Period, the Individual Defendants, as senior executive officers of ARIAD, were privy to confidential and proprietary information concerning ARIAD, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material, adverse, non-public information concerning ARIAD, as discussed in detail above.  Because of their positions with ARIAD, the Individual Defendants had access to non-public information about the Company's business, finances, and future business prospects through access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and through reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or as to statements of historic fact at least recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

414.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior

executive officers and/or directors, were "controlling persons" within the meaning of Section

20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in

the unlawful conduct complained of herein.   Because of their positions of control, the Individual

Defendants were able to, and did, directly or indirectly, control the conduct of ARIAD's

business.

415.    The Individual Defendants, because of their positions with the Company,

controlled and/or possessed the authority to control the contents of ARIAD's reports, press

releases, and presentations to securities analysts and, through them, to the investing public.  The

Individual Defendants were provided with copies of the Company's reports and press releases

alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and

opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual

Defendants had the opportunity to commit the fraudulent acts alleged herein.

## PART TWO: THE STRICT LIABILITY AND
## NEGLIGENCE CLAIMS UNDER THE SECURITIES ACT

416.    Lead Plaintiffs assert the following claims against the Defendants specified

below, for violations of §§ 11 and/or 15 of the Securities Act, 15 U.S.C. §§ 77k and 77(o), on

behalf of all persons and entities, other than the Defendants and certain related persons and

entities, who purchased or acquired shares of ARIAD's common stock pursuant or traceable to

the January 24, 2013 secondary offering of 15,307,000 shares of ARIAD common stock priced

at $19.60 per share, conducted pursuant to the registration statement and prospectus supplement

dated January 24, 2013, and the prospectus dated December 14, 2011 filed with the SEC (the

"2013 Stock Offering"), and were damaged thereby.[14]  The date of the 2013 Stock Offering—

---

[14] Lead Plaintiffs do not assert at this time a claim under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), in this Consolidated Complaint but put ARIAD, the Officer Defendants, and the

and not the prior date of its associated registration statement—was the "effective date" of the registration statement for purposes of Section 11 liability under 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).  The registration statement, together with the prospectus supplement, prospectus, as well all SEC filings incorporated therein, are collectively referred to herein as the "Offering Materials."

417.    Lead Plaintiffs do not allege or intend to allege any claims or assertions of fraud in connection with their claims in this section of the Complaint, which are rooted exclusively in theories of innocent and/or negligent conduct to which the strict liability provisions of the §§ 11 and/or 15 apply, except that any challenged statements of opinion or belief made in connection with the 2013 Stock Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the offering.

## I.    JURISDICTION AND VENUE

418.    The claims asserted herein arise under and pursuant to §§ 11 and 15 of the Securities Act, 15 U.S.C. § 77k and 77o.

419.    This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v.

420.    Venue is proper in this District pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v; ARIAD is headquartered in this District.

421.    Many of the acts and omissions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of the materially untrue and misleading Offering Materials, took place in this District.

---

Underwriter Defendants on notice that, if warranted by the facts and circumstances, they may assert such a claim at a later date.

422.    In connection with the allegations herein, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## II.    PARTIES RELATING TO THE SECURITIES ACT CLAIMS

### A.    Lead Plaintiffs

423.    Lead Plaintiffs are defined in Part One, Section II.A above, which is incorporated by reference.

### B.    The Securities Act Defendants

#### 1.    The Company

424.    The Company, ARIAD, is defined in Part One, Section II.B.1 above, which is incorporated by reference.

#### 2.    The Officer Defendants

425.    The following defendants are collectively referred to as the "Officer Defendants":

(a)    Harvey J. Berger ("Berger") was Chairman and Chief Executive Officer ("CEO") of the Company at the time of the 2013 Stock Offering.   Berger signed the registration statement in connection with the 2013 Stock Offering.  Berger also signed the Company's 2011 Form 10-Ks and 10-Qs that were incorporated by reference into the Offering Materials.

(b)    Edward M. Fitzgerald ("Fitzgerald") was Executive Vice President and Chief Financial Officer ("CFO") of the Company at the time of the 2013 Stock Offering. Fitzgerald signed the registration statement in connection with the 2013 Stock Offering. Fitzgerald also signed the Company's 2011 Form 10-Ks and 10-Qs that was incorporated by reference into the Offering Materials.  Fitzgerald also signed the Form 10-Qs and current reports on Form 8-K that were incorporated by reference into the Offering Materials.

### 3. The Director Defendants

426.    The following defendants are collectively referred to as the "Director

Defendants":

(a)    Jay R. LaMarche ("LaMarche") is a director of the Company. LaMarche

signed the Registration Statement in connection with the 2013 Stock Offering.

(b)    Athanase Lavidas, Ph.D. ("Lavidas") is a director of the Company.

Lavidas signed the Registration Statement in connection with the 2013 Stock Offering.

(c)    Massimo Radaelli, Ph.D. ("Radaelli") is a director of the Company.

Radaelli signed the Registration Statement in connection with the 2013 Stock Offering.

(d)    Norbert G. Riedel, Ph.D. ("Riedel") is a director of the Company. Riedel

signed the Registration Statement in connection with the 2013 Stock Offering.

(e)    Robert M. Whelan, Jr. ("Whelan") is a director of the Company. Whelan

signed the Registration Statement in connection with the 2013 Stock Offering.

(f)    Wayne Wilson ("Wilson") is a director of the Company. Whelan signed

the Registration Statement in connection with the 2013 Stock Offering.

### 4. The Underwriter Defendants

427.    The following defendants are collectively referred to as the "Underwriter

Defendants."

(a)    J.P. Morgan Securities LLC served as an underwriter and/or selling agent

in connection with the 2013 Stock Offering. J.P. Morgan Securities LLC also served as a Joint

Book-Running Manager in connection with the 2013 Stock Offering.

(b)    Cowen and Company, LLC served as an underwriter and/or selling agent

in connection with the 2013 Stock Offering. Cowen and Company, LLC also served as a Joint

Book-Running Manager in connection with the 2013 Stock Offering.

(c)      Jefferies & Company, Inc. served as an underwriter and/or selling agent in connection with the 2013 Stock Offering.  Jefferies & Company, Inc. also served as a Joint Book-Running Manager in connection with the 2013 Stock Offering.

(d)      BMO Capital Markets Corp. served as an underwriter and/or selling agent in connection with the 2013 Stock Offering.  BMO Capital Markets Corp. also served as a Co-Manager in connection with the 2013 Stock Offering.

(e)      Leerink Swann LLC served as an underwriter and/or selling agent in connection with the 2013 Stock Offering.  Leerink Swann LLC also served as a Co-Manager in connection with the 2013 Stock Offering.

(f)      RBC Capital Markets, LLC served as an underwriter and/or selling agent in connection with the 2013 Stock Offering.  RBC Capital Markets, LLC also served as a Co-Manager in connection with the 2013 Stock Offering.

(g)      UBS Securities LLC served as an underwriter and/or selling agent in connection with the 2013 Stock Offering.  UBS Securities LLC also served as a Co-Manager in connection with the 2013 Stock Offering.

428.    The Company, the Officer Defendants, the Director Defendants, and the Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

## III.    FACTUAL ALLEGATIONS RELATING TO THE SECURITIES ACT CLAIMS

### A.    ARIAD and the Development of Ponatinib

429.    ARIAD is a developmental biotechnology company that discovers and markets cancer drugs.  ARIAD devoted its resources principally to developing, seeking FDA approval for, and marketing ponatinib, an internally-discovered tyrosine kinase inhibitor ("TKI") designed to combat chronic myeloid leukemia ("CML").  ARIAD's goal was to ultimately obtain approval for front-line use of ponatinib – a market worth over $1 billion dollars in sales annually.  In

order to obtain their goal of front-line use of ponatinib, ARIAD had to show that the drug was just as effective and just as safe, if not more so, than its competitors.

430.    ARIAD sponsored its first clinical trial of ponatinib in 2008 ("PACE 1").  PACE 1 was a Phase 1, dose-finding clinical trial, in which ARIAD tested escalating doses of ponatinib on human subjects.  Via PACE 1, ARIAD settled on 45 mg per day as the maximum tolerated dose of ponatinib ("MTD").

431.    In July 2010, ARIAD initiated a Phase 2 clinical trial of ponatinib ("PACE 2"). PACE 2 was a single arm trial designed to assess the efficacy and safety of ponatinib in a larger subject group.  The test protocol provided that test subjects were to receive the MTD daily dose of 45 mg.

432.    From May to July 2012, ARIAD applied to the FDA for accelerated approval to market ponatinib to treat TKI-resistant/intolerant CML.

433.    In support of its FDA application, ARIAD submitted a report to the FDA containing updated interim data from PACE 2 that had a cutoff date of July 23, 2012 (the "July 2012 Interim Report").  The results of the July 2012 Interim Report, which showed an increase in both adverse and "serious" adverse cardiovascular events in patients taking ponatinib, publicly came to light for the first time in December 2012 as a result of the FDA's approval of ponatinib for limited indications with a black box warning for such events on the label.

434.    On July 27, 2012, ARIAD initiated the "EPIC" trial.  EPIC was a randomized Phase 3 clinical trial of ponatinib that was designed to support FDA approval of ponatinib in newly-diagnosed, never-treated CML patients, a.k.a., "front-line" CML.  EPIC's trial protocol specified that, as with PACE 2, EPIC trial subjects would receive the PACE 1 MTD of 45 mg per day.

435.    On December 14, 2012 ARIAD received accelerated approval to market

ponatinib for treatment of TKI-resistant/intolerant CML (*i.e.*, second-line use) which was based

on the results of the July 2012 Interim Report.  In connection with this approval, the FDA

required ARIAD to include a black box warning label on each bottle of ponatinib that stated, in

relevant part:

> ***Cardiovascular, cerebrovascular, and peripheral vascular thrombosis, including fatal myocardial infarction and stroke*** have occurred in Iclusig[ponatinib]-treated patients.  In clinical trials, ***serious arterial thrombosis occurred in 8%*** of Iclusig[ponatinib]-treated patients.  Interrupt and consider discontinuation of Iclusig [ponatinib] in patients who develop arterial thrombotic events.

436.    As a condition of approval, the FDA required ARIAD to submit follow-up data

from PACE 2 subjects.

437.    In August 2013, ARIAD submitted a report containing follow-up data from

PACE 2 to the FDA which included data from August 2012 through August 2013 (the "August

2013 Report").  Data contained in the August 2013 Report showed that the rate of serious

arterial thrombosis associated with ponatinib had increased from 8% to 11.8% in the time since

the July 2012 Interim PACE 2 Report.

438.    Based on the data from the August 2013 Report, in October 2013, the FDA

placed a hold on enrollment in clinical trials of ponatinib, terminated the EPIC trial, and

suspended marketing of ponatinib for its approved indication.  In taking these drastic measures,

the FDA stated that:

> approximately ***24 percent*** of patients (nearly 1 out of 4) in the Phase 2 clinical trial (median treatment duration 1.3 years) and approximately ***48 percent*** of patients in the Phase 1 clinical trial (median treatment duration 2.7 years) have experienced serious adverse vascular events, including ***fatal and life-threatening heart attack, stroke, loss of blood flow to the extremities resulting in***

***tissue death, and severe narrowing of blood vessels in the extremities, heart, and brain requiring urgent surgical procedures to restore blood flow***.  In some patients, fatal and serious adverse events have occurred as early as ***2 weeks*** after starting Iclusig [ponatinib] therapy…***the increasing rate and pattern of the events strongly suggests that many are drug-related***.  At this time, FDA cannot identify a dose level or exposure duration that is safe.

In the Phase 2 clinical trial, adverse events affecting the blood vessels that supply the heart, brain, and extremities were observed in 12 percent, 6 percent, and 8 percent of patients, respectively.  Patients with and without cardiovascular risk factors, including patients in their 20s, have experienced these events.  Serious adverse reactions involving the eyes, which led to blindness or blurred vision, occurred in Iclusig [ponatinib]-treated patients.  High blood pressure occurred in 67 percent of patients treated with Iclusig [ponatinib] in the clinical trials.  Heart failure, including fatalities, occurred in 8 percent of patients treated with the drug.

**B.**     **The 2013 Stock Offering**

439.     On or about January 24, 2013, ARIAD conducted the 2013 Stock Offering, a public offering of 15,307,000 shares of ARIAD stock at $19.60 per share.

440.     The 2013 Stock Offering raised $310 million for the Company.  The Company's press release filed on January 24, 2013 announcing the offering stated that those proceeds were intended to "enable ARIAD to support sales, marketing, manufacturing and distribution of Iclusig (ponatinib)."

441.     The 2013 Stock Offering was conducted pursuant to a shelf registration statement filed with the SEC on Form S-3 and dated December 14, 2011, a Prospectus dated December 14, 2011, and a Prospectus Supplement dated January 24, 2013, as well as a number of SEC filings that were incorporated by reference into the Prospectus and the Prospectus Supplement.

442.     The shelf registration statement was signed by Officer Defendants Berger and Fitzgerald.

443.    The shelf registration statement was also signed by Director Defendants

LaMarche, Lavidas, Radaelli, Riedel, Whelan, and Wilson who were directors of the Company

at the time that the 2013 Stock Offering became effective.

444.    Underwriter Defendants J.P. Morgan Securities LLC, Cowen and Company,

LLC, Jefferies & Company, Inc., BMO Capital Markets Corp., Leerink Swann LLC, RBC

Capital Markets, LLC, and UBS Securities LLC served as the underwriters for the 2013 Stock

Offering.  J.P. Morgan Securities LLC, Cowen and Company, LLC and Jefferies & Company,

Inc. acted as joint book-running managers for the 2013 Stock Offering.  BMO Capital Markets

Corp., Leerink Swann LLC, RBC Capital Markets, LLC, and UBS Securities LLC acted as Co-

Managers for the 2013 Stock Offering.

445.    The total number of shares that each of the Underwriter Defendants sold is set

forth in the table below:

| Underwriter Defendant | Shares Sold |
|---|---|
| J.P. Morgan Securities LLC | 4,081,867 |
| Cowen and Company, LLC | 4,081,866 |
| Jefferies & Company, Inc. | 4,081,867 |
| BMO Capital Markets Corp. | 765,350 |
| Leerink Swann LLC | 765,350 |
| RBC Capital Markets, LLC | 765,350 |
| UBS Securities LLC | 765,350 |
| **Total** | **15,307,000** |

**C.      Statements Relating to Cardiovascular Safety Issues, Dosing, and Ponatinib's
Likelihood to Be Approved for Front-Line Use**

446.    Data collected by ARIAD from the PACE 2 clinical trial reflected that ponatinib

caused cardiovascular events, including increasingly serious cardiovascular adverse events, in

trial subjects throughout 2012 and into January 2013.

447.    Data collected by ARIAD from the PACE 2 clinical trial reflected that the drug could not be tolerated at the prescribed and most effective 45 mg dose because there was a significant increase in adverse events correlated with use of the 45 mg dose.  73% of patients required a dose modification and the majority of patients received a dose closer to the less effective 30 mg and 15 mg doses.

448.    The PACE 2 data, which linked the 45 mg trial dose to a higher incidence of adverse events and showed that the majority of subjects could not tolerate the most effective 45 mg dose, increased the risk that ponatinib would not be approved for the lucrative front-line use that the Company depended on, because ARIAD's front-line EPIC trial dose was 45 mg.

449.    ARIAD made statements regarding the safety profile of ponatinib, the 45 mg dose and the Company's prospects of obtaining front-line use of ponatinib throughout 2012 and January 2013 in filings submitted to the SEC that were incorporated by reference into the Offering Materials.  As further specified, in Sections IV.A, IV.B, and IV.C, *infra*, these statements omitted the above information in ¶¶446-448, which was material to investors and which rendered the statements made misleading.

## IV.    UNTRUE STATEMENTS AND OMISSIONS OF MATERIAL FACT

450.    With respect to the 2013 Stock Offering, the Prospectus Supplement expressly incorporated by reference the following documents filed with the SEC:

(a)    ARIAD's Form 10-K for the fiscal year ended December 31, 2011, filed on February 29, 2012, as amended by the Company's Form 10-K/A filed on March 30, 2012;

(b)    ARIAD's quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2012, filed on May 9, 2012;

(c)    ARIAD's quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2012, filed on August 9, 2012;

(d) ARIAD's quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2012, filed on November 9, 2012;

(e) The portions of ARIAD's current reports "deemed to be filed" on Form 8-K, filed on February 15, 2012, February 28, 2012, May 9, 2012, June 4, 2012, June 6, 2012, June 19, 2012, June 26, 2012, July 27, 2012, July 30, 2012, August 2, 2012, August 30, 2012, September 19, 2012, October 1, 2012, October 24, 2012, November 7, 2012, December 11, 2012, December 17, 2012, January 8, 2013, and January 24, 2013.

(f) The portions "deemed to be filed" of ARIAD's definitive Proxy Statement on Schedule 14A, filed on April 30, 2012.

451. None of the Securities Act Defendants believed or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were fully accurate and complete in all material respects.

452. The Offering Materials contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. Those untrue statements and omissions included the following:

A. **Cardiovascular Safety Issues**

1. **The 2011 10-K**

453. The 2011 10-K filed on March 30, 2012 stated with respect to the PACE 2 study: "The data also show that ponatinib continues to be well-tolerated by patients in the study" and "Initial safety data showed ponatinib to be well tolerated."

454. These two statements were materially untrue and omitted to state material facts required to be stated or necessary to make the statements regarding ponatinib's safety data not misleading, as described above in Section III.C, including that the drug was not "well tolerated"

because patients in the PACE 2 study were increasingly experiencing cardiovascular adverse events relating to the drug, including serious adverse cardiovascular events.

455.    In addition, under Item 1.A. "Risk Factors," the 2011 10-K included a section titled "Risks Relating to Regulatory Approvals, Pricing and Reimbursement."  This section stated, in relevant part:

> We, the FDA or other foreign governmental agencies could delay, suspend or halt our clinical trials of a product candidate for numerous reasons, including:
> ….
> **the product candidate <u>may</u> have unforeseen adverse side effects,** including fatalities, or a determination may be made that a clinical trial presents unacceptable health risks;
> ….
> **Our failure, or the failure of our collaborators, to adequately demonstrate the safety and efficacy of a product candidate in clinical development <u>could</u> delay or prevent obtaining marketing approval of the product candidate** and, after obtaining marketing approval, **data from post-approval studies <u>could</u> result in the product being withdrawn from the market**, either of which would likely have a material adverse effect on our business.

456.    The above-emphasized statements were materially false and/or omitted to state material facts required to be stated or necessary to make them not misleading because use of the words "may" and "could" suggested that the described scenarios had not already graduated in likelihood from a risk to a certainty, which they had, as described above in Section III.C.

## 2.    <u>The August 9, 2012 and November 9, 2012 10-Qs</u>

457.    The August 9, 2012 and November 9, 2012 10-Qs both stated with respect to the PACE 2 study: "The most common adverse events considered related to ponatinib included thrombocytopenia, rash, dry skin, abdominal pain, and headache." (Aug. 9, 2012 10-Q at 12; Nov. 9, 2012 10-Q at 17).

458.    These statements were materially untrue and omitted to state material facts required to be stated or necessary to make the statements regarding ponatinib's safety data not

misleading, as described above in Section III.C, including the PACE 2 safety data contained in

the July 2012 Interim Report, that patients were increasingly experiencing cardiovascular

adverse events relating to use of the drug, including serious adverse cardiovascular events.

### 3. The June 4, 2012 and June 19, 2012 Form 8-Ks and Press Release

459. The June 4 and 19, 2012 Form 8-Ks and appended Press Releases both stated the

following with regards to the safety profile of ponatinib:

> *Safety profile* (N=449)
>
> *Updated safety data show ponatinib to have a favorable profile in these heavily pretreated patients.*
>
> *The most common adverse events considered related to ponatinib included thrombocytopenia (in 35% of patients), rash (32%), dry skin (30%), abdominal pain (22%), and headache (18%).* Elevated serum lipase, fatigue and arthralgia were observed less frequently.
>
> The incidence of pancreatitis across the study and including all grades was 6%. Pancreatitis was previously determined to be the dose-limiting toxicity of ponatinib in the Phase 1 trial.
>
> *"These updated findings of the PACE trial show beneficial responses and an increasing molecular response rate to ponatinib,"* said Frank G. Haluska, M.D., Ph.D., senior vice president and chief medical officer of ARIAD. *"Importantly, these data provide clear evidence of a favorable safety and tolerability profile of ponatinib in resistant or intolerant CML patients. The adverse event profile is similar to what was seen in the earlier Phase 1 study of ponatinib, although the incidence of pancreatitis is less in the PACE trial,"* added Dr. Haluska.

460. The above-emphasized statements were materially untrue and omitted to state

material facts required to be stated or necessary to make the statements regarding ponatinib's

safety profile not misleading, as described above in Section III.C. In particular, the statements

omitted any mention of the safety information contained in the July 2012 Interim Report,

including that the safety profile was not "favorable" because of the increasing incidence of

adverse cardiovascular events relating to use of the drug, including serious adverse cardiovascular events.

### 4. The December 11, 2012 Form 8-K and Press Releases

461. On December 11, 2012 ARIAD filed its Form 8-K appending three press releases. The Press Releases dated December 9, 2012 and December 10, 2012 contained the following statements relating to the safety profile of ponatinib:

(a)    December 9, 2012 Press Release

- The most common non-hematologic treatment-emergent adverse events in the PACE trial included rash (in 38% of patients), abdominal pain (38%), headache (35%), dry skin (35%), and constipation (34%), with the majority of these being grades 1 or 2 in severity.

- The most common hematologic treatment-emergent adverse events were thrombocytopenia (42%), neutropenia (24%), and anemia (20%), which were primarily grades 3 or 4 in severity.

- Pancreatitis and pneumonia were the most common non-hematologic treatment-emergent serious adverse events (5% each), followed by abdominal pain (4%), myocardial infarction (3%), congestive heart failure (3%), atrial fibrillation (3%), and pyrexia (3%). The most common hematologic serious adverse events were anemia, febrile neutropenia, and thrombocytopenia (3% each).

(b)    The December 10, 2012 Press Release

- The most common non-hematologic treatment-related adverse events [in Phase I] in all patients in this trial included rash (42%), arthralgia (20%), increased lipase (20%), fatigue (19%) and dry skin (19%), with the majority of these being grades 1 or 2 in severity. The most common hematologic treatment-related adverse events included thrombocytopenia (34%), neutropenia (14%) and anemia (12%), with thrombocytopenia and neutropenia being primarily grades 3 or 4 in severity.

- The most common non-hematologic treatment-emergent adverse events [in Phase 2] all patients in the PACE trial included rash (38%), abdominal pain (38%), headache (35%),

dry skin (35%), and constipation (34%), with the majority of these being grades 1 or 2 in severity.

- The most common hematologic treatment-emergent adverse events were thrombocytopenia (42%), neutropenia (24%), and anemia (20%), which were primarily grades 3 or 4 in severity.

- Pancreatitis and pneumonia were the most common non-hematologic treatment-emergent serious adverse events (5% each), followed by abdominal pain (4%), myocardial infarction (3%), congestive heart failure (3%), atrial fibrillation (3%), and pyrexia (3%). The most common hematologic serious adverse events were anemia, febrile neutropenia, and thrombocytopenia (3% each).

462.    The foregoing statements were materially untrue and omitted to state material facts required to be stated or necessary to make the statements regarding ponatinib's safety data not misleading, as described above in Section III.C, including the safety data contained in the July 2012 Interim Report, that patients were increasingly experiencing cardiovascular adverse events relating to use of the drug, including serious adverse cardiovascular events.  While the press releases did mention a small incidence of minor cardiovascular events, they did not mention that cardiovascular events were widely prevalent among patients and that several suffered serious adverse cardiovascular events relating to use of the drug.

## 5.    The Prospectus Supplement

463.    As of January 23, 2013, the date of the Prospectus Supplement, the Company had collected an additional six months of data following the July 2012 Interim Report.  This data showed an increase in the number of adverse cardiovascular events.  The January 23, 2013 Prospectus Supplement contained the following statements relating to the safety profile of ponatinib:

On December 14, 2012, we obtained accelerated approval from the U.S. Food and Drug Administration, or FDA, to sell our first new cancer medicine, Iclusig [ponatinib]…The FDA approval of Iclusig [ponatinib] was based on results from the pivotal Phase 2

PACE (Ponatinib Ph+ ALL and CML Evaluation) trial in patients with CML or Ph+ ALL who were resistant or intolerant to prior TKI therapy, or who had the T315I mutation of BCR-ABL…The most common non-hematologic adverse reactions reported (20%) were hypertension, rash, abdominal pain, fatigue, headache, dry skin, constipation, arthralgia, nausea, and pyrexia. Hematologic adverse reactions included thrombocytopenia, anemia, neutropenia, lymphopenia, and leukopenia.

The full prescribing information for Iclusig [ponatinib] includes a boxed warning specifying that arterial thrombosis and hepatotoxicity have occurred in some patients during clinical trials of Iclusig [ponatinib]. Cardiovascular, cerebrovascular, and peripheral vascular thrombosis, including fatal myocardial infarction and stroke, have occurred in Iclusig[ponatinib]-treated patients. Serious arterial thrombosis occurred in 8% of Iclusig-treated patients. In addition, hepatotoxicity, liver failure and death have occurred in Iclusig-treated patients.  (page S-2)

Our future sales of Iclusig depend on numerous factors, including…the safety profile of Iclusig, including whether previously unknown side-effects or increased incidence or severity of known side-effects as compared to those seen during development are identified with the increased use of Iclusig after approval.  (page S-9)

If Iclusig and any of our product candidates are not accepted by patients, physicians and third-party payors, we will not be successful…Physicians and health care payors may conclude that Iclusig or our product candidates are not as safe and/or effective as competing therapies or are not as attractive based on a cost/benefit analysis as alternative treatments.  For example, physicians may elect not to prescribe our drugs, and patients may elect not to request or take them for a variety of reasons, including lower demonstrated or perceived clinical safety and efficacy compared to other drugs; prevalence and severity of adverse events or other side effects; lack of cost-effectiveness; lack of reimbursement availability from third-party payors; a decision to wait for the approval of other therapies that are believed to have significant advantages over our drugs and drug candidates; convenience and ease of administration; other potential advantages of alternative treatment methods; or ineffective marketing and distribution support.  (page S-11).

In addition, physicians and other health care providers may restrict their use of Iclusig due to the inclusion of a warning which is not

present in some other competitive products. The full prescribing information for Iclusig includes a boxed warning specifying that arterial thrombosis and hepatotoxicity have occurred in some patients during our clinical trials of Iclusig. Cardiovascular, cerebrovascular, and peripheral vascular thrombosis, including fatal myocardial infarction and stroke, have occurred in Iclusig-treated patients. Serious arterial thrombosis occurred in 8% of Iclusig-treated patients. In addition, hepatotoxicity, liver failure and death have occurred in Iclusig-treated patients.  (page S-11)

Our failure, or the failure of our collaborators, to adequately demonstrate the safety and efficacy of a product candidate in clinical development could delay or prevent obtaining marketing approval of the product candidate and, after obtaining marketing approval, data from post-approval studies could result in the product being withdrawn from the market, either of which would likely have a material adverse effect on our business.  (page S-26)

464.    The preceding statements from the Prospectus Supplement omitted information that existed at the time the Prospectus Supplement was published, including the increasing incidence of cardiovascular events including serious adverse cardiovascular events experienced by patients in the PACE 2 and EPIC studies, and that these events were related to the use of the drug and not the make-up of the patient population.

**B.    <u>Dose Reduction</u>**

465.    The Offering Materials incorporate by reference the following public filings which contained statements relating to the 45 mg dose for ponatinib.

(a)    June 4, 2012 Form 8-K:

Efficacy data were reported at ASCO on 444 treated patients in six pre-specified cohorts at *45 mg of ponatinib administered orally once daily.*

(b)    June 19, 2012 Form 8-K:

Efficacy data were reported at EHA on 444 treated patients in six pre-specified cohorts receiving *45 mg of ponatinib administered orally once daily.*

(c)    December  11, 2012 Form 8-K:

Efficacy data were reported at ASH on *444 treated patients in six pre-specified cohorts at 45 mg of ponatinib administered orally once daily*, including 267 patients with chronic-phase CML.

(d)     July 27, 2012 Form 8-K:

The EPIC trial is a randomized, two-arm, multicenter trial that compares the efficacy of ponatinib with that of imatinib in adult patients with newly diagnosed CML in the chronic phase… Approximately 500 patients will be randomized 1:1 to *standard doses of ponatinib (45 mg given orally once daily)* or imatinib (400 mg given orally once daily).

(e)     December 17, 2012:

The *recommended dose of Iclusig [ponatinib] is a 45 mg tablet taken once-daily* with or without food.

(f)     January 8, 2013 8-K:

Patients will be switched to *ponatinib (45 mg orally once daily)* based on defined criteria of suboptimal response, treatment failure, or intolerance to first-line therapy…

The *recommended dose of Iclusig [ponatinib] is a 45 mg tablet taken once-daily* with or without food.

(g)     January 24, 2013 8-K:

The *recommended dose of Iclusig [ponatinib] is a 45 mg tablet taken once daily*, with or without food.

(h)     January 24, 2013 Prospectus Supplement:

The *recommended dose of Iclusig [ponatinib] is a 45 mg tablet taken once daily*, with or without food.

466.     These statements were materially untrue and omitted to state material facts required to be stated or necessary to make the statements regarding ponatinib's dose not misleading, as described above in Section III.C, including that the drug was toxic at the 45 mg dose; that the PACE 2 data in the July 2012 Interim Report showed that 73% of PACE 2 patients were given a less efficacious, lower dose in order to reduce adverse events and continue to

tolerate the drug, or taken off ponatinib altogether; that therefore the more effective 45 mg

"recommended dose" was not a feasible dose that could be maintained; and that follow-up data

from the PACE 2 trial showed that patients continued to receive reduced doses of ponatinib, as

confirmed by CWs.

### C.    Material Undisclosed Risk of No FDA Approval for Front-Line Use

467.    The following statements from the Prospectus Supplement contained information

relating to use of ponatinib as a treatment for "front-line" CML:

> Our initial commercial strategy is to position Iclusig [ponatinib] as
> the product of choice for CML and Ph+ ALL patients who are
> resistant or intolerant to TKI therapies.  (page S-3).
>
> As of January 2013, we estimate that global sales of Iclusig
> [ponatinib] for treatment of patients with CML and Ph+ ALL
> patients may reach $1 billion by 2018, subject to the risks and
> cautionary statements set forth in the "Risk factors" section of this
> prospectus supplement." (page S-3) [referring to front-line sales
> projections for ponatinib].

468.    These statements were materially untrue and omitted to state material facts

required to be stated or necessary to make the statements regarding ponatinib's front-line use not

misleading, as described above in Section III.C, including that the drug's potential for front-line

use was dramatically decreasing based on (1) the increasingly negative safety profile relating to

cardiovascular events, and (2) the necessary down-dosing from the more effective 45 mg dose to

the less effective 30 mg and 15 mg doses, which dosage reductions would reduce ARIAD's

chances of beating Gleevec on an efficacy basis in the two-arm EPIC trial, where 45 mg was the

official trial dose.

**D.**    **The Registration and Prospectus Omitted Information Required by Item 303 of Regulation S-K**

469.    The Registration Statement, Prospectus, and Prospectus Supplement were also materially untrue and misleading because they failed to disclose the information required by Item 303.

470.    Item 303 requires issuers to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations...."  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 29, 2003).

471.    First, as set forth above in Section III.C, clinical trial data, including the safety data contained in the July 2012 Interim Report, showed that PACE 2 patients were experiencing adverse cardiovascular events relating to use of the drug, including serious adverse cardiovascular events, and that these events were known to management.  Second, ponatinib's centrality to ARIAD's business and commercial prospects establishes that this trend was "reasonably likely to have material effects on [ARIAD's] financial condition or results of operations."

472.    Accordingly, pursuant to Item 303, Defendants were required to disclose: (i) that the incidence of adverse cardiovascular events in PACE 2 had or was reasonably expected to have a "material … unfavorable impact on … revenues," and (ii) to what extent that trend had

impacted or was reasonably expected to impact ARIAD's revenue.  Nevertheless, Defendants

failed to disclose any of this information in the 2011 10-K.

## V.      CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT III

**For Violation of § 11 of the Securities Act
Against ARIAD, the Officer Defendants,
the Director Defendants and the Underwriter Defendants
In Connection with the 2013 Stock Offering**

473.    Lead Plaintiffs repeat and reallege each of the foregoing paragraphs in Part Two:

The Non-Fraud Claims Under the Securities Act as if fully set forth herein.

474.    The Offering Materials were inaccurate and misleading, contained untrue

statements of material facts regarding the safety of ponatinib, dosages administered in the

PACE 2 and EPIC clinical trials and ponatinib's commercial viability, including for front-line

use, and omitted to state other facts necessary to make the statements made not misleading.

475.    The Securities Act Defendants were responsible for the contents and

dissemination of the Offering Materials issued in connection with the 2013 Stock Offering, and

caused them to be filed with the SEC.

476.    By incorporating the Offering Materials into the Prospectus Supplement for the

2013 Stock Offering, the Securities Act Defendants assumed the duty to provide all material

information about the safety of ponatinib, dosages administered in the PACE 2 clinical trial and

ponatinib's commercial viability.

477.    ARIAD is the registrant for the Stock Offering.  As the issuer of these securities,

ARIAD is liable under § 11 of the Securities Act to the Lead Plaintiffs and members of the Class

who acquired ARIAD stock pursuant or traceable to the false and misleading Offering Materials.

478.     The Securities Act Defendants owed the acquirers of the stock, including the members of the Class who acquired ARIAD common stock pursuant to or traceable to the Offering Materials, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials at the time they became effective, to assure that those statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

479.     All of the Securities Act Defendants either: (a) signed the 2013 Stock Offering Registration Statement and/or the incorporated Offering Materials; (b) were directors of ARIAD at the time the Prospectus was filed with the SEC; and/or (c) served as underwriters for the 2013 Stock Offering.  Further, none of these Defendants made a reasonable investigation or possessed reasonable grounds for believing that the statements contained in the Offering Materials were true and devoid of any misstatements or contained omissions of material fact.  Therefore, all of the Securities Act Defendants are liable under § 11 of the Securities Act to the members of the Class who acquired ARIAD common stock pursuant or traceable to the Offering Materials for the various misstatements and omissions contained therein.

480.     Members of the Class purchased ARIAD common stock pursuant to or traceable to the Offering Materials.  At the time of their purchase of common stock, the members of the Class were without knowledge of the facts concerning the inaccurate and misleading statements and omissions alleged herein.

481.     By reason of the conduct alleged herein, each of the Securities Act Defendants violated § 11 of the Securities Act.  As a direct and proximate result of their conduct, members of the Class have sustained substantial damage in connection with the purchase of the common stock issued pursuant to or traceable to the Offering Materials.

## COUNT IV

### For Violation of § 15 of the Securities Act
### Against the Officer Defendants
### In Connection with the 2013 Stock Offering

482.     Lead Plaintiffs repeat and reallege each of the foregoing paragraphs in Part Two: The Non-Fraud Claims Under the Securities Act as if fully set forth herein.

483.     This Count is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o against the Officer Defendants.

484.     The Officer Defendants exercised direct control over ARIAD by acting as day-to-day managers of ARIAD, and by virtue of their positions as officers of ARIAD.  As a result of the Officer Defendants' actual control over the Company's day-to-day operations, financial statements, public filings and statements, and their intimate involvement and control over the Offering Materials, the Officer Defendants had the power, and exercised the same, to cause ARIAD to engage in the violations of law complained of herein and were able to and did control the contents of the Offering Materials.

485.     As a result of their control over ARIAD, the Officer Defendants are jointly and severally liable with and to the same extent as ARIAD to Lead Plaintiffs and the Class.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on behalf of themselves and the other members of the Class, pray for judgment as follows:

(a)     Declaring this action to be a proper class action pursuant to Rule 23;

(b)     Awarding Lead Plaintiffs and the members of the Class damages and interest;

(c)     Awarding Lead Plaintiffs' reasonable costs, including attorneys' fees; and

(d)     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: March 25, 2014

Respectfully submitted,


  /s/ Jonathan Gardner_____
Jonathan Gardner (admitted *pro hac vice*)
**LABATON SUCHAROW LLP**
Christopher J. Keller (admitted *pro hac vice*)
Eric J. Belfi (admitted *pro hac vice*)
Matthew C. Moehlman (admitted *pro hac vice*)
Carol C. Villegas (admitted *pro hac vice*)
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Emails: ckeller@labaton.com
ebelfi@labaton.com
jgardner@labaton.com
mmoehlman@labaton.com


John C. Browne
Kristin Ann Meister
**BERNSTEIN LITOWITZ BERGER &
   GROSSMANN LLP**
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444
johnb@blbglaw.com
Kristin@blbglaw.com


Ariana J. Tadler (admitted *pro hac vice*)

Melissa Ryan Clark (admitted *pro hac vice*)
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229
atadler@milberg.com
mclark@milberg.com

*Co-Lead Counsel for Lead Plaintiffs and the*
*Proposed Class*


Glen DeValerio (BBO #122010)
**BERMAN DeVALERIO**
One Liberty Square
Boston, MA  02109
Tel: (617) 542-8300
Fax:  (617) 542-1194
gdevalerio@bermandevalerio.com

*Liaison Counsel for Lead Plaintiffs and the*
*Class*


Joseph M. Fisher (BBO # 629024)
**FISHER LAW OFFICES**
94 Station Street
Hingham, MA 02043
Telephone: (781) 740-1140
Fax: (781) 836-4297
legal@lawfisher.com

*Additional Counsel for Lead Plaintiff*
*Joseph Bradley*

## APPENDIX A

AE ................................................................................................................ adverse event

ALL ................................................................................ acute lymphoblastic leukemia

AP-CML ............................................... accelerated phase-chronic myeloid leukemia

ASCO ........................................................... American Society of Clinical Oncology

ASH .................................................................... American Society of Hematology

BCR-ABL ................................................................ break point cluster region-abelson

BP ..................................................................................................................... blast phase

BP-CML ........................................................... blast phase-chronic myeloid leukemia

CCyR ........................................................................ complete cytogenetic response

CDER ................................................... Center for Drug Evaluation and Research

CHR ............................................................................. complete haematologic response

CML ......................................................................................... chronic myeloid leukemia

CMR4.5 ...................................................................... complete molecular response

CP ...................................................................................................................... chronic phase

CP-CML ........................................................... chronic phase-chronic myeloid leukemia

DLT ........................................................................................... dose limiting toxicity

DSMB .................................................................... data safety monitoring board

EAP ............................................................................................ expanded access program

EMA ........................................................................................ European Medicines Agency

EPIC ...................... evaluation of ponatinib versus imatinib in chronic myeloid leukemia trial

FDA ........................................................................ Food and Drug Administration

IND ................................................................................................... Investigational New Drug

IRB ................................................................................................ Institutional Review Board

KOL ................................................................................................... Key Opinion Leaders

**MCyR** ...................................................................................... major cytogenetic response

**MMR** ...................................................................................... major molecular response

**MTD** ...................................................................................... maximum tolerated dose

**NDA** ...................................................................................... new drug application

**PACE** .................................................................. ponatinib Ph+ ALL and CML evaluation trial

**PCyR** ...................................................................................... partial cytogenetic response

**Ph+** ...................................................................................... Philadelphia chromosome positive

**REMS** ...................................................................... risk evaluation and mitigation strategy

**Ph+ALL** ............................. Philadelphia chromosome positive acute lymphoblastic leukemia

**SAE** ...................................................................................... serious adverse event

**TKI** ...................................................................................... tyrosine kinase inhibitor

**USPI** ...................................................................................... U.S. prescribing information

**CERTIFICATE OF SERVICE**

I, Jonathan Gardner, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 25, 2014.

 /s/ Jonathan Gardner
Jonathan Gardner