# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---------------------------------------------------------
In re: ARIAD Pharmaceuticals, Inc. Securities     )
Litigation,                                    ) No. 1:13-cv-12544 (WGY)
                                                      )
---------------------------------------------------------

**<u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>**

**March 6, 2017**

# Table of Contents

**Page**

I.     INTRODUCTION ................................................................................................... 3

II.    QUALIFICATIONS ............................................................................................... 3

III.   SUMMARY OF OPINIONS ................................................................................. 4

IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS ............................. 6

V.     DISCUSSION OF RELIANCE ELEMENT ....................................................... 7

VI.    *CAMMER* FACTORS .......................................................................................... 10

VII.   APPLICATION OF EFFICIENCY FACTORS TO ARIAD COMMON STOCK ... 11

    A.     OVERVIEW ................................................................................................ 11

    B.     *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME .................... 13

    C.     *CAMMER* FACTOR 2: ANALYST COVERAGE ....................................... 15

    D.     *CAMMER* FACTOR 3: MARKET MAKERS ............................................. 17

    E.     *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY ........................... 19

    F.     *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION ............... 20

    G.     ADDITIONAL FACTOR 1: MARKET CAPITALIZATION .................... 34

    H.     ADDITIONAL FACTOR 2: THE BID-ASK SPREAD ........................... 36

    I.     ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP .............. 37

    J.     ADDITIONAL FACTOR 4: AUTOCORRELATION ............................. 38

VIII.  DAMAGES .......................................................................................................... 39

IX.    CONCLUSION .................................................................................................... 40

## I.    INTRODUCTION

1.      My name is Chad Coffman. I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. I have been asked by counsel for the Lead Plaintiffs in this matter to examine and opine on whether the market for ARIAD Pharmaceuticals, Inc. ("ARIAD" or the "Company") common stock ("ARIAD Common Stock") was efficient during the period December 11, 2012 – December 14, 2012 ("Class Period").[1] In addition, I have been asked to opine on whether damages in this matter are subject to a common methodology under Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.      The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $700 per hour for my work on this matter, and my compensation is in no way contingent on the outcome of this case or the opinions offered. My qualifications are described below.

## II.    QUALIFICATIONS

3.      I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient

---

[1] Per the United States Court of Appeals For the First Circuit, the actionable Class Period spans this four day window. *See*, United States Court of Appeals For the First Circuit Opinion dated November 28, 2016, pp. 13-16. According to the Court, the Class Period ends on December 14, 2012. The FDA issued a press release at 11:45 AM on December 14, 2012 announcing the approval of ARIAD's drug, Iclusig (ponatinib), with a black box warning. *See*, "FDA approves Iclusig to treat two rare types of leukemia," *FDA News Release*, December 14, 2012 and "FDA Approves Iclusig to Treat Two Rare Types of Leukemia," *Bloomberg News*, December 14, 2012, 11:45 AM EST.

practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

4.      I, along with several others, founded Global Economics Group in March 2008.[2] Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, Directors and Officers liability insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5.      My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## III.   SUMMARY OF OPINIONS

6.      After analyzing ARIAD Common Stock during the Class Period and an expanded time period (the "Analysis Period", of which the Class Period is a subset) and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for ARIAD Common Stock was efficient during the Class Period. More specifically, I have determined that the evidence supports that the market for ARIAD

---

[2] Global Economics Group was formerly known as Winnemac Consulting, LLC.

Common Stock was efficient during the broader Analysis Period of December 1, 2011 through

October 9, 2013, and thus was also efficient for the Class Period.[3]

7.      I have also formed the opinion that damages in this matter can be calculated on a

class-wide basis.

8.      The remainder of this report is organized as follows: **Section IV** of this report

provides an overview of ARIAD's business operations and the allegations in this case. **Section V**

discusses the reliance requirement and the "fraud on the market" theory. **Section VI** introduces

the *Cammer* factors and other factors for evaluating market efficiency under the "fraud on the

market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer*

factor and other factors for ARIAD Common Stock during the Analysis Period and Class Period.

**Section VIII** addresses how damages in this matter are subject to a common approach and

methodology that can be applied class-wide. Finally, **Section IX** offers my conclusions.

9.      I reserve the right to amend this report to reflect new information that becomes

available to me in light of the discovery process and/or future rulings from the Court.

---

[3] I analyzed a broader time period (the "Analysis Period") because the Class Period of four trading days is not sufficiently long to provide enough data with which to test market efficiency in isolation.  By analyzing and applying the methodologies described herein to the longer period of which the Class Period is a subset I am able to opine that the evidence supports market efficiency during the Class Period.  The Analysis Period of December 1, 2011 through October 9, 2013 was selected as follows:  I first considered using a period covering the year before and year after the Class Period.  I chose to start on December 1, 2011 in order to have a full month of data in December 2011.  After the Class Period, on October 9, 2013, the FDA put a hold on clinical trials of the Company's leukemia drug, Iclusig (*See,* "ARIAD Announces Changes in the Clinical Development Program of Iclusig," *Business Wire,* October 9, 2013.) Following this announcement, ARIAD's stock price dropped by over 65%, the Company had fundamentally different business prospects, and the volatility of the stock spiked to levels well above the remainder of the Analysis Period.  Therefore, in my view the post-October 9, 2013 period was not as representative of the Company during the Class Period or the rest of the Analysis Period.  Therefore, I determined it was appropriate to terminate the Analysis Period on October 9, 2013 even though it was less than a year after the Class Period.

## IV.   OVERVIEW OF THE COMPANY AND ALLEGATIONS

10.   ARIAD Pharmaceuticals, Inc. is a Delaware incorporated company headquartered in Cambridge, Massachusetts that develops drugs in the biotechnology space. The Company describes itself as follows in its Form 10-K for the period ending December 31, 2012:

> ARIAD is a global oncology company whose vision is to transform the lives of cancer patients with breakthrough medicines. Our mission is to discover, develop and commercialize small molecule drugs to treat cancer in patients with the greatest and most urgent unmet medical need – aggressive cancers where current therapies are inadequate. We are focused on commercializing our first approved cancer medicine, Iclusig™ (ponatinib), and developing additional molecularly targeted therapies to treat patients with blood cancers and solid tumors.
>
> Iclusig and our product candidates, AP26113 and ridaforolimus, were discovered internally by our scientists based on our expertise in computational and structure based drug design. Ridaforolimus is being developed by Merck & Co., Inc., or Merck, pursuant to a license agreement we entered into with Merck in 2010.[4]

11.   ARIAD's market value, which during the Class Period was in the billions, was primarily based on expectations of future revenue from the drugs it was developing and not revenue from selling any products at the time of the Class Period.  For example, for the year ended 2012, ARIAD reported revenue of less than a million dollars.  Specifically, ARIAD's 2012 10-K reported the following: Total Revenue $558,000; Total Assets $180,193,000; and Weighted Average Number of Shares Outstanding 164,964,000.[5] As of the end of 2012, ARIAD employed "approximately 300 employees, of whom more than half held postgraduate professional, medical or science degrees."[6] Finally, its shares traded on the NASDAQ Global Select Market under the symbol "ARIA".[7]

---

[4] ARIAD 2012 10-K, p. 1.

[5] ARIAD 2012 10-K, pp. 66, 67.

[6] ARIAD 2012 10-K, p. 19.

[7] ARIAD 2012 10-K, p. 44.

12. Lead Plaintiffs' Complaint alleges that ARIAD and Individual Defendants issued false and misleading statements and omitted material information during the Analysis Period, ultimately causing damages to purchasers of ARIAD Common Stock who unknowingly bought the stock at artificially inflated prices and were damaged when the stock price ultimately reflected the concealed information and the artificial inflation was removed.[8]

13. More specifically, the Complaint alleges that false and misleading statements and material omissions were made with respect to "the commercial prospects, safety profile, and efficacy of its single most important product – a proprietary cancer drug called 'ponatinib'" and that when the full truth came out investors "lost hundreds of millions of dollars" and "are entitled to recover for their losses."[9]

14. While Lead Plaintiffs' Complaint alleged a number of additional misstatements and a broader set of potential corrective disclosures, I understand that the Court has limited Lead Plaintiffs' claims to relate to the failure to disclose the FDA's concerns and the rate of serious cardiovascular events with respect to Iclusig over the period December 11, 2012 to December 14, 2012.[10]

## V. DISCUSSION OF RELIANCE ELEMENT

15. Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiffs' Section 10(b) claims. Lead Plaintiffs assert the "fraud on the market" theory of reliance in this matter. The "fraud on the market" theory is based on the fact that in an efficient market (one in which widely-available public information is quickly

---

[8] Corrected Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *In Re ARIAD Pharmaceuticals, Inc. Securities Litigation*, dated March 25, 2014 ("Complaint") ¶ 19.

[9] Complaint ¶¶ 1 – 19.

[10] United States Court of Appeals For the First Circuit Opinion dated November 28, 2016, pp. 15-16.

incorporated into the market price), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[11]

16.     The Supreme Court recently reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[12]

17.     As indicated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is known about a company. If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated (or deflated) compared to what the price would have been if the truth were known (but-for misleading information). Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and lack of disclosure by paying the inflated (deflated) price.

---

[11] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[12] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014) ("*Halliburton II*").

18.     Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise.[13] The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[14] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[15]

19.     The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[16] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not

---

[13] To recognize the presumption of reliance, the Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. The Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id* at 247 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, rather, market efficiency is a matter of degree.

[14] Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970).

[15] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[16] *Basic,* 485 U.S. at 241.

necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

20.   In the next section, I explain the factors that are regularly considered by courts in determining whether the market for a particular security is efficient.

## VI.  *CAMMER* FACTORS

21.   In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[17]

22.   The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency.[18] As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency.[19] For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
>
> An *efficient market* is one which rapidly reflects new information in price.

---

[17] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[18] *Cammer,* 711 F. Supp. at 1276, n.17.

[19] Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970).

> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[20]

23.    While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics are determinative as to whether a particular market is efficient.

24.    In the subsequent sections, I evaluate each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, and 4) autocorrelation (meaning whether there is a pattern in a security's returns so that past returns have the ability to predict future returns).

## VII.  APPLICATION OF EFFICIENCY FACTORS TO ARIAD COMMON STOCK

### A.  OVERVIEW

25.    After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports my opinion that the market for ARIAD Common Stock was efficient throughout the Analysis Period, and thus the Class Period. In addition to the discussion below, **Exhibit 1** summarizes how, for each of the factors examined, the empirical

---

[20] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988)) (emphasis added).

evidence supports a finding that ARIAD Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2** displays ARIAD Common Stock's closing price and trading volume for each day throughout the Analysis Period.

26.    In summary, and as discussed more fully below, ARIAD Common Stock traded in an efficient market. First, the average weekly trading volume of ARIAD Common Stock during the Analysis Period far exceeded benchmarks that courts have established. During the Analysis Period, the average weekly trading volume for ARIAD Common Stock was 15,492,698 shares, which represents 8.47% of shares outstanding, higher than the average common stock traded on the NASDAQ. Second, there were a large number of securities analysts following and reporting on ARIAD. Third, ARIAD Common Stock was actively traded on the NASDAQ, fulfilling the *Cammer* factor regarding market makers. Fourth, ARIAD filed a Form S-3 during the Analysis Period, met the important eligibility criteria, and was apparently eligible to file Form S-3's throughout the Analysis Period since the Company had previously provided sufficiently high levels of public information to the market in its SEC filings. Fifth, ARIAD Common Stock had a large market capitalization relative to all other firms that traded on the NASDAQ. Sixth, ARIAD Common Stock had a low bid-ask spread relative to other exchange-traded common stocks. Seventh, institutions, which are considered generally to be well-informed investors, held, on average, over 77% of the public float during the Analysis Period. Eighth, there was no evidence of consistent autocorrelation during the Analysis Period. Finally, there was a strong cause-and-effect relationship between new Company-specific information and the market price of ARIAD Common Stock during the Analysis Period. These factors all support the conclusion that ARIAD Common Stock traded in an open, developed, and efficient market throughout the Analysis Period, and thus the Class Period.

## B.  *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

27.     The first *Cammer* Factor is the average weekly trading volume of a security. According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[21]

28.     Volume as a fraction of shares outstanding is an important indicator of market efficiency. First, volume is objectively quantifiable and comparable across securities. Second, high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency.[22] Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security. As Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[23]

29.     ARIAD Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly trading volume for ARIAD Common Stock during the Class Period was 32,124,250 shares. This represents 19.28%

---

[21] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[22] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 44-45. Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988) as cited by *Cammer*, 711 F. Supp. at 1276 n.17. Market depth refers to the number of shares that can be traded at quoted prices. A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Yakov Amihud et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).

[23] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105, 108 (2000). Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter is an Associate Professor of Finance at Wake Forest University.

of shares outstanding, compared to 3.30% average weekly turnover for the NASDAQ during this same period.

30.    The average weekly trading volume for ARIAD Common Stock during the Analysis Period was 8.47% of shares outstanding, compared to 3.92% for the NASDAQ. **Exhibit 3** plots ARIAD Common Stock's trading volume as a fraction of shares outstanding for each week during the Analysis Period.[24] Indeed, the average weekly trading volume during the Analysis Period was 15,492,698 shares.

31.    The volume of trading for ARIAD Common Stock supports the conclusion that the market for this security was efficient throughout the Analysis Period, and thus the Class Period.

32.    Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* Factor expressed in dollar terms.[25] To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (i.e., shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (i.e., shares outstanding multiplied by price per share). This is the same ratio because the numerator and denominator are multiplied by price per share. The advantage of this measure is that once quoted in annualized terms, ARIAD Common Stock's turnover velocity can be compared directly with other publicly traded stocks based on exchange-reported statistics. For example, over the Analysis Period, the annualized turnover velocity ratio for ARIAD Common Stock was 441%, compared with the NASDAQ average of 204% for the Analysis Period.[26] Thus,

---

[24] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days (this may not follow the calendar week).

[25] Turnover velocity is simply the average trading volume as a percentage of shares outstanding (the first *Cammer* Factor) expressed in dollar terms:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

[26] Turnover velocity for the NASDAQ is calculated from data provided by the World Federation of Exchanges. *See,* https://www.world-exchanges.org/home/index.php/statistics.

ARIAD Common Stock had an average annualized turnover that was substantially higher than the average stock trading on the NASDAQ, further supporting that it traded in an efficient market.

33.   In short, the relatively high trading volume in ARIAD Common Stock throughout the Analysis Period and the Class Period supports the conclusion that the market for ARIAD Common Stock was efficient.

### C.   *CAMMER* FACTOR 2: ANALYST COVERAGE

34.   The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[27]

35.   Analyst coverage can be important confirmatory evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

36.   During the Analysis Period, there was an abundance of analyst coverage for ARIAD. **Exhibit 4** shows that there were at least 538 reports issued during the Analysis Period and lists 21 separate firms that had equity analysts issue reports on ARIAD, including major firms such as BMO Capital Markets, UBS Research, JP Morgan, Barclays, and Credit Suisse.[28] **Exhibit 4** also lists the 12 different firms that issued at least 19 reports during the Class Period. Reports issued during the Analysis Period served the purpose of disseminating publicly available

---

[27] *Cammer*, 711 F. Supp. at 1286.

[28] I obtained ARIAD analyst reports from Investext. The number of analyst reports I identified is likely understated since many are not available through third party data providers such as Investext.

information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The extensive coverage of ARIAD by securities analysts supports the conclusion that ARIAD Common Stock traded in an efficient market throughout the Analysis Period, and thus the Class Period.

37.    Since 1989, when the *Cammer* decision was rendered, there has been a massive increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[29] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

38.    Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the substantial analyst coverage of ARIAD, there were many other sources of public information dissemination. For example, there was substantial public press regarding ARIAD. A search for articles classified as related to ARIAD by Factiva over the twenty-two-month Analysis Period results in 1,349 unique articles.[30] In addition, there

---

[29] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasing popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (http://www.rss-specifications.com/ and http://www.rss-specifications.com/what-is-rss.htm).

[30] Based on a search for "All Sources" with the company field "ARIAD Pharmaceuticals, Inc." or keyword fields "ARIAD Pharma" or "ARIAD Pharmaceuticals" for the period "December 1, 2011 – October 9, 2013." The Factiva search yielded 1,349 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type.

were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information available throughout the Analysis Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding ARIAD in the public arena throughout the Analysis Period.

39.    In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding ARIAD provides evidence of a robust and active market for public information about ARIAD and evidence that its common stock traded in an efficient market during the Analysis Period, and thus the Class Period.

### D. *CAMMER* FACTOR 3: MARKET MAKERS

40.    A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[31] The third *Cammer* Factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[32]

41.    The basic premise that the number of market makers can serve as an efficiency criteria relates to the notion that market makers are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[33]

---

[31] *See* http://www.sec.gov/answers/mktmaker.htm.

[32] *Cammer*, 711 F. Supp. at 1293.

[33] Brad M. Barber, et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285, 291 (1994).

42.     ARIAD Common Stock traded on the NASDAQ with continuous public price and volume reporting, as opposed to an over-the-counter market without volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[34] On such over-the-counter markets, there may be reason for concern regarding liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NASDAQ, which are presumed to be efficient,[35] report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[36]

43.     The NASDAQ is one of the largest and most liquid security exchanges in the world with billions of shares traded each day. Unlike an over-the-counter market that relies on decentralized market makers providing liquidity for trading, the NASDAQ relies on a computerized system to match orders and provide quotes.[37] The minimum requirements to be listed on the NASDAQ and remain in good standing virtually guarantee a liquid market for that security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

44.     Nevertheless, according to Bloomberg, there were at least 133 and 46 market makers for ARIAD Common Stock throughout the Analysis Period and Class Period, respectively.[38]   Therefore, ARIAD Common Stock easily meets the letter and spirit of this factor,

---

[34] *See Cammer,* 711 F. Supp. at 1292, citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988): ("We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.").

[35] Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988).

[36] https://listingcenter.nasdaq.com/assets/initialguide.pdf.

[37] *See* http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf; http://www.nasdaqomx.com/transactions/trading/equities; http://www.nasdaq.com/reference/market_mechanics.pdf.

[38] Bloomberg RANK function.

further supporting the efficiency of the market during the Analysis Period, and thus the Class Period.

### E. *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

45.    The fourth *Cammer* Factor is SEC Form S-3 Eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[39]

46.    Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[40] In order to be eligible to issue a Form S-3, among other things, a company: 1) must be subject to the Securities Exchange Act of 1934's reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases.  Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

47.    ARIAD was apparently S-3 eligible throughout the Analysis Period and, in fact, filed a Form S-3ASR on December 14, 2011. While a Form S-3 is a registration statement for specified transactions by certain issuers, a Form S-3ASR is a type of Form S-3, but only "well-

---

[39] *Cammer*, 711 F. Supp. at 1287.

[40] For additional information, see www.sec.gov/about/forms/forms-3.pdf.

known seasoned issuers" are eligible to file these.[41]   Therefore, this factor affirmatively supports
the conclusion that ARIAD Common Stock traded in an efficient market.

### F.  *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

48.   The fifth *Cammer* Factor relates to how the price of a security reacts to new
information and states:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency
> would be to illustrate, over time, a cause and effect relationship between
> company disclosures and resulting movements in stock price.[42]

49.   Establishing a causal connection between new company-specific news events and
movements in the market price is convincing evidence of market efficiency. A technique often
relied upon, both inside and outside of the context of litigation, to establish such a causal
connection is called the "event study." An event study is a well-accepted statistical method
utilized to isolate the impact of information on market prices.[43] Indeed, academics used event
studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies
have been used for over 40 years and have appeared in hundreds if not thousands of academic
articles as scientific evidence in evaluating how new information affects securities prices.[44]

50.   An event study is a technique used to measure the effect of new information on the
market prices of a company's publicly traded securities. New information may include, for
example, company press releases, earnings reports, SEC filings, and news reports or analyst
reports. An event study is conducted by specifying a model of expected price movements

---

[41] https://www.sec.gov/about/forms/forms-3.pdf

[42] *Cammer,* 711 F. Supp. at 1291.

[43] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997), p. 13.

[44] John Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998), p. 111.

conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

51.   To analyze cause-and-effect, I performed an event study to determine whether ARIAD Common Stock reacted to the announcement of new firm-specific news in a manner significantly different from how the stock moved on days with no ARIAD-related news. Based on the event study I performed, which explicitly controls for market and industry factors, I find that there is a clear cause-and-effect relationship between new public information about ARIAD and the market price of ARIAD Common Stock. I now describe in further detail the event study methodology, the events I test, and the results.

52.   A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[45] I have performed such an analysis in this matter where I evaluate the relationship between ARIAD Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return (the "Market Index") and an Industry Index.[46]

_____

[45] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent" variable). In this case, the daily percentage change in ARIAD Common Stock (the ARIAD daily "return") is the dependent variable and the contemporaneous daily returns for a market and peer index are the independent variables. For a general discussion of regression analysis, *see* Chapters 1-3 in Damodar N. Gujarati, *Basic Econometrics*, Third Edition, McGraw Hill, 1995.

[46] The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (NASDAQ Biotechnology Index), which ARIAD compares itself against in its 2011, 2012, and 2013 10-K filings. ARIAD was a member of the NASDAQ Biotechnology Index (around 125 members) throughout the Class Period and the Analysis Period. ARIAD's Common Stock returns are not removed from the Industry Index because the weighting methodology of the Industry Index is not publicly available, and ARIAD's price movements had a relatively minimal effect on the index returns due to the large amount of members in the Industry Index during the Analysis Period. The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements and the alleged corrective disclosure date have been removed from the estimation.

53.    For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).[47] By using a "rolling" estimation window, it allows for the relationship between ARIAD common stock, market factors, as well as firm-specific volatility to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[48]

54.    The model indicates that there is a positive correlation between ARIAD Common Stock and the control variables. In other words, the movements of the Market Index and Industry Index help explain movements in ARIAD's stock price. For instance, choosing a day in the Analysis Period purely as an example, April 27, 2012, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.43 which means that a 1% rise in the S&P 500 predicts a 1.43% increase in returns for ARIAD Common Stock. The estimated coefficient for the Industry Index is 1.45, meaning that the expected return for ARIAD Common Stock is about a 1.45% increase for every 1% increase in the Industry Index over and above the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the rolling regression models for each day during the Analysis Period. **Exhibit 5** demonstrates there was a consistently positive relationship between the general market, the Industry Index, and ARIAD's common stock price.

55.    Another important statistic from the regression is the Standard Deviation of the Errors, which measures the degree of imprecision in the predictions from the model. Put another

---

[47] *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13, 15 (1997) ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.").

[48] Phillip A. Braun, et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575, 1597 (1995).

way, this measure provides a metric for how much "randomness" remains in the price movement of ARIAD Common Stock after controlling for the Market Index and Industry Index. For instance, on the example date, April 27, 2012, the model predicted that absent any new firm-specific information, the price of ARIAD Common Stock would increase by 1.36% because the S&P 500 was up 0.24% and the Industry Index was up 0.65%.[49] Because of the inherent randomness observed in stock price returns, I do not expect the model to predict returns exactly. In this example, I observe an actual return of 1.63%. Thus, the "abnormal return" for this day is 0.27% (the actual return of 1.63% minus the predicted return of 1.36%). I then rely on the Standard Deviation of the Errors from the regression model to tell if this abnormal return of 0.27% is sufficiently large that I reject random movement as the explanation.

56.    The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic," which represents the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of 0.27% represents 0.14 standard deviations or a t-statistic of 0.14 (abnormal return of 0.27% divided by the Standard Deviation of the Errors of 0.0196). Using the standard assumption that, in the absence of new firm-specific news, abnormal returns will be normally distributed around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[50] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some

---

[49] The expected return of 1.36% is found as follows: 1.43 * 0.24% (Coefficient on Market Index *times* Market Index return) + 1.45 * 0.65% (Coefficient on Industry Index Return *times* Industry Index Return) + 0.07% (constant term from regression).

[50] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001. The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

non-random explanation. Since our example has a t-statistic of 0.14, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

57.   **Exhibit 6** shows that the Standard Deviation of the Errors varied over the Analysis Period. By adopting the rolling regression model, my event study explicitly adjusts for the changing firm-specific volatility.

58.   To analyze cause-and-effect, I examined the price response of ARIAD Common Stock to earnings announcements and new firm-specific news regarding the Company's two primary product candidates, Iclusig (ponatinib) and AP26113, that occurred during the Analysis Period, which I refer to as "Event Dates" (*see* **Exhibit 7**). To be clear, I did not include events based upon a subjective expectation that each event (or even a majority of the events) would be expected to result in a statistically significant stock price movement.  Recall that a statistically significant movement is a high threshold which would require a large price movement and would only occur for a high-impact event that changed the value of ARIAD by over approximately 3% in low volatility periods and over 5% in the highest volatility periods (a significant result would be one that is roughly 2 times the values plotted in **Exhibit 6**).  Rather, I cast a wide and objective net to identify events on which there should be at least a better chance of observing a statistically significant price movement.

59.   In total, I identified 35 Event Dates throughout the Analysis Period based on the following criteria:

i.   All earnings announcements throughout the Analysis Period were considered an Event Date.[51]

ii.   A Factiva search for "All Sources" with the company field "ARIAD Pharmaceuticals, Inc." for the Analysis Period "December 1, 2011 – October 9, 2013" was conducted. All dates with news headlines containing ARIAD announcements of new information related to either Iclusig (ponatinib) or AP26113, the Company's two primary product candidates, were identified as Event Dates.[52]

iii.   Separately, based on analyst reports supplied by Investext, additional Event Dates were identified. Dates where more than one analyst reported/noted events that fit the

---

[51] In most of my market efficiency analyses I perform this analysis using only earnings announcement dates. Typically, such an analysis provides sufficient evidence of a cause-and-effect relationship.  What makes ARIAD somewhat unique is that current earnings (and thus deviations in current earnings) are not the focus of investors since the value of the firm is primarily based upon expected cash flows from its drugs in development that are not yet on the market.  Therefore, changes in current earnings during the analysis period were not generally material to the valuation of the company.  Indeed, analysts publishing reports following ARIAD earnings announcement dates throughout the Analysis Period focused on drug development updates that were also released in the same announcement as opposed to earnings results.  For example:

"Ariad reported 4Q11 revenue and EPS of $78,000 and $(0.38), posting revenue below consensus of $94,000 and missing consensus EPS of $(0.19), *but neither of which are material to the investment thesis*, as we look forward to the launch of ridaforolimus (rid) in 2012, with Ariad co-promoting the drug in the U.S., as well as the potential launch of ponatinib (pon) in 1Q13." ("Clinical Progress Continues – Reports 4Q11 Results," *Brean Murray Carret & Co.*, February 28, 2012, emphasis added.)

"This morning Ariad reported Q1:12 financials and provided an update on its pipeline programs. *Most important*, lead candidate ponatinib remains on track for regulatory filings in the U.S. and EU during Q3:12, with updated data from the pivotal PACE trial to be presented at ASCO on June 4." ("Reports Q1:12; Ponatinib Data At ASCO, AP26113 At ESMO," *Cowen and Company,* May 9, 2012, emphasis added.)

"Ariad reported FY2Q12 earnings before market open, recording EPS of $(0.31), marginally below our estimate of $(0.30) and the Street consensus of $(0.27). *We remind investors that ARIA shares will be driven by the launch and continued clinical development of ponatinib, as well as the clinical progress of AP26113 rather than earnings.*" ("ARIA FY2Q12; Looking Past NDA Submission and Gearing Up for Launch," *Rodman & Renshaw,* August 2, 2012, emphasis added.)

"Ariad reported in-line revenue and EPS, neither of which are material at this moment, in our view, as we look forward to Iclusig sales beginning in 1Q13." ("Reports 4Q12 – 2013 Looking On Track Commercially And Clinically," *Brean Capital*, February 25, 2013.)

"We remind investors that ARIA share value is driven primarily by the continuing clinical and commercial potential of Iclusig and AP26113 rather than near-term earnings." ("Initial Reaction to ARIA 4Q12 / FY12 Earnings Announcement," *JMP Securities,* February 25, 2013.)

Due to the market's focus on ARIAD's drug product development, I elected to develop a broader set of events to test than earnings announcement dates alone.

[52] *See* ARIAD's 2011, 2012, and 2013 10-K's.

criteria outlined in step (ii), but had not already been identified through the Factiva search, were identified as Event Dates.

60.    There are 35 final Event Dates based on 36 news announcements (two of the material news announcements had the same market date).[53]

61.    Academic articles validate that the announcements of drug product information can impact the stock prices of pharmaceutical companies.[54] For instance, a Harvard University study from January 2011 to May 2013 on the impact of clinical trial results on daily stock market returns of large US-listed pharmaceutical and biotechnology companies concluded that "[t]he release of clinical trial results is an economically significant event and has meaningful effects on market value for large biopharmaceutical companies."[55]

62.    As expected, this process identified several events that were clearly material and moved the market price of ARIAD stock.  For example, on July 27, 2012, ARIAD announced the initiation of "EPIC", a Phase 3 Trial of its leukemia drug, Iclusig (ponatinib).[56] This was encouraging news for the success of the drug, as demonstrated by analyst reaction to this announcement:

> …this morning's release provides much detail on the statistical design of the study. We think that the data ponatinib has produced in prior studies in treatment experienced patients suggest EPIC is very likely to succeed in light of these statistics.[57]

---

[53] These decision rules were set without knowledge of how ARIAD's stock price moved on any given day.  The rules were implemented by two analysts independently and the results then reconciled.

[54] *See, e.g.*, Jeffrey M. Rothenstein, George Tomlinson, Ian F. Tannock, and Allan S. Detsky, *Company Stock Prices Before and After Public Announcements Related to Oncology Drugs*, J Natl Cancer Inst (2011) 103 (20): 1507-1512.

[55] Thomas J. Hwang, *Stock Market Returns and Clinical Trial Results of Investigational Compounds: An Event Study Analysis of Large Biopharmaceutical Companies*, 2013, available at: http://dx.doi.org/10.1371/journal.pone.0071966

[56] "ARIAD Announces Initiation of Randomized Phase 3 Trial of Ponatinib in Newly Diagnosed Patients with Chronic Myeloid Leukemia," *Business Wire,* July 27, 2012.

[57] "Quick Take: EPIC Trial Initiated; Statistics Set Ponatinib Up For Success," *Cowen and Company,* July 27, 2012.

> A key feature of the trial design is the planned interim analysis, which will occur 12 months after half of the patients have been randomized. Should the results be favorable, ARIA plans to file for ponatinib in the newly diagnosed setting at that time. Timing of the interim analysis will be based on the rate of patient enrollment, but given full enrollment expected by YE'13, we estimate interim results could read out in 1H'14. We have modest expectation for ponatinib in first-line CML with generic Gleevec coming in 2015; however, ***earlier than expected approval in first-line represents upside.*** [58]

> We are taking a bullish stance on the enrollment rate and the interim readout for EPIC.[59]

63.    In response, the market price of ARIAD Common Stock increased 6.23%, compared to the predicted return of 3.56%. Thus, the abnormal return on July 27, 2012 was 2.67%. With a t-statistic of 1.99, this abnormal price movement is statistically significant at the 95% confidence level, and I therefore have scientific evidence that ARIAD Common Stock reacted rapidly to this new information.

64.    As another example, on Sunday, December 9, 2012, the 20th Event Date on **Exhibit 7**, ARIAD released 12-month Phase II trial follow up data for ponatinib at the Annual Meeting of the American Society for Hematology. Data indicated increasing response rates in patients.[60] This announcement provided analysts with confirmation of their positive outlook on the drug:

> This most recent update on PACE reinforces our view that ponatinib will eventually become the standard bearer in CML therapy. With compelling and durable responses such as these, in a patient population with population with significant unmet medical need, we believe ponatinib will be approved well ahead of its scheduled March 27th, 2013 PDUFA. We also believe that ponatinib's differentiated activity profile will be considerably replicated in the front-line Phase III EPIC trial currently underway.[61]

---

[58] "Phase III EPIC Trial Initiated," *Barclays*, July 27, 2012, emphasis added.

[59] "Ariad Makes EPIC Announcement; Ponatinib Pivots into Phase III," *Rodman & Renshaw,* July 27, 2012.

[60] "ARIAD Announces 12-Month Data from Pivotal PACE Trial of Ponatinib in Heavily Pretreated Chronic-Phase CML Patients," *Business Wire,* December 9, 2012.

[61] "Ponatinib Keeps PACE with Expectations at ASH," *Dawson James*, December 10, 2012.

> ARIA reported 15-month follow-up data from the phase II PACE trial of
> ponatinib in resistant/intolerant CML. Ponatinib continues to show deep and
> early responses which are highly durable and have good tolerability…This
> data is incrementally positive for [ARIAD].[62]

> In our opinion, the data continue to position ponatinib as the agent of
> choice.[63]

65.   ARIAD's share price increased by 4.35% on December 10, 2012 in response to this

updated data. The abnormal return was 2.68%, which is statistically significant at the 95%

confidence level with a t-statistic of 2.09.

66.   A few days later, on the morning of December 14, 2012, the FDA issued a press

release announcing the approval of Iclusig with a black box warning due to concerns of blood

clots and liver toxicity.[64] A few hours later, ARIAD issued a press release announcing the FDA

approval and also disclosed that serious arterial thrombosis (blood clots) occurred in 8% of

Iclusig-treated patients.[65] Iclusig's approval was earlier than expected; however, the black box

warning and cardiac concerns were surprises to the market as evidenced by the reaction of

analysts:

> The inclusion of a black box warning for arterial thrombosis and liver
> toxicity clearly caught the Street off-guard.[66]

> The FDA approved Iclusig (ponatinib) for refractory CML and Ph+ ALL.
> The approval was widely anticipated, but came three months earlier than

---

[62] "ASH 2012 Annual Meeting Update– Day 1 and Day 2 Update," *Summer Street Research Partners*, December 10, 2012.

[63] "Positive Ariad Data & Mgt Updates at ASH," *UBS Investment Research,* December 10, 2012.

[64] "FDA approves Iclusig to treat two rare types of leukemia," *FDA News Release*, December 14, 2012 and "FDA Approves Iclusig to Treat Two Rare Types of Leukemia," *Bloomberg News*, December 14, 2012, 11:45 AM EST.

[65] "*DJ ARIAD Announces Accelerated Approval By FDA Of Iclusig (Ponatinib) For Patients With CML And Ph+ ALL Resistant Or Intolerant To Prior Tyrosine Kinase Inhibitor Therapy >ARIA," *Dow Jones*, December 14, 2012.

[66] "Surprising Boxed Warnings Overshadow Iclusig' Rapid Approval," *JP Morgan*¸ December 14, 2012.

scheduled… Importantly, the label contains a surprising boxed warning for arterial thrombosis/liver toxicity.[67]

However, investors were surprised and disappointed by the presence of a black box warning for hepatotoxicity and arterial thrombosis, and by adverse event rates listed in the label that are generally higher than in recent presentations. Investors are worried that the black box specifically, and the picture of tolerability that has been painted more generally, decrease the chances that ponatinib will take share outside of salvage.[68]

67.    ARIAD's share price declined by -20.73% on December 14, 2012 in response to this news. The abnormal return was -20.21%. With a t-statistic of -15.70, this price movement is statistically significant at the 99% confidence level and I therefore have scientific evidence that ARIAD Common Stock reacted rapidly to this announcement on this day. Because December 14, 2012 is in the Class Period, there is direct evidence of a cause-and-effect relationship between new ARIAD specific news regarding the Company's drug development and ARIAD's Common Stock price during the Class Period.

68.    As a final example, on the morning of October 9, 2013, before the market opened, ARIAD reported that concerning side effects associated with Iclusig had prompted the FDA to put a hold on any new testing for the drug.[69] This negative announcement was disappointing to analysts:

While CV-related safety concerns for Iclusig are not new, FDA's partial clinical hold (dose modification) crystallizes concerns regarding safety & future potential of Iclusig. As longer FU brings out a clearer picture of safety, confidence in longer-term potential of Iclusig seems elusive at present. While disappointment is running high, on our revised ~$420M Iclusig peak sales potential (vs. prior $1.1B), we arrive at a $7 PT.[70]

---

[67] "FDA Approves Iclusig for CML; Unexpected Label Warnings," *Oppenheimer*, December 14, 2012.

[68] "Quick Take: Iclusig Approved. Black Box Unexpected, But Has Safety Changed?," *Cowen and Company*, December 14, 2012.

[69] "ARIAD Announces Changes in the Clinical Development Program of Iclusig," *Business Wire,* October 9, 2013.

[70] "Partial Clinical Hold on Iclusig Safety Concerns; Lowering Estimates," *Jefferies*, October 9, 2013.

> We're significantly reducing our Iclusig sales expectations (and subsequently our price target as well) following this morning's news that adverse cardiovascular event rates continue to increase with further follow-up of the pivotal PACE study, resulting in a partial clinical hold for ongoing studies.[71]

> We think this morning's update dimmed Iclusig's prospects for use in 1st and 2nd line CML, and have removed ests for both.[72]

> We expect ARIAD to trade down meaningfully today because of increased risk to the future overall utilization of the drug and investor uncertainty over risk/benefit in front-line which is needed to become a $1B+ drug and support current valuation.[73]

69.    The raw return in ARIAD Common Stock on October 9, 2013 was -65.99% with an abnormal return of -62.10%. The t-statistic of this negative price movement was -23.21, which is statistically significant at the 99% confidence level.

70.    These examples provide important evidence of a cause-and-effect relationship when there is important news related to ARIAD's drug development.  However, to formalize the test and demonstrate that the news dates are more likely than non-news dates to demonstrate a price reaction, I compared the rate of statistical significance and the size of the stock price movements on the Event Dates to days during the Analysis Period that have no news at all about ARIAD. Within the 35 Event Dates I identified during the Analysis Period, seven resulted in statistically significant price movements above the 95% confidence level. Given that the market was generally expecting positive news about the development of ponatinib as it moved towards FDA

---

[71] "Thoughts on Iclusig's Negative Safety Update," *J.P. Morgan,* October 9, 2013.

[72] "Iclusig's CV Signal Gets Worse; Cutting Our Iclusig Ests," *Cowen and Company,* October 9, 2013.

[73] "New Safety Data Lead to Partial Hold for Iclusig, Here's Some Scenarios," *RBC Capital Markets,* October 9, 2013.

approval, it is not surprising that the stock price did not react significantly to many of the positive news events that indicated the drug was still on a trajectory towards approval.[74]

71.    I then compared these results against the 64 days in the Analysis Period with no ARIAD-related news based on a Factiva search and also found that no analyst reports or SEC filings were issued.[75] Of these 64 days, there were 2 statistically significant price movements. In other words, I observed a statistically significant reaction only 3.13% of the time for days with no ARIAD-related news, compared to a statistically significant price reaction at the 95% confidence level on 20.00% of the Event Dates.[76] For days with no news, the fact that I observed 3.13% of the days with significant movements is consistent with what I would expect to observe by randomness alone.[77] This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information and changes in the price of ARIAD Common Stock.

---

[74] For example, this was the case when ARIAD announced that the European Commission granted marketing authorization for Iclusig(R) (ponatinib) before market hours on July 2, 2013. (*See*, "ARIAD Announces Marketing Authorization for Iclusig(R) (pontinib) in the European Union," Business Wire, July 2, 2013.) This was not surprising news as evidenced by the following analysts:

*See* "EMA Approves Iclusig, as Widely Expected," *Jefferies*, July 2, 2013: "As widely expected following the positive CHMP recommendation on 3/22/13, EMA approved Iclusig for refractory/intolerant CML/Ph+ ALL."

*See* "Iclusig Approved in Europe," *Cowen and Company,* July 2, 2013: "With the CHMP having recommended approval in March 2013, an approval of Iclusig around mid-year was expected."

*See* "ICLUSIG Approval in EU Expected, Opportunity Under-appreciated," *BMO Capital Markets,* July 2, 2013: "The approval of ICLUSIG in Europe with third-line labeling was expected based on prior CHMP recommendation two months ago."

[75] Based on a Factiva search for "All Sources" with the company field "ARIAD Pharmaceuticals, Inc." or keyword fields "ARIAD Pharma" or "ARIAD Pharmaceuticals" for the period "December 1, 2011 – October 9, 2013." I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type. There may be other news articles and sources that are not a part of Factiva's database; however, to the extent there are additional news stories not captured by Factiva the treatment of those days as "no news days" would tend to bias toward finding a lack of cause-and-effect.

[76] This difference between 20.00% and 3.13% is itself statistically significant at the 95% confidence level.

[77] There is no statistically significant difference between 3.13% and 5.00% (this is within the proportion of dates that would be significant by chance alone when using a 95% confidence interval).

72.   Furthermore, on the 64 days with no news, the average change in price of ARIAD Common Stock was 1.28% after controlling for market and industry factors, while the average change in ARIAD Common Stock on the Event Dates was 3.90%. In other words, the average magnitude of stock price movement on Event Dates was about 3 times higher.[78] Again, this demonstrates that on days when important firm-specific information is released to the market, the stock price moves much more than on days where there is no firm-specific news. This provides further evidence of a cause-and-effect relationship between firm-specific news and changes in the price of ARIAD Common Stock, and thus an efficient market.

73.   The bar charts below summarize this analysis while **Exhibit 8** gives more detail.



---

[78] This difference between 3.90% and 1.28% is itself statistically significant at the 90% confidence level and nearly statistically significant at the 95% confidence level with a p-value of 0.053 (a p-value of 0.050 or less indicates statistical significance at the 95% confidence level). The 90% threshold is a widely accepted relevant boundary for significance. *See*, David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, 3rd Ed., 2001.



74.     Finally, when important firm-specific news is released to the market, the daily trading volume also tends to be much higher than on days where there no news. For instance, the average daily trading volume of the 35 Event Dates was 7.43 million. Compare this to the average daily trading volume of 2.26 million for days where there is no ARIAD news in the Analysis Period. This difference in average daily trading volume is statistically significant at the 95% confidence level. The bar chart below summarizes this analysis.



75.   The bar charts above establish a strong cause-and-effect relationship between new, unexpected news and rapid changes in ARIAD Common Stock. The Event Dates have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with the least amount of news.

76.   In conclusion, the event study analysis presented in this section demonstrates a clear cause-and-effect relationship between new material news and changes in the market price of ARIAD Common Stock during the Analysis Period, and thus the Class Period.

## G.  ADDITIONAL FACTOR 1: MARKET CAPITALIZATION

77.   In *Krogman v. Sterritt*, the Court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the

*Cammer* factors.[79] The *Krogman* Court held, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[80] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[81] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

78.   ARIAD Common Stock had higher market capitalization than the majority of NASDAQ stocks during the Analysis Period, thus suggesting this factor is supportive of efficiency. There were between 132.9 million and 185.1 million shares of ARIAD Common Stock outstanding throughout the Analysis Period, and 166.7 million shares outstanding throughout the Class Period.[82]

79.   Based on the market price, the market capitalization for ARIAD Common Stock averaged $3.14 billion during the Analysis Period and $3.76 billion during the Class Period. **Exhibit 9** shows ARIAD's market capitalization over the Analysis Period. **Exhibit 10** shows that during the Analysis Period, ARIAD Common Stock's market capitalization fell between the 88th and 93rd percentile of the NASDAQ market for the applicable quarters during the Analysis

---

[79] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). The factors identified by the *Krogman* Court are 1) market capitalization, 2) size of float of common stock, and 3) bid-ask spread.

[80] *Krogman*, 202 F.R.D. at 478.

[81] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105, 117 (2000).

[82] S&P Capital IQ.

Period.[83] In other words, over the Analysis Period, ARIAD Common Stock had a higher market

capitalization than at least 88% of the firms on the NASDAQ exchange.

80.     Given that the market capitalization for ARIAD Common Stock was consistently

large relative to other publicly traded companies, this factor is supportive of market efficiency

for ARIAD Common Stock during the Analysis Period, and thus the Class Period.

## H. ADDITIONAL FACTOR 2: THE BID-ASK SPREAD

81.     The *Krogman* Court's last additional efficiency factor considered the bid-ask spread

for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market, because it

suggests that the stock is too expensive to trade."[84] The bid-ask spread is an important indicator

of the degree to which a market is developed. The bid-ask spread represents a measure of the

cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation

and that reasonably sized trades will not substantially impact the market price. Wider bid-ask

spreads indicate greater liquidity costs and less ability to trade without moving the market price.

In addition, the wider the bid-ask spread, the costlier it is to arbitrage away small inefficiencies.

Thus, the narrower the bid-ask spread, the greater indication of an efficient market.

82.     I analyzed bid-ask spreads for ARIAD Common Stock during the Class Period.

**Exhibit 11** shows that during this period, the time-weighted average percentage bid-ask spread

for ARIAD Common Stock for each day ranged from 0.053% and 0.098%. This is well below

the average and median bid-ask spread of a random sample of 100 other common stocks trading

on the NYSE and NASDAQ in December 2012 (the full month during which the Class Period

---

[83] Thomson Reuters Eikon database.

[84] *Krogman*, 202 F.R.D. at 478.

falls).[85],[86] **Exhibit 11** demonstrates that ARIAD Common Stocks' daily average bid-ask spread was at a maximum of 0.098% during the Class Period, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 0.97% in December 2012.[87] Accordingly, ARIAD's bid-ask spread was low during the Class Period, and thus this factor further supports market efficiency for ARIAD Common Stock.

## I.   ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP

83.   Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own. These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. As **Exhibit 12** shows, 488 institutions reported owning ARIAD Common Stock during the Analysis Period, holding, on average, 77% of public float. This substantial level of institutional ownership of ARIAD Common Stock during the Analysis Period coupled with the high trading volume further supports a conclusion of market efficiency.

---

[85] Quote data for ARIAD and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[86] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads.  Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology. I determined the constituents of the NYSE and NASDAQ throughout December 2012 and then randomly generated a list of 100 common stock securities.  I then calculated the time-weighted average monthly bid-ask spread for these securities.

[87] The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market. That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stall, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

## J.   ADDITIONAL FACTOR 4: AUTOCORRELATION

84.   If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if it is persistent and sufficiently large enough that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

85.   Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news. Efficiency would only be violated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[88]

86.   A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[89] If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation. Even if the regression shows a significant result for a certain period, then one must ask whether the effect is persistently significant and large enough to suggest a predictable arbitrage opportunity in the next period.

87.   **Exhibit 13** displays the autocorrelation coefficient for ARIAD Common Stock using the abnormal returns from the event study model described above. The coefficient for the Analysis Period is not statistically significant, meaning there is no evidence of autocorrelation (*i.e.*, throughout the Analysis Period, the coefficient on the previous day's abnormal return

---

[88] Doron Avramov, et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95 (1978).

[89] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

averaged -0.01, which is not statistically significant with a t-statistic of -0.24). This result is thus inconsistent with the notion that an investor could consistently predict abnormal movements and earn arbitrage profits. Therefore, this factor also supports the conclusion that ARIAD Common Stock traded in an efficient market throughout the Analysis Period.

## VIII. DAMAGES

88.   Although I have not been asked to calculate class-wide damages in this action, which I understand will be subject to further discovery, it is clear that damages in this matter can be calculated using a methodology common to the class. Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the PSLRA's "90-day lookback" provision, a formulaic limit on damages that can also be applied on a class-wide basis).[90]

89.   The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Analysis Period is also common to the class and can be measured class-wide. In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class. Damages for any individual class member could then be calculated

---

[90] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

formulaically based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Accordingly, although I have not been asked to calculate class-wide damages, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole.

## IX.   CONCLUSION

90.    In sum, every factor analyzed supports my opinion that ARIAD Common Stock traded in an efficient market during the Analysis Period. In addition, factors analyzed for the Class Period are also indicative of an efficient market. Therefore, I can affirmatively opine that ARIAD Common Stock traded in an efficient market during both the Analysis Period and the Class Period. Furthermore, class-wide damages in this matter can be calculated using a common methodology.

91.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on March 6, 2017.

Chad Coffman

**Exhibit 1**

## Summary of Efficiency Factors for ARIAD Pharmaceuticals, Inc.

| Factor | Summary of Factor | ARIAD Pharmaceuticals, Inc. |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | The average weekly trading volumes of 8.47% during the Analysis Period and 19.28% during the Class Period, as percentages of shares outstanding, well exceed the standard of 2% that courts have suggested would justify a strong presumption of an efficient market. (Note: 3,098,540 shares and 6,424,850 shares traded daily on average during the Analysis Period and Class Period, respectively.) |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | During the Analysis Period, at least 21 different securities analysts followed ARIAD. While during the Class Period, at least 12 different securities analysis followed ARIAD. This implies that important information relevant to trading ARIAD Common Stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | Because ARIAD shares were exchange-traded on the NASDAQ during the Analysis Period and the Class Period, not over the counter, this factor is satisfied. Nevertheless, according to Bloomberg there were at least 133 and 46 market makers for ARIAD Common Stock throughout the Analysis Period and the Class Period, respectively. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | ARIAD met the important eligibility criteria for SEC Form S-3 and was apparently S-3 eligible throughout the Class Period and Analysis Period and, in fact, ARIAD filed a Form S-3 on December 14, 2011. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for ARIAD Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | During the Analysis Period, ARIAD Common Stock market capitalization ranged from $1.08 billion to $4.18 billion, which is at or above the 88th percentile off NASDAQ stocks on a quarterly basis. ARIAD therefore easily meets this criterion. During the Class Period, ARIAD Common Stock market capitalization ranged from $3.15 billion to $3.98 billion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market.  Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price.  Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | During the Class Period, the bid-ask spread for ARIAD Common Stock ranged from 0.053% to 0.098%. ARIAD's daily percentage bid-ask spread was well below the mean bid-ask spread of 0.97% and median bid-ask spread of 0.19% of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in December 2012. |
| Institutional Holdings | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | 488 institutions held 77% of the public float throughout the Analysis Period, on average, which further supports the finding that ARIAD Common Stock traded in an efficient market. (Note: Institutions held as much as 83% of the public float during the Analysis Period). |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | No evidence of autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading ARIAD Common Stock based solely on its past price movements. |

**Exhibit 2**
## ARIAD Pharmaceuticals, Inc. Common Stock Price and Volume
## 12/1/2011 - 12/31/2013



Source: S&P Capital IQ

**Exhibit 3**
## ARIAD Pharmaceuticals, Inc. Common Stock Average Weekly Trading Volume as a Percentage of Shares Outstanding
### 12/1/2011 - 10/9/2013



Source: S&P Capital IQ.

Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) during the Analysis Period of 12/1/2011 through 10/9/2013. The last trading week of the Analysis Period consists of one trading day only, 10/9/2013, and therefore was excluded from this analysis. The Class Period consists of four trading days (i.e., 12/11/2012, 12/12/2012, 12/13/2012, and 12/14/2012), and therefore the average of the daily trading volume divided by shares outstanding is multiplied by 5 to get a comparable measure for average weekly trading volume as a percentage of shares outstanding.

**Exhibit 4**

# Summary of Securities Analyst Reports Issued
# for ARIAD Pharmaceuticals Inc.

| | | Number of Reports Issued | |
|---|---|---|---|
| | **Analyst Name** | **Analysis Period**<br>**12/1/2011 - 10/9/2013** | **Class Period**<br>**12/11/2012 - 12/14/2012** |
| [1] | BMO Capital Markets | 89 | 2 |
| [2] | RBC Capital Markets | 53 | 1 |
| [3] | Jefferies | 43 | 1 |
| [4] | JMP Securities LLC | 43 | |
| [5] | UBS Research | 34 | 1 |
| [6] | Brean Capital, LLC | 28 | 2 |
| [7] | Cowen and Company | 25 | 2 |
| [8] | Barclays | 23 | |
| [9] | JP Morgan | 23 | 1 |
| [10] | Oppenheimer and Co | 23 | 1 |
| [11] | Summer Street Research | 23 | 1 |
| [12] | Maxim Group LLC | 22 | |
| [13] | Rodman & Renshaw | 21 | |
| [14] | Thomson Reuters Company | 21 | 2 |
| [15] | William Blair & Company | 21 | |
| [16] | Guggenheim Securities LLC | 16 | 2 |
| [17] | Leerink Partners LLC | 11 | |
| [18] | Credit Suisse | 7 | |
| [19] | Dawson James | 6 | 3 |
| [20] | Cross Current Research, LLC | 4 | |
| [21] | Edison Investment Research | 2 | |
| | **Total** | **538** | **19** |

Source: Investext

Note: Many analyst reports are not available through third party data providers (e.g. Investext); therefore, this almost certainly understates the total amount of analyst coverage.

**Exhibit 5**
## Coefficients from Event Study for ARIAD Pharmaceuticals, Inc.
## 12/1/2011 - 10/9/2013



Source: S&P Capital IQ

The even study results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (NASDAQ Biotechnology Index), which ARIAD compares itself against in its 2011, 2012, and 2013 10-K filings. ARIAD was a member of the NASDAQ Biotechnology Index (around 125 members) throughout the Class Period and the Analysis Period. ARIAD's Common Stock returns are not removed from the Industry Index because the weighting methodology of the Industry Index is not publicly available, and ARIAD's price movements had a relatively minimal effect on the index returns due to the large amount of members in the Industry Index during the Analysis Period. The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements and the alleged corrective disclosure date have been removed from the estimation.

**Exhibit 6**
**Standard Deviation of the Errors**
**from Event Study for ARIAD Pharmaceuticals, Inc.**
**12/1/2011 - 10/9/2013**



Source: S&P Capital IQ
The event study results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (NASDAQ Biotechnology Index), which ARIAD compares itself against in its 2011, 2012, and 2013 10-K filings. ARIAD was a member of the NASDAQ Biotechnology Index (around 125 members) throughout the Class Period and the Analysis Period. ARIAD's Common Stock returns are not removed from the Industry Index because the weighting methodology of the Industry Index is not publicly available, and ARIAD's price movements had a relatively minimal effect on the index returns due to the large amount of members in the Industry Index during the Analysis Period. The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements and the alleged corrective disclosure date have been removed from the estimation.

**Exhibit 7**

**Summary Statistics of ARIAD Pharmaceutical, Inc.'s Event Dates During the Analysis Period**

| # | Date | Time | Day of Week | Market Date | Event | ARIAD Common Stock | | Rolling Regression Model (120-day rolling window)[1] | | | | Sig Level[2] |
|---|------|------|------|------|------|------|------|------|------|------|------|------|
| | | | | | | Price | Raw Return | Abnormal Return | Abnormal Dollar Change | T-Stat | P-Value | |
| 1 | 12/11/2011 | 7:30 PM | Sun | 12/12/2011 | ARIAD Announces Preliminary Data from Pivotal Pace Trial of Ponatinib, Its Investigational pan-BCR-ABL Inhibitor | $11.31 | -2.75% | -1.16% | -$0.14 | -0.46 | 0.65 | |
| 2 | 2/15/2012 | 7:35 AM | Wed | 2/15/2012 | ARIAD Announces Issuance of Key U.S. Patent on Ponatinib | $15.05 | -0.07% | -0.14% | -$0.02 | -0.06 | 0.95 | |
| 3 | 2/28/2012 | 7:35 AM | Tue | 2/28/2012 | ARIAD Reports 2011 Financial Results and Outlines Key Development and Commercialization Plans for 2012 | $14.49 | -4.42% | -4.98% | -$0.76 | -2.18 | 0.03 | ** |
| 4 | 4/2/2012 | 9:00 AM | Mon | 4/2/2012 | ARIAD Presents New Preclinical Data on Ponatinib and AP26113 | $16.23 | 1.56% | 0.16% | $0.03 | 0.08 | 0.94 | |
| 5 | 5/9/2012 | 7:35 AM | Wed | 5/9/2012 | ARIAD Reports First Quarter 2012 Financial Results and Development Progress | $15.90 | -2.15% | -0.28% | -$0.04 | -0.16 | 0.87 | |
| 6 | 5/16/2012 | 12:20 PM | Wed | 5/16/2012 | ARIAD Presents Data at Bank of America Merril Lynch Health Care Conference | $17.52 | 1.45% | 1.44% | $0.25 | 0.87 | 0.39 | |
| 7 | 6/4/2012 | 7:00 AM | Mon | 6/4/2012 | ARIAD Announces Updated Data from Pivotal PACE Trial of Ponatinib, Its Investigational pan-BCR-ABL Inhibitor | $15.63 | -0.51% | -1.44% | -$0.23 | -0.88 | 0.38 | |
| 8 | 7/27/2012 | 7:35 AM | Fri | 7/27/2012 | ARIAD Announces Initiation of Randomized Phase 3 Trial of Ponatinib in Newly Diagnosed Patients with Chronic Myeloid Leukemia | $18.92 | 6.23% | 2.67% | $0.48 | 1.99 | 0.05 | ** |
| 9 | 7/30/2012 | 4:05 PM | Mon | 7/31/2012 | Ariad Announces Submission of New Drug Application for Ponatinib to the U.S. Food and Drug Administration | $19.13 | 0.18% | 2.33% | $0.44 | 1.68 | 0.10 | * |
| 10 | 8/2/2012 | 7:35 AM | Thu | 8/2/2012 | ARIAD Reports Second Quarter 2012 Financial Results and Development Progress | $18.14 | -2.05% | -1.47% | -$0.27 | -1.06 | 0.29 | |
| 11 | 8/20/2012 | 7:35 AM | Mon | 8/20/2012 | ARIAD Begins Phase 1/2 Trial of Ponatinib in Japan | $19.54 | -1.06% | -1.11% | -$0.22 | -0.81 | 0.42 | |
| 12 | 8/30/2012 | 7:35 AM | Thu | 8/30/2012 | ARIAD Announces Submission of Marketing Authorization Application for Ponatinib to the European Medicines Agency | $20.51 | 0.05% | 0.85% | $0.17 | 0.61 | 0.54 | |
| 13 | 9/17/2012 | 7:00 AM | Mon | 9/17/2012 | ARIAD releases abstract for ESMO Conference and initial data on AP26113 | $23.50 | 1.47% | -0.02% | $0.00 | -0.01 | 0.99 | |
| 14 | 9/27/2012 | 4:05 PM | Thu | 9/28/2012 | ARIAD Completes Rolling Submission of New Drug Application for Ponatinib to the U.S. Food and Drug Administration | $24.21 | 3.02% | 2.83% | $0.66 | 2.00 | 0.05 | ** |
| 15 | 9/29/2012 | 5:15 AM | Sat | 10/1/2012 | ARIAD Presents Initial Clinical Proof-of-Concept of AP26113 in Patients with Non-Small Cell Lung Cancer at ESMO 2012 Congress | $23.88 | -1.36% | -2.67% | -$0.65 | -1.85 | 0.07 | * |
| 16 | 10/19/2012 | 8:00 AM | Fri | 10/19/2012 | ARIAD Hosts analyst and R&D event | $23.14 | -4.85% | -0.95% | -$0.23 | -0.67 | 0.50 | |
| 17 | 10/24/2012 | 7:35 AM | Wed | 10/24/2012 | ARIAD Announces U.S. Food and Drug Administration Acceptance of NDA Filing for Ponatinib | $22.02 | -1.26% | -1.60% | -$0.36 | -1.14 | 0.26 | |
| 18 | 11/7/2012 | 7:35 AM | Wed | 11/7/2012 | ARIAD Reports Third Quarter 2012 Financial Results and Development Progress | $21.32 | -3.49% | -0.02% | $0.00 | -0.02 | 0.99 | |
| 19 | 11/28/2012 | 5:02 PM | Wed | 11/29/2012 | ARIAD Announces Publication of Ponatinib Phase 1 Clinical Trial Results in the New England Journal of Medicine | $22.56 | 4.78% | 2.76% | $0.59 | 2.09 | 0.04 | ** |
| 20 | 12/9/2012 | 8:05 AM | Sun | 12/10/2012 | ARIAD Announces 12-Month Data from Pivotal PACE Trial of Ponatinib in Heavily Pretreated Chronic-Phase CML Patients | $23.03 | 4.35% | 2.68% | $0.59 | 2.09 | 0.04 | ** |
| 21 | 12/14/2012 | 11:45 AM | Fri | 12/14/2012 | ARIAD confirms accelerated approval by FDA of Iclusig (and discloses unexpected blackbox warning) | $18.93 | -20.73% | -20.21% | -$4.83 | -15.70 | 0.00 | *** |
| 22 | 2/25/2013 | 7:35 AM | Mon | 2/25/2013 | ARIAD Reports 2012 Financial Results and Outlines Key Objectives for 2013 | $21.21 | 0.00% | 1.41% | $0.30 | 0.87 | 0.39 | |
| 23 | 3/22/2013 | 8:32 AM | Fri | 3/22/2013 | ARIAD Announces That Iclusig(TM) (Ponatinib) Receives Positive CHMP Opinion for Approval in the European Union | $19.38 | -1.67% | -2.56% | -$0.51 | -1.52 | 0.13 | |

**Exhibit 7**

**Summary Statistics of ARIAD Pharmaceutical, Inc.'s Event Dates During the Analysis Period**

| # | Date | Time | Day of Week | Market Date | Event | ARIAD Common Stock | | Rolling Regression Model (120-day rolling window)[1] | | | | |
|---|------|------|-------------|-------------|-------|-------|------------|-----------------|----------------------------|--------|---------|-------------------|
| | | | | | | Price | Raw Return | Abnormal Return | Abnormal Dollar Change | T-Stat | P-Value | Sig Level[2] |
| 24 | 4/4/2013 | 7:35 AM | Thu | 4/4/2013 | ARIAD Provides Update on Important Progress Being Made in R&D and Commercial Initiatives | $17.04 | 1.67% | 1.27% | $0.21 | 0.70 | 0.49 | |
| 25 | 4/8/2013 | 7:35 AM | Mon | 4/8/2013 | ARIAD Presents New Preclinical Data Showing Ponatinib is a Potent Inhibitor of RET and FGFR, Two Oncogenic Drivers of Non-Small Cell Lung Cancer | $17.25 | 2.19% | 1.95% | $0.33 | 1.07 | 0.29 | |
| 26 | 4/10/2013 | 8:00 AM | Wed | 4/10/2013 | ARIAD Presents New Preclinical Data Showing AP26113 Inhibits Clinically Relevant Mutants of ALK and ROS1 | $18.13 | 3.90% | 1.26% | $0.22 | 0.69 | 0.49 | |
| 27 | 5/7/2013 | 7:35 AM | Tue | 5/7/2013 | ARIAD Reports First Quarter 2013 Financial Results and Development Progress | $17.55 | 1.15% | 1.87% | $0.32 | 0.98 | 0.33 | |
| 28 | 5/15/2013 | N/A | Wed | 5/15/2013 | Abstracts released before the ASCO presentation on 6/3/2013 | $17.12 | -5.10% | -3.92% | -$0.71 | -1.94 | 0.05 | * |
| 29 | 6/1/2013 | 9:00 AM | Sat | 6/3/2013 | ARIAD Presents Analysis of Cardiovascular Risk Profile of Patients from Pivotal PACE Trial of Iclusig(R) (Ponatinib) | $17.74 | -3.27% | -1.73% | -$0.32 | -0.79 | 0.43 | |
| | 6/2/2013 | 9:00 AM | Sun | 6/3/2013 | ARIAD Presents Updated Phase 1 Data on AP26113 in Patients with Non-Small Cell Lung Cancer | $17.74 | -3.27% | -1.73% | -$0.32 | -0.79 | 0.43 | |
| 30 | 6/11/2013 | 7:35 AM | Tue | 6/11/2013 | ARIAD Announces Initiation of Phase 2 Trial of Ponatinib in Patients with Gastrointestinal Stromal Tumors | $18.94 | 1.01% | 1.03% | $0.19 | 0.46 | 0.65 | |
| 31 | 7/2/2013 | 7:46 AM | Tue | 7/2/2013 | ARIAD Announces Marketing Authorization for Iclusig(R) (ponatinib) in the European Union | $19.41 | -0.61% | -0.55% | -$0.11 | -0.24 | 0.81 | |
| 32 | 8/7/2013 | 7:35 AM | Wed | 8/7/2013 | ARIAD Reports Second Quarter 2013 Financial Results and Development Progress | $18.94 | 0.74% | 0.64% | $0.12 | 0.26 | 0.80 | |
| 33 | 9/4/2013 | 7:35 AM | Wed | 9/4/2013 | ARIAD Reaches 50 Percent Patient Enrollment in Phase 3 EPIC Trial of Iclusig | $20.35 | 5.99% | 3.82% | $0.73 | 1.52 | 0.13 | |
| 34 | 9/28/2013 | 5:30 AM | Sat | 9/30/2013 | ARIAD Presents Updated Phase 1/2 Data on AP26113 in Patients with Non-Small Cell Lung Cancer | $18.40 | -1.55% | -0.73% | -$0.14 | -0.27 | 0.79 | |
| 35 | 10/9/2013 | 7:00 AM | Wed | 10/9/2013 | ARIAD Announces Changes in the Clinical Development Program of Iclusig | $5.83 | -65.99% | -62.10% | -$10.64 | -23.21 | 0.00 | *** |

Source: S&P Capital IQ and Factiva.

Notes:

(1) The event study results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (NASDAQ Biotechnology Index), which ARIAD compares itself against in its 2011, 2012, and 2013 10-K filings. ARIAD was a member of the NASDAQ Biotechnology Index (around 125 members) throughout the Class Period and the Analysis Period. ARIAD's Common Stock returns are not removed from the Industry Index because the weighting methodology of the Industry Index is not publicly available, and ARIAD's price movements had a relatively minimal effect on the index returns due to the large amount of members in the Industry Index during the Analysis Period. The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements and the alleged corrective disclosure date have been removed from the estimation.

(2) "***" Denotes statistical significance at the 99% confidence level or greater, "**" denotes statistical significance at the 95% confidence level or greater, and "*" denotes statistical significance at the 90% confidence level or greater.

**Exhibit 8**
**Comparison of Statistical Significance and Abnormal Returns**
**for ARIAD Pharmaceuticals, Inc. Event Dates**
**vs. Days with No News**

| Statistic | Event Dates | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N | 35 | 64 |
| Significant Days at 95% Confidence Level | 7 | 2 |
| % Significant Days at 95% Confidence Level[1] | 20.00% | 3.13%[2] |
| Average Absolute Abnormal Return[3],[4] | 3.90% | 1.28% |

Source: S&P Capital IQ and Factiva.

Notes:

(1) 20.00% rate of statistical significance is statistically significantly different than 3.13% at the 95% confidence level.

(2) One would expect to observe 5% based on random chance alone. 3.13% is not statistically significantly different than 5% based on results of a t-test at the 95% confidence level.

(3) The event study results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (NASDAQ Biotechnology Index), which ARIAD compares itself against in its 2011, 2012, and 2013 10-K filings. ARIAD was a member of the NASDAQ Biotechnology Index (around 125 members) throughout the Class Period and the Analysis Period. ARIAD's Common Stock returns are not removed from the Industry Index because the weighting methodology of the Industry Index is not publicly available, and ARIAD's price movements had a relatively minimal effect on the index returns due to the large amount of members in the Industry Index during the Analysis Period. The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements and the alleged corrective disclosure date have been removed from the estimation.

(4) An average absolute abnormal return of 3.90% is statistically significantly different than 1.28% based on a t-test for difference of means at the 90% confidence level and nearly statistically significant at the 95% confidence level with a p-value of 0.053 (a p-value of 0.050 or less indicates statistical significance at the 95% confidence level).

**Exhibit 9**
## ARIAD Pharmaceuticals, Inc. Common Stock Market Capitalization
## 12/1/2011 - 12/31/2013



Source: S&P Capital IQ

**Exhibit 10**

## ARIAD Pharmaceuticals, Inc. Common Stock Market Capitalization Compared to Companies Traded on the NASDAQ During the Analysis Period

| Last trading day of: | ARIAD Market Capitalization (millions) | Percentile Rank in NASDAQ |
|---|---|---|
| Q4 2011 | $1,890.41 | 88.21% |
| Q1 2012 | $2,539.70 | 89.58% |
| Q2 2012 | $2,852.18 | 90.82% |
| Q3 2012 | $4,023.82 | 92.96% |
| Q4 2012 (Quarter During the Class Period) | $3,196.50 | 91.35% |
| Q1 2013 | $3,323.43 | 90.64% |
| Q2 2013 | $3,230.25 | 89.96% |
| Q3 2013 | $3,405.97 | 89.43% |

Source: S&P Capital IQ and Thomson Reuters Eikon.

**Exhibit 11**
**ARIAD Pharmaceuticals, Inc. Common Stock**
**Daily Bid-Ask Percentage Spread per Share during the Class Period**
**12/11/2012 - 12/14/2012**



Source: TICK Data

**Exhibit 12**

## ARIAD Pharmaceuticals, Inc. Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings

| Last Trading Day of: | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| Q4 2011 | 154,319 | 226 | 5,281 | 16,360 | 165,398 | 3.42% | 122,840 | 79.60% | 74.27% |
| Q1 2012 | 158,930 | 224 | 5,908 | 14,182 | 167,204 | 3.72% | 132,733 | 83.52% | 79.38% |
| Q2 2012 | 165,728 | 255 | 5,842 | 13,716 | 173,602 | 3.52% | 134,352 | 81.07% | 77.39% |
| Q3 2012 | 166,205 | 281 | 5,726 | 10,263 | 170,742 | 3.45% | 137,229 | 82.57% | 80.37% |
| Q4 2012 (Quarter During the Class Period) | 166,658 | 272 | 5,803 | 8,862 | 169,717 | 3.48% | 137,492 | 82.50% | 81.01% |
| Q1 2013 | 183,818 | 289 | 6,029 | 11,805 | 189,594 | 3.28% | 158,500 | 86.23% | 83.60% |
| Q2 2013 | 184,691 | 269 | 5,468 | 15,129 | 194,352 | 2.96% | 160,822 | 87.08% | 82.75% |
| Q3 2013 | 185,107 | 274 | 5,690 | 18,905 | 198,322 | 3.07% | 162,225 | 87.64% | 81.80% |
| Q4 2013 | 185,656 | 204 | 5,603 | 32,257 | 212,310 | 3.02% | 120,730 | 65.03% | 56.86% |

| Total Institutions over Analysis Period: | 488 | | | Average: | 3.32% | | 81.69% | 77.49% |
|---|---|---|---|---|---|---|---|---|

Sources: S&P Capital IQ.

Note: ARIAD shares sold short by institutions throughout the Analysis Period are not reflected in total institutional holdings because these shares are already accounted for in Short Interest (Column 5).

**Exhibit 13**
**ARIAD Pharmaceuticals, Inc. Common Stock**
**Test for Autocorrelation During the Analysis Period**

| Quarter | Coefficient on Previous Day Abnormal Return [1] | T-statistic |
|---|---|---|
| Q4 2011 | -0.03 | -0.13 |
| Q1 2012 | -0.17 | -1.34 |
| Q2 2012 | -0.20 | -1.58 |
| Q3 2012 | 0.07 | 0.56 |
| Q4 2012 (Quarter During the Class Period) | -0.10 | -0.78 |
| Q1 2013 | 0.18 | 1.39 |
| Q2 2013 | 0.20 | 1.62 |
| Q3 2013 | -0.16 | -1.24 |
| Q4 2013 | -0.25 | -0.70 |
| **Analysis Period** | **-0.01** | **-0.24** |

Source: S&P Capital IQ.
Note: The estimation period runs from 12/1/2011 - 10/9/2013.
(1) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. Earnings announcements and the alleged corrective disclosure date have been removed from the estimation.

**Appendix A**
**Documents Considered**

## Court Documents

- United States Court of Appeals For the First Circuit Opinion, *In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation*, dated November 28, 2016.
- Memorandum and Order, *In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation,* dated March 24, 2015.
- Corrected Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *In Re ARIAD Pharmaceuticals, Inc. Securities Litigation*, dated March 25, 2014.

## Court Decisions and Securities Law

- *Basic, Inc. v. Levinson*, 485 U.S. (1988).
- *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. (2014).
- Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. (D.N.J. 1989).
- *Krogman v. Sterritt* 202 F.R.D. (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## SEC Filings/Forms

- ARIAD Pharmaceuticals, Inc. 10-K filings submitted to the SEC related to the Analysis Period:
  - ARIAD Pharmaceuticals, Inc., 10-K for the Fiscal Year End December 31, 2013.
  - ARIAD Pharmaceuticals, Inc., 10-K for the Fiscal Year End December 31, 2012.
  - ARIAD Pharmaceuticals, Inc., 10-K for the Fiscal Year End December 31, 2011.
- ARIAD Pharmaceuticals, Inc. Form S-3ASR filed with the SEC on December 14, 2011.
- ARIAD Pharmaceuticals, Inc. 10-Q Quarterly filings submitted to the SEC during the Analysis Period.
- ARIAD Pharmaceuticals, Inc. 8-K Current reports submitted to the SEC during the Analysis Period.
- Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.

## Security Data

- Historical data for ARIAD Pharmaceuticals, Inc. Common Stock, NASDAQ Biotechnology Index and the S&P 500 Total Return Index were obtained from S&P Capital IQ.

- Trade and quote data for ARIAD Pharmaceuticals, Inc. during the Class Period and one hundred random companies trading on the New York Stock Exchange and NASDAQ in December 2012 were obtained from Tick Data, *see* https://tickapi.tickdata.com/.
- Institutional and Insider holdings data was obtained from S&P Capital IQ.
- Turnover velocity data for NASDAQ was obtained from the World Federation of Exchanges, *see* https://www.world-exchanges.org/home/index.php/statistics.
- The number of market makers during the Analysis Period and the Class Period for ARIAD Pharmaceuticals, Inc. Common Stock was obtained from Bloomberg.
- Data for ARIAD Pharmaceuticals, Inc. Common Stock Market Capitalization percentile rank among NASDAQ stocks was obtained from Thomson Reuters Eikon database.

## ARIAD Pharmaceuticals, Inc. News

- ARIAD Pharmaceuticals, Inc. news headlines and select articles downloaded from Factiva for the Analysis Period. News was obtained by executing a search via Factiva for "All Sources" with the company field "ARIAD Pharmaceuticals, Inc." or keyword fields "ARIAD Pharma" or "ARIAD Pharmaceuticals" for the period "December 1, 2011 – October 9, 2013." The Factiva search yielded 1,349 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. News articles include, but are not limited to:
  - "FDA approves Iclusig to treat two rare types of leukemia," *FDA News Release*, December 14, 2012.
  - "*DJ ARIAD Announces Accelerated Approval By FDA Of Iclusig (Ponatinib) For Patients With CML And Ph+ ALL Resistant Or Intolerant To Prior Tyrosine Kinase Inhibitor Therapy >ARIA," *Dow Jones*, December 14, 2012.
  - "FDA Approves Iclusig to Treat Two Rare Types of Leukemia," *Bloomberg News*, December 14, 2012.
- ARIAD Pharmaceuticals, Inc. earnings releases and earnings conference call transcripts throughout the Analysis Period.
- ARIAD Pharmaceuticals, Inc. press releases throughout the Analysis Period, including, but not limited to:
  - "ARIAD Announces Initiation of Randomized Phase 3 Trial of Ponatinib in Newly Diagnosed Patients with Chronic Myeloid Leukemia," *Business Wire,* July 27, 2012.
  - "ARIAD Announces 12-Month Data from Pivotal PACE Trial of Ponatinib in Heavily Pretreated Chronic-Phase CML Patients," *Business Wire,* December 9, 2012.
  - "ARIAD Announces Marketing Authorization for Iclusig(R) (Ponatinib) in the European Union," *Business Wire*, July 2, 2013.
  - "ARIAD Announces Changes in the Clinical Development Program of Iclusig," *Business Wire,* October 9, 2013.

## ARIAD Pharmaceuticals, Inc. Analyst Reports

- ARIAD Pharmaceuticals, Inc. analyst reports supplied by Investext via Thomson Reuters

for the period December 2011 to December 2013, including, but not limited to:

- o "Clinical Progress Continues – Reports 4Q11 Results," *Brean Murray Carret & Co.*, February 28, 2012.
- o "Reports Q1:12; Ponatinib Data At ASCO, AP26113 At ESMO," *Cowen and Company,* May 9, 2012.
- o "ARIA FY2Q12; Looking Past NDA Submission and Gearing Up for Launch," *Rodman & Renshaw*, August 2, 2012.
- o "Reports 4Q12 – 2013 Looking On Track Commercially And Clinically," *Brean Capital*, February 25, 2013.
- o "Initial Reaction to ARIA 4Q12 / FY12 Earnings Announcement," *JMP Securities,* February 25, 2013.
- o "Quick Take: EPIC Trial Initiated; Statistics Set Ponatinib Up For Success," *Cowen and Company,* July 27, 2012.
- o "Phase III EPIC Trial Initiated," *Barclays*, July 27, 2012.
- o "Ariad Makes EPIC Announcement; Ponatinib Pivots into Phase III," *Rodman & Renshaw,* July 27, 2012.
- o "Ponatinib Keeps PACE with Expectations at ASH," *Dawson James*, December 10, 2012.
- o "ASH 2012 Annual Meeting Update– Day 1 and Day 2 Update," *Summer Street Research Partners*, December 10, 2012.
- o "Positive Ariad Data & Mgt Updates at ASH," *UBS Investment Research,* December 10, 2012.
- o "Surprising Boxed Warnings Overshadow Iclusig' Rapid Approval," *JP Morgan¸* December 14, 2012.
- o "FDA Approves Iclusig for CML; Unexpected Label Warnings," *Oppenheimer*, December 14, 2012.
- o "Quick Take: Iclusig Approved. Black Box Unexpected, But Has Safety Changed?" *Cowen and Company*, December 14, 2012.
- o "Partial Clinical Hold on Iclusig Safety Concerns; Lowering Estimates," *Jefferies*, October 9, 2013.
- o "Thoughts on Iclusig's Negative Safety Update," *J.P. Morgan,* October 9, 2013.
- o Iclusig's CV Signal Gets Worse; Cutting Our Iclusig Ests," *Cowen and Company,* October 9, 2013.
- o "New Safety Data Lead to Partial Hold for Iclusig, Here's Some Scenarios," *RBC Capital Markets,* October 9, 2013.
- o "EMA Approves Iclusig, as Widely Expected," *Jefferies*, July 2, 2013.
- o "Iclusig Approved in Europe," *Cowen and Company,* July 2, 2013.
- o "ICLUSIG Approval in EU Expected, Opportunity Under-appreciated," *BMO Capital Markets,* July 2, 2013.

**Academic Articles/Texts**

- Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. (1970).
- Brad M. Barber, et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. Corp. L. 285 (1994).
- William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995.
- Yakov Amihud, et al., *Liquidity and Asset Prices*, 1 Found. & Trends Fin. (2005).
- Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 Law & Contemp. Probs. (2000).
- A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Literature (1997).
- John Binder, *The Event Study Methodology Since 1969*, 11 Rev. Quantitative Fin. & Acct. (1998).
- Damodar N. Gujarati, *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Phillip A. Braun, et al., *Good News, Bad News Volatility, and Betas*, 50 J. Fin. (1995).
- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.
- Jeffrey M. Rothenstein, George Tomlinson, Ian F. Tannock, and Allan S. Detsky, *Company Stock Prices Before and After Public Announcements Related to Oncology Drugs*, J Natl Cancer Inst (2011) 103 (20): 1507-1512.
- Thomas J. Hwang, *Stock Market Returns and Clinical Trial Results of Investigational Compounds: An Event Study Analysis of Large Biopharmaceutical Companies*, 2013, available at: http://dx.doi.org/10.1371/journal.pone.0071966
- Roger D. Huang & Hans R. Stall, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. Fin. Econ. (1996).
- William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Doron Avramov, et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. Fin. (2006).
- Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. Fin. Econ. (1978).

**Other**

- http://www.world-exchanges.org/home/
- http://www.sec.gov/answers/mktmaker.htm
- https://listingcenter.nasdaqomx.com/assets/initialguide.pdf
- http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf

- http://www.nasdaqomx.com/transactions/trading/equities
- http://www.nasdaq.com/reference/market_mechanics.pdf
- http://www.sec.gov/edgar/searchedgar/companysearch.html
- http://www.sec.gov/about/forms/form13f.pdf/
- http://www.rss-specifications.com/
- http://www.rss-specifications.com/what-is-rss.html

APPENDIX B

CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:          (312) 470-6500
Mobile:        (815) 382-0092
Email:          ccoffman@globaleconomicsgroup.com

## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

    **B.A.**    Knox College, 1995
                Economics, Magna Cum Laude
                Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
                Supply Pricing:  Using Galesburg, Illinois as a Case Study"
                Dean's List Every Term
                Phi Beta Kappa

**PROFESSIONAL EXPERIENCE:**

<u>Securities, Valuation, and Market Manipulation Cases:</u>

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

  - In Re: <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation</u>.  Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: <u>Schering-Plough Corporation/ Enhance Securities Litigation</u>. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: <u>REFCO Inc. Securities Litigation</u>. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: <u>Computer Sciences Corporation Securities Litigation</u>. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
  - Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>.  Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed rebuttal expert report August 4, 2010.  Filed declaration re: Plan of Allocation September 25, 2009**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009. Filed rebuttal expert report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.  Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed rebuttal expert report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed rebuttal expert report July 8, 2010.  Deposition September 1, 2010. Filed supplemental rebuttal expert report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>.  Filed rebuttal expert report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed rebuttal expert report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed rebuttal expert report September 26, 2011. Filed expert report March 16, 2012. Filed rebuttal expert report April 9, 2012. Filed rebuttal expert report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed rebuttal expert report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed rebuttal expert report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed rebuttal expert report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed rebuttal expert report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed rebuttal expert report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed rebuttal expert report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed rebuttal expert report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed rebuttal expert report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert report May 13, 2016. Deposition June 10, 2016.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed rebuttal expert report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed rebuttal expert report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed rebuttal expert report December 7, 2015. Filed expert report November 18, 2016. Filed expert report January 17, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed rebuttal expert report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed rebuttal expert report February 2, 2016. Filed expert reply report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan</u>

Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division. Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division. Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert report February 10, 2017.

- Testifying expert in KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division. Filed expert report October 31, 2016. Deposition January 5, 2017.

- Testifying expert in Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York. Filed expert report November 7, 2016. Filed expert report February 17, 2017.

- Testifying expert in Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division. Filed expert report November 10, 2016. Deposition December 9, 2016.

- Testifying expert in Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada. Filed declaration re: damages December 8, 2016.

Experience in Labor Economics and Discrimination-Related Cases:

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

      KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
      KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

      Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

## PROFESSIONAL AFFILIATIONS:

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

## AWARDS:

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

## PERSONAL ACTIVITIES:

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.