**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

IN RE ARIAD PHARMACEUTICALS,    )  No. 1:13-cv-12544 (WGY)
INC. SECURITIES LITIGATION        )


**JOINT DECLARATION OF SANFORD P. DUMAIN, JOHN C. BROWNE, AND
JONATHAN GARDNER IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND
(II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT
<u>OF LITIGATION EXPENSES</u>**

We, SANFORD P. DUMAIN, JOHN C. BROWNE, and JONATHAN GARDNER, declare as follows pursuant to 28 U.S.C. §1746:

1.      Sanford P. Dumain is an of counsel at the law firm of Milberg Tadler Phillips Grossman LLP ("Milberg"), John C. Browne is a partner of the law firm of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), and Jonathan Gardner is a partner of the law firm of Labaton Sucharow LLP ("Labaton Sucharow").  Milberg, Bernstein Litowitz, and Labaton Sucharow serve as Court-appointed Co-Lead Counsel for Settlement Class Representatives William A. Gaul ("Dr. Gaul") and the City of Fort Lauderdale Police & Fire Retirement System (the "City of Fort Lauderdale") (collectively, "Settlement Class Representatives") and the proposed Settlement Class in the Action.  We have been actively involved in the prosecution and settlement of the Action, are familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon our supervision and participation in all material aspects of the Action.[1]

2.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, we submit this declaration in support of the Settlement Class Representatives' Motion for Final Approval of Class Action Settlement and Plan of Allocation.  We also submit this declaration in support of Plaintiffs' Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses.   Both motions have the full support of the Settlement Class Representatives.  *See* Declaration of William A. Gaul, dated April 4, 2018 attached hereto as

---

[1] All capitalized terms used herein that are not otherwise defined shall have the meanings provided in the Stipulation and Agreement of Settlement, dated as of November 29, 2017 (ECF No. 236) (the "Stipulation").

Exhibit 1 and Declaration of Lynn Wenguer on Behalf of the City of Fort Lauderdale, dated April 3, 2018, attached hereto as Exhibit 2.[2]

## I.   PRELIMINARY STATEMENT

3.   The proposed Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $3,500,000, for the benefit of the Settlement Class.  The proposed Settlement does not provide for any "reversion" to Defendants and it is not "claims-made," meaning that once the Settlement reaches its Effective Date, the Defendants will have no right to a return of any settlement funds depending upon the amount of claims submitted.  *See* Stipulation ¶14 ("This is not a claims-made settlement. The entire Net Settlement Fund shall be distributed to the Authorized Claimants.  The Defendants shall not be entitled to the return of any of the settlement monies once the Settlement reaches the Effective Date. The Defendants and Defendants' Counsel shall have no involvement in reviewing or challenging claims.").

4.   As detailed herein, the Settlement Class Representatives and Plaintiffs' Co-Lead Counsel respectfully submit that the Settlement represents a favorable result for the Settlement Class in light of the significant benefit achieved for the Settlement Class and the risks of a lesser, or no, recovery after continued prosecution of the Action.

5.   In entering into the Settlement with Defendants,[3] the Settlement Class Representatives and Plaintiffs' Co-Lead Counsel were fully informed about the strengths and

---

[2] Citations to "Exhibit" or "Ex.___" herein refer to exhibits to this Joint Declaration.  For clarity, citations to exhibits that have attached exhibits will be referenced as "Ex. __-__."  The first numerical reference refers to the designation of the entire exhibit attached hereto and the second alphabetical reference refers to the exhibit designation within the exhibit itself.

weaknesses of the case.  The Parties reached an agreement in principle to settle the Action in May 2017—more than three-and-a-half years after the commencement of the Action—and only after extensive litigation before this Court and the U.S. Court of Appeals for the First Circuit ("First Circuit").  As set forth more fully below, Plaintiffs' Counsel: (i) conducted a thorough and wide-ranging investigation concerning the allegedly fraudulent misrepresentations made by Defendants, which included a review and analysis of: documents filed publicly by the Company with the U.S. Securities and Exchange Commission ("SEC"); press releases, news articles, and other public statements, issued by or concerning the Company, Defendants, and ponatinib; research reports issued by financial analysts concerning the Company and ponatinib; information concerning clinical trials related to ponatinib conducted by the Company and submitted to the United States Food and Drug Administration ("FDA"); and interviews with 38 potential witnesses, who were either former ARIAD employees or other persons with relevant knowledge; (ii) prepared and filed a detailed consolidated complaint, styled Corrected Consolidated Complaint for Violations of the Federal Securities Laws, (the "Complaint"), which included the accounts of seven confidential witnesses; (iii) researched and drafted an opposition to the comprehensive motions to dismiss the Complaint filed by Defendants and the underwriter defendants; (iv) participated in oral argument on the motions to dismiss; (v) appealed the Court's order granting the motions to dismiss, which resulted in a partial reversal with respect to the Exchange Act claims during an abbreviated four-day class period and the case being remanded; (vi) moved for class

---

[3] Defendants are ARIAD Pharmaceuticals, Inc. ("ARIAD") and Harvey J. Berger, Timothy P. Clackson, Edward M. Fitzgerald, and Frank G. Haluska.

certification; (vii) successfully opposed Defendants' Motion for Judgment on the Pleadings; (viii) engaged in fact discovery, which included Plaintiffs' Counsel's analysis of documents produced by Defendants; (ix) conferred with experts on damages, insider trading and loss causation issues, as well as a pharmaceutical industry expert; and (x) engaged in extensive mediation efforts with former Judge Faith S. Hochberg (Ret.) of the United States District Court for the District of New Jersey that included the preparation of mediation briefs, a full-day mediation session, and extensive subsequent negotiations.

6.      As discussed in further detail below, given the facts, the applicable law, and the risk and expense of continued litigation, the Settlement Class Representatives and Plaintiffs' Co-Lead Counsel submit that the proposed Settlement is fair, reasonable and adequate, represents a very favorable result, and is in the best interests of the Settlement Class.  Indeed, the Settlement recovers a significant amount of the Settlement Class's maximum estimated damages for the four-day Class Period that the First Circuit upheld.  Based on the estimate of aggregate damages by the Settlement Class Representatives' consulting damages expert, which totaled approximately $10.5 million, the Settlement represents approximately 33.3% of maximum recoverable class-wide aggregate damages, an outstanding result particularly when compared to the risks that continued litigation might result in a vastly smaller recovery, or no recovery at all.

7.      With respect to the proposed Plan of Allocation for the net settlement proceeds, as discussed in further detail below, the proposed Plan of Allocation was developed with the assistance of the Settlement Class Representatives' damages expert, and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms

that are approved for payment by the Court on a *pro rata* basis based on their losses attributable to the alleged fraud.

8.      Additionally, Plaintiffs' Co-Lead Counsel, on behalf of all Plaintiffs' Counsel, request an award of attorneys' fees, payment of litigation expenses, and PSLRA reimbursement for the Settlement Class Representatives.  Specifically, Plaintiffs' Co-Lead Counsel are applying for a fee award of $875,000 (*i.e.,* 25% of the Gross Settlement Fund) and for payment of their litigation expenses in the amount of $288,846.02, plus interest on the awarded amounts at the rate earned by the Gross Settlement Fund.  The Settlement Class Representatives are seeking $61,450, in the aggregate, pursuant to the PSLRA.  As explained in the accompanying memorandum of law in support of Plaintiffs' Co-Lead Counsel's requests, the requested fee of 25% of the Gross Settlement Fund is consistent with amounts awarded in similar actions.  The Settlement Class Representatives support the requests.  *See* Ex. 1 ¶¶ 1, 6-7; Ex. 2 ¶¶1, 4.

## II.      FACTUAL BACKGROUND

9.      As set forth in the Complaint, ARIAD is a pharmaceutical manufacturer focused on developing drugs for the treatment of cancer.  Complaint ¶36.  Traditionally, ARIAD designed and developed drugs in-house, then licensed them to larger pharmaceutical companies with the capacity to market and distribute them.  *Id*. ¶37.  As alleged in the Complaint, in 2007, ARIAD's CEO, Berger, sought to remake ARIAD into what he later termed a "self-sustaining global, commercial drug company" meaning that ARIAD would now market the Company's drugs itself and retain all generated profits.  *Id*.  ARIAD selected ponatinib, a developmental-stage cancer medication to drive this new business strategy.  To

fund the development of ponatinib, ARIAD conducted two public stock offerings during the class period, collectively raising more than $560 million from investors. *Id.* ¶¶61-64.

10.      In order to obtain FDA approval to market and sell ponatinib, ARIAD enrolled the drug in a series of clinical trials including a PACE 1 clinical trial designed to test ponatinib's safety and efficacy across several dosage levels and a multi-year PACE 2 trial. *Id.* ¶¶45, 47, 431.

11.      The Complaint was brought against ARIAD and four of its officers, Chief Executive Officer Harvey Berger, Chief Financial Officer Edward Fitzgerald, Chief Medical Officer Frank Haluska, and Chief Scientific Officer Timothy Clackson alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  The Complaint also alleged violations of Sections 11 and 15 the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77(0) against ARIAD, Berger, Fitzgerald, six directors who signed the Registration Statement in connection with the 2013 Stock Offering, and seven underwriters[4] who served as underwriters and/or selling agents in connection with the 2013 Stock Offering.

## III.   PROCEDURAL HISTORY

### A.   Commencement of the Action and Appointment of Lead Plaintiffs and Lead Counsel

12.      In October 2013, an initial securities class action complaint was filed in the United States District Court for the District of Massachusetts (the "Court") on behalf of

---

[4] These underwriters include: J.P. Morgan Securities LLC, Cowen and Company, LLC, Jefferies & Company, Inc., BMO Capital Markets Corp., Leerink Swann LLC, RBC Capital Markets, LLC, UBS Securities LLC.

investors in ARIAD.  This complaint alleged a class period of December 12, 2011 through October 8, 2013. ECF No. 1.

13.     Pursuant to Section 21D(a)(3) of the Exchange Act, 15 U.S.C. §78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), seven movants  applied for appointment as lead plaintiffs along with their respective chosen counsel. *See* ECF Nos. 9, 13, 15, 20, 25, 28, 31.

14.     On January 9, 2014, the Court entered an Order appointing the City of Fort Lauderdale, Dr. Gaul, Joseph Bradley ("Bradley"), the Pension Trust Fund for Operating Engineers ("Operating Engineers") and the Automotive Industries Pension Trust Fund ("Automotive Industries") as lead plaintiffs (collectively "Plaintiffs")[5] pursuant to the PSLRA and consolidating related securities class actions into the litigation, *In re ARIAD Pharmaceuticals, Inc. Securities Litigation*, Case No. 13-cv-12544 (WGY).  ECF No. 95.  By the same Order, the Court approved lead plaintiffs' selection of Labaton Sucharow, Bernstein Litowitz, and Milberg as Co-Lead Counsel for the class.  *Id*.

### B.     The Consolidated Class Action Complaint

15.     The Settlement Class Representatives filed the operative complaint in the Action, styled the Corrected Consolidated Complaint for Violations of the Federal Securities Laws, on March 25, 2014, asserting claims under Sections 10(b) and 20(a) of the Exchange

---

[5] Bradley, Operating Engineers, and Automotive Industries were appointed lead plaintiffs on January 9, 2014, along with the City of Fort Lauderdale and Dr. Gaul, but while their purchases of ARIAD common stock were made within the class period alleged in the filed complaints, their shares were only held during the Settlement Class Period, not purchased or otherwise acquired. Therefore, Bradley, Operating Engineers, and Automotive Industries are not members of the Settlement Class and are not bound by or eligible to participate in this Settlement.

Act and claims under Sections 11 and 15 of the Securities Act.  ECF No. 131.  The Exchange

Act allegations were detailed in paragraphs 20 through 415 of the Complaint and the Securities

Act allegations were detailed in paragraphs 416-485.  The class period alleged in this

complaint was December 12, 2011 through October 30, 2013.

16.     The Complaint was the result of a significant effort by Plaintiffs' Co-Lead

Counsel that included, among other things, the review and analysis of:  (i) documents filed

publicly by the Company with the SEC; (ii) press releases, news articles, and other public

statements, issued by or concerning the Company, Defendants, and ponatinib; (iii) information

concerning clinical trials related to ponatinib conducted by the Company and submitted to the

FDA; (iv) research reports issued by financial analysts concerning the Company and ponatinib;

(v) economic analyses of securities movement and pricing data; and (vi) transcripts of investor

calls with ARIAD senior management.  The investigation also included Plaintiffs' Co-Lead

Counsel's in-house investigators' interviews of 38 individuals who were either former ARIAD

employees or other persons with potentially relevant knowledge, seven of whom became

confidential witnesses named in the Complaint.  Additionally, in preparing the Complaint,

Plaintiffs' Co-Lead Counsel consulted with experts on issues related to loss causation, insider

trading, damages, the pharmaceutical industry, and new drug development.

17.     In general, the Complaint alleged that Defendants violated the federal securities

laws by making false and misleading statements and omissions regarding the commercial

prospects, safety profile and efficacy of the Company's single most important product,

ponatinib, and its prospects for approval for front line use by the FDA with a "favorable label"

for the drug.  For example, the Complaint alleges that during the Class Period, Defendants told

the market that data from a clinical test (known as the PACE 2 trial) was showing that ponatinib was highly effective at treating CML and that the drug was "safe and well-tolerated." Complaint ¶72.  These and similar statements, which were repeated by Defendants throughout 2012, allegedly caused ARIAD's stock price to rise over 122% from $11.31 on December 12, 2011 to $25.16 by October 2012.  As ARIAD's CEO publicly acknowledged, this increase was "driven by the…compelling clinical data" supposedly supporting ponatinib's safety and efficacy.  *Id*. ¶5

18.     Investors were alleged to have begun to learn the truth on December 14, 2012 when ARIAD announced that the FDA had determined, based on data from the PACE 2 trial that had long been in the possession of ARIAD and its senior executives, that ponatinib was causing a significant number of serious and previously undisclosed adverse events.  As a result, the FDA determined that while ponatinib would be approved for sale as a secondary treatment (i.e., for those patients that had tried other drugs without success), it could be marketed and sold only with a so-called "black box" warning – the strongest warning that can appear on the packaging for a prescription medication under FDA guidelines.  *Id*. ¶7.  In response, ARIAD's stock declined from $23.88 to $18.93, a drop of 21% in a single day.  *Id*. ¶8.[6]

C.     **Motions to Dismiss the Complaint**

19.     On April 14, 2014, Defendants moved to dismiss the Complaint.  ECF No. 147-48.  The underwriter defendants also moved to dismiss the Complaint.  ECF Nos. 144-45.

---

[6] Additional alleged disclosures were made in 2013, but they did not survive the Defendants' motion to dismiss and were not reinstated in connection with the appeal.

Defendants' motion cited dozens of cases and raised numerous legal issues aimed at undermining the Plaintiffs' claims and allegations.

20.     Among other things, Defendants argued that statements made before the drug's approval concerning safety, tolerability, and dose modifications were not false and misleading. Regarding statements made after approval, among other things, Defendants argued that they were not misleading by omission because the information allegedly missing was actually disclosed in the prescribing information.

21.     Regarding scienter, Defendants argued, among other things, that:

(a)     Allegations that ponatinib was an important product for ARIAD were generic and too universal to demonstrate scienter.

(b)     The allegations that Defendants closely monitored the clinical trials and the data from post-approval sales of ponatinib were too vague to demonstrate scienter because they did not allege what Defendants knew and when they knew it.

(c)     The insider trading allegations failed to support an inference of scienter because the insider sales in question were undertaken in the ordinary course to satisfy tax obligations and such sales raise no inference of scienter.

(d)     Many of the insider sales occurred pursuant to Rule 10b5-1 trading plans which also reduces any inference of scienter.

22.     Regarding the Securities Act claims, Defendants and the underwriter defendants argued that Plaintiffs failed to plead that their shares were traceable to the 2013 Stock Offering, and therefore, the claims under Section 11 of the Securities Act should be dismissed.  In particular, the Defendants argued that Plaintiffs failed to allege that they purchased shares directly in ARIAD's January 24, 2012 secondary offering.

23.     The underwriter defendants also argued that, in addition, the Offering Materials contained no material misstatements or omissions, as all material information was disclosed in the Offering Materials or other public disclosures prior to the 2013 Stock Offering.

24.     On May 21, 2014, the Plaintiffs filed an omnibus opposition to Defendants' motions to dismiss the Complaint.  ECF No. 157.  Regarding the Exchange Act claims, the Plaintiffs argued that the Complaint sufficiently alleged that Defendants made false and misleading statements regarding ponatinib with scienter.  The Plaintiffs argued that, among other things:

(a)     Defendants conflated falsity and scienter.  In pre-approval statements Defendants assured investors that data from PACE 2 indicated that ponatinib was both effective and safe for the intended treatment population.  However, in contrast to Defendants' statements, the Complaint detailed that the drug was causing significant adverse events, and this was known to Defendants.

(b)     Regarding the pre-approval statements about dose reduction, the mere fact that the FDA had approved a 45mg dose in the PACE 2 trial did not relieve Defendants of the obligation to inform investors of the material fact that the 45mg dosage had high toxicity and that the majority of patients were not consistently receiving that dosage.

(c)     With respect to the post-approval statements, Defendants' argument that the truth was on the market was baseless.

25.     Plaintiffs also argued that, with regard to scienter, among other things:

(a)     The Individual Defendants' massive and highly unusual stock sales during the alleged class period raised a strong inference of scienter.  In particular, Plaintiffs argued that Defendants' explanation of the sales based on "tax obligations" was unsupported and could not be credited on a motion to dismiss.

(b)     The Rule 10b5-1 trading plans were created during the class period and could have been designed to allow defendants to take advantage of inflated stock price or insider information.

     (c)    Defendants' admissions made to the FDA evidenced their knowledge of facts contrary to their alleged misstatements: Defendants prepared and submitted the July 2012 Report and the August 2013 Report, both of which formed the sole basis for the FDA's decision in December 2012 to require a stringent black box warning label and later to suspend enrollment in ponatinib clinical trials.

     (d)    Ponatinib was the Company's single most important product and accounted for nearly 80% of the Company's valuation, and that when a company's key business segment is the subject of misleading statements, courts hold that insiders are likely to be aware of the facts, thereby strengthening the inference of scienter.

26.    Regarding the Securities Act claims, the Plaintiffs argued that the Complaint alleged that they and other members of the class purchased ARIAD common stock "pursuant or traceable to the false and misleading Offering Materials," which is sufficient at the pleading stage to establish standing. The Plaintiffs also argued that the Complaint alleged materially false and misleading statements in connection with the January 2013 Stock Offering given that the PACE 2 data gave rise to material, adverse facts, trends, and uncertainties that Defendants were required to disclose at the time of the Offering, including that adverse events were increasing over time.

27.    On June 5, 2014, the Defendants and the underwriter defendants filed reply briefs in further support of their motions. ECF Nos. 162 and 166.

**D.    The Court Grants Defendants' Motion to Dismiss the Complaint**

28.    On June 10, 2014, the Court heard oral argument on the motions to dismiss. On March 25, 2015, the Court issued a Memorandum and Order granting the motions and dismissed the Complaint in their entirety. ECF No. 173.

29.    With respect to the Exchange Act claims, the Court ruled that while Plaintiffs had pled material falsity as to most of the alleged misstatements, although not the post-

approval statements, they failed to plead scienter.  While the allegations of unusual trading volume and frequency supported an allegation of insider trading, the scienter facts in their totality did not amount to a strong inference of scienter.

30.     With respect to the Securities Act claims, the Court ruled that Plaintiffs had sufficiently alleged standing under Section 11.  However, the Court ruled that they failed to allege actionable misstatements or omissions in the Offering materials, given, *inter alia*, that negative information about ponatinib was available to the market at the time of the Offering and the Complaint did not sufficiently specify when and the extent to which additional negative, but undisclosed, information came to light.

### E.     Plaintiffs' Appeal to the First Circuit

31.     On April 21, 2015, the Plaintiffs filed a Notice of Appeal of the Court's Memorandum and Order.  ECF No. 175.  On August 5, 2015, the Plaintiffs filed their opening brief.  1st Cir. ECF No. 9.  The issues on appeal included, among other things, whether: (i) Plaintiffs established a strong inference of scienter by pleading that Defendants closely monitored and had real-time access to highly material adverse data regarding severe side effects occurring in their core product, and knew (or recklessly disregarded) that the prescribed dose of the drug was being reduced to levels that would risk its crucial FDA front-line approval; (ii) Plaintiffs were required to plead intent to defraud or active concealment, rather than knowledge or recklessness; (iii) Plaintiffs had adequately pled false and misleading statements under the Exchange Act and the Securities Act; and (iv) whether Plaintiffs had adequately alleged standing to pursue claims under the Securities Act.

32.     On September 25, 2015, the Defendants and the underwriter defendants submitted their appellee briefs.  Defendants argued that the Court should affirm the dismissal of the Complaint because, among other things: (i) the Complaint did not generate the requisite inference of culpability because it did not specify what the Defendants knew or when they knew and because the far more cogent explanation for the Defendants' behavior is that they reasonably took the opportunity to assess (and to allow the FDA to assess) the possibility of a causal link; and (ii) with respect to the alleged post-approval misstatements and omissions, the Complaint also did not adequately allege material falsity, scienter, or a duty to disclose.

33.     The underwriter defendants argued, among other things, that (i) the Court correctly held that Plaintiffs had failed to identify any material misstatements or omissions in the Offering Materials; and (ii) the First Circuit should affirm the Court's Final Judgment on the alternative and independently sufficient ground that Plaintiffs failed to plead facts plausibly showing that they purchased ARIAD shares issued in the 2013 Stock Offering itself.

34.     After oral argument was held, on November 28, 2016, the First Circuit reversed the dismissal of the claims under Section 10(b) and Section 20(a) of the Exchange Act, but only with respect to pre-approval statements made by Defendants **on December 11, 2012** in a report issued by Cowen and Company (the "Cowen Report").  The Cowen Report allegedly stated, in pertinent part, that "'management continues to be optimistic about ponatinib's prospects for approval in the U.S. . . .with a favorable label.'  It further indicated that the drug's 'profile continues to look very benign, with few worrisome signals.'  The report cited pancreatitis as 'the most prevalent' serious adverse event (occurring in 5% of patients) and

noted 'low rates of cardiovascular issues.'" *Bradley v. ARIAD Pharms.*, 842 F.3d 744, 753 (1st Cir. Nov. 28, 2016).

35.     The First Circuit affirmed the dismissal of all other claims, including the dismissal of the claims from December 12, 2011 to December 10, 2012, and from December 15, 2012 to October 30, 2013, and all claims under the Securities Act for lack of standing.

36.     The very narrowed case was remanded back to the District Court.  *See In re ARIAD Pharms. Sec. Litig.*, 842 F.3d 744 (1st Cir. 2016).  Thus upon remand the only claims that were alive arose under the Exchange Act, were against the Defendants, centered on alleged statements only in the Cowen Report, and involved a class period of just four days, from December 11, 2012 through December 14, 2012.   All claims against the underwriter defendants were dismissed.

37.     On February 2, 2017, Defendants filed an answer to the Complaint, denying the Complaint's substantive allegations and raising five affirmative defenses.  ECF No. 193.

38.     On February 7, 2017, the Court referred the case to Alternative Dispute Resolution, to be conducted by May 2017.  ECF No. 195.

**F.      Plaintiffs' Motion for Certification of the Class**

39.     On March 6, 2017, Plaintiffs filed a motion for class certification.  ECF No. 197.  Plaintiffs argued that the Action was appropriate for class action treatment and that all the requirements of Federal Rule of Civil Procedure 23 were satisfied.   Plaintiffs moved for certification on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, shares of ARIAD publicly traded common stock during the period from December 11, 2012 through December 14, 2012, inclusive.

40.     In connection with the class certification motion, the Plaintiffs submitted a report from Chad Coffman, CFA, which opined that the market for ARIAD common stock was efficient during the proposed class period and that damages are subject to a common methodology.  ECF No. 198-1.

41.     On March 9, 2017, Defendants filed a Motion for Judgment on the Pleadings together with a Memorandum of Law in support of the motion.  ECF Nos. 203-04.  Defendants argued, among other things, that because the Plaintiffs relied on an incomplete description of the Cowen Report, did not attach the document to their Complaint, and only mentioned it in their appellate brief in reply, the First Circuit did not know what the Report actually said, and could not have conclusively assessed the viability of the claims based on it, and, therefore, the Court could and should fill the gap by considering the entirety of the Cowen Report. Defendants argued that when the Court considers the entirety of the Cowen Report, it should conclude that the Plaintiffs cannot establish that the two remaining statements were false or misleading when made.

42.     On March 23, 2017, the Plaintiffs filed their opposition to Defendants' Motion for Judgment on the Pleadings.  ECF No. 208.  The Plaintiffs argued that Defendants' highly factual arguments were not only inappropriate on a motion for judgment on the pleadings, but that Defendants' arguments were substantively wrong.

43.     On April 18, 2017, Defendants filed a reply brief in further support of their Motion for Judgment on the Pleadings.  ECF No. 212.

44.     The Court denied Defendants' Motion for Judgment on the Pleadings following a hearing before the Court on May 18, 2017.

## IV.    DISCOVERY

45.    Discovery was underway when the Parties agreed to settle.  On February 10, 2017, Plaintiffs propounded detailed discovery requests on Defendants.  Plaintiffs sought a variety of documents, including, among others, documents concerning the safety and efficacy of ponatinib; documents concerning the PACE trial; documents concerning proposed trials studies or analyses concerning ponatinib.  Defendants served their responses and objections to plaintiffs' discovery requests on March 16, 2017.  Plaintiffs engaged in a thorough meet and confer process with Defendants on the scope of discovery, reviewing and analyzing the initial phase of Defendants' production before the Parties agreed to settle the Action.

46.    On March 21, 2017, Defendants served Plaintiffs with document requests and interrogatories related to class issues.  Plaintiffs served Defendants with their responses and objections on April 20, 2017.  In response to Defendants' discovery requests, Plaintiffs began producing responsive documents, including organizational charts, account statements and trading activity, and any non-privileged communications regarding ARIAD.

47.    Plaintiffs also subpoenaed the production of documents from third-parties, including the FDA and the hospital at which ponatinib's clinical trials were conducted.

## V.    SETTLEMENT NEGOTIATIONS

### A.    Mediation

48.    On May 24, 2017, the Parties participated in a full-day mediation session before Judge Hochberg, in an attempt to achieve a negotiated resolution of the claims in the Action. Prior to the mediation session, the Parties exchanged detailed mediation statements discussing their respective views of the claims and alleged damages.  The Parties agreed to a resolution of

the Action at the mediation and entered into a term sheet setting forth material deal points associated with settlement of the Action.

49.     The Parties subsequently negotiated the terms of the Stipulation, which was executed by the Parties on November 29, 2017.  On November 30, 2017, the Settlement Class Representatives moved for preliminary approval of the Settlement, as supplemented on December 28, 2017.  ECF No. 242.  On January 19, 2018, the Court entered the Preliminary Order for Notice and Hearing in Connection with Settlement Proceedings ("Order for Notice and Hearing"), authorizing that notice of the Settlement be sent to Settlement Class Members and scheduling the Settlement Hearing for May 10, 2018 to consider whether to grant final approval to the Settlement.  ECF No. 245.

## VI.    THE SETTLEMENT CLASS REPRESENTATIVES' COMPLIANCE WITH ORDER FOR NOTICE AND HEARING AND REACTION OF THE SETTLEMENT CLASS TO DATE

50.     Pursuant to the Order for Notice and Hearing, the Court appointed Epiq Class Action & Claims Solutions, Inc. ("Epiq") as Claims Administrator in the Action and instructed Epiq to disseminate copies of the Notice of Pendency of Class Action and Proposed Settlement, Motion for Attorneys' Fees and Expenses, and Settlement Fairness Hearing (the "Notice") and Proof of Claim (collectively the "Claim Packet") by mail and to publish the Publication Notice.

51.     The Notice, attached as Exhibit A to the Declaration of Alexander Villanova Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Mailing Decl." or "Mailing Declaration") (Exhibit 3 hereto), provides potential Settlement Class Members with

information about the terms of the Settlement and contains, among other things: (i) a description of the Action and the Settlement; (ii) the terms of the proposed Plan of Allocation; (iii) an explanation of Settlement Class Members' right to participate in the Settlement; (iv) an explanation of Settlement Class Members' rights to object to the Settlement, the Plan of Allocation, and/or the Plaintiffs' Co-Lead Counsel's Application for fees and expenses, or exclude themselves from the Settlement Class; and (v) the manner for submitting a Claim Form in order to be eligible for a payment from the net proceeds of the Settlement. The Notice also informs Settlement Class Members of Plaintiffs' Co-Lead Counsel's intention to apply for an award of attorneys' fees in an amount not to exceed $1,050,000 (30% of the settlement amount) and for payment of litigation expenses in an amount not to exceed $450,000, including an application for reimbursement of the reasonable costs and expenses incurred by the Settlement Class Representatives.

52.    As detailed in the Mailing Declaration, Epiq mailed Claim Packets to potential Settlement Class Members as well as banks, brokerage firms, and other third party nominees whose clients may be class members. Mailing Decl. ¶¶3-12. In total, to date, Epiq has mailed 7,675 Claim Packets to potential nominees and Settlement Class Members by first-class mail, postage prepaid. *Id.* ¶11. To disseminate the Notice, Epiq obtained the names and addresses of potential Settlement Class Members from listings provided by ARIAD's transfer agent and from banks, brokers and other nominees. *Id.* ¶¶4, 6-7, 10.

53.    On February 12, 2018, Epiq caused the Publication Notice to be published in *Investor's Business Daily* and to be transmitted over *PR Newswire*. *Id.* ¶13 and Exhibit C thereto.

54.     Epiq also maintains and posts information regarding the Settlement on a dedicated website established for the Settlement, www.AriadSecuritiesLitigation.com, which provides Settlement Class Members with information concerning the Settlement, as well as downloadable copies of the Claim Packet and the Stipulation.  *Id*. ¶18.

55.     Pursuant to the terms of the Order for Notice and Hearing, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the application for attorneys' fees and expenses, or to request exclusion from the Settlement Class is April 19, 2018.  To date, no objections to the Settlement or the Plaintiffs' Co-Lead Counsel's application for attorneys' fees and expenses have been received, and no requests for exclusion have been received.  Should any objections or requests for exclusion be received, the Settlement Class Representatives will address them in their reply papers, which are due to be filed with the Court on May 3, 2018.

## VII.    RISKS FACED BY CONTINUED LITIGATION OF THE ACTION

56.     Based on their experience and close knowledge of the facts and applicable law, Plaintiffs' Co-Lead Counsel believe that the Settlement is in the best interests of the Settlement Class.  As described herein, at the time of settlement, there were significant risks facing the Settlement Class Representatives with respect to establishing both liability and damages. Plaintiffs' Co-Lead Counsel also realize that the Settlement Class Representatives faced considerable risks and obstacles to achieving a greater recovery, were the case to continue. The Settlement Class Representatives and Plaintiffs' Co-Lead Counsel carefully considered these challenges during the months leading up to the Settlement and during the settlement discussions with Defendants.

A.      **Risks Concerning Liability**

57.      As the case progressed, Defendants' would continue to argue that the Settlement Class Representatives could not prove that the challenged statements summarized in the Cowen Report, of which there were only two, were materially false and misleading when made.

58.      While the First Circuit found that the Complaint sufficiently pled that statements made in the December 11, 2012 Cowen Report regarding the Defendants' "optimism" about the prospects of FDA approval of ponatinib with a "favorable label" were misleading, Defendants would argue and seek to prove, among other things, that the Company's optimism was in fact justified given that the FDA approved ponatinib and gave it a favorable label for patients who were "resistant or intolerant to prior tyrosine kinas inhibitor therapy."  Defendants would also argue that the statements about the scope of FDA approval were truthful because Defendants were referring to the favorability of ponatinib's label with respect to indication, not safety.

59.      Defendants would also argue that the statement that "pancreatitis" with a 5% incidence rate "is the most prevalent" serious adverse event associated with ponatinib was accurate, notwithstanding the argument that serious "arterial occlusive or thromboembolic events" occurred in 8% of patients.  Defendants would seek to establish that the 8% incidence rate represented an aggregation of multiple distinct adverse events and was not an appropriate comparison.  The Cowen Report also contained an accurate breakdown of individual adverse events.

60.    Moreover, Defendants would likely attack the premise that the adverse events were even caused by ponatinib, instead arguing that they were the result of a very sick drug trial population.  There were significant challenges to proving that in this patient population, events were caused by the drug and not some other underlying medical problems within already very sick patients.

61.    Complex and subtle scientific evidence, presented through multiple dueling experts' testimony, would have been needed to establish the falsity and materiality of these statements and there was no certainty that the jury, or the Court at summary judgment, would have credited Settlement Class Representatives' experts' views.  Thus, the Settlement Class Representatives faced a significant risk that the Court or a jury could have concluded that one or both of these statements were not false or misleading – eliminating the possibility of a recovery.

62.    Defendants would have also likely sought to prove that they did not even make these alleged misstatements, which were in an analyst report after a meeting with Defendants, and that the Settlement Class Representatives could not factually or legally attribute them to the Defendants.

63.    Defendants would also continue to argue that the Settlement Class Representatives would not be able to prove that any of the Defendants acted with scienter, which is generally the most difficult element of a securities fraud claim for a plaintiff to prove. In this case, Defendants had numerous scienter arguments that posed very significant hurdles to proving that they acted with an intent to commit securities fraud or with severe recklessness. In addition to arguments relating to planned trading to undercut profit motive, Defendants

would likely argue that "the fact that ARIAD was under the close supervision of the FDA…cuts strongly against any inference that ARIAD was acting recklessly in hiding events from investors." *In re ARIAD Pharm., Inc. Sec. Litig.*, 98 F. Supp. 3d at 163.

64.    Proving scienter within the context of pharmaceutical development is also a very complex, nuanced, and evidence intensive process, which would have presented significant challenges here.  There was no certainty that the jury would have ultimately credited Settlement Class Representatives' theories of the case and evidence concerning scienter over Defendants' counter evidence.

     **B.**    **Risks Related to Loss Causation and Damages**

65.    Even assuming that Class Representatives overcame the above risks and successfully established liability, they faced additional challenges in terms of establishing loss causation and ultimately proving damages.  The First Circuit shortened the Class Period to just a few days, with only two alleged misleading statements remaining and one corrective disclosure on December 14, 2012.

66.    The Settlement Class Representatives' damages expert has estimated maximum aggregate damages during the Settlement Class Period, based on the single disclosure, of just approximately $10.5 million.  However, proving loss causation in a securities fraud case is notoriously difficult and exacting – boiling down to a "battle of the experts," in which one cannot predict which expert a jury will find more persuasive.  If Defendants were able to successfully rebut plaintiffs' expert's testimony and eliminate the alleged disclosure or cast doubt on loss causation, damages would have been eviscerated.

67.     Additionally, as the case proceeded to trial and post-trial proceedings, plaintiffs' litigation expenses could have easily consumed the bulk of any awarded damages – assuming a verdict was upheld on appeal.

68.     Furthermore, in order to recover any damages at trial, the Settlement Class Representatives would have to prevail at many stages in the litigation—namely, a pending motion for class certification, motions for summary judgment, *Daubert* motions directed at experts, and then trial and, even if the Class Representatives prevailed at those stages, in the appeals that would likely follow.  At each of these stages, there would be significant risks attendant to the continued prosecution of the Action, and no guarantee that further litigation would have resulted in a higher recovery, or any recovery at all.

### C.     Risks Concerning Maintaining Class Certification Through Trial

69.     As set forth above, Plaintiffs' motion for class certification was pending at the time the Parties agreed to settle.  While the Settlement Class Representatives believe they would prevail in a contested class certification proceeding and that a class would be certified for the current class period, Defendants would likely have continued to challenge class certification, especially if plaintiffs had sought to enlarge the class period.  Decertification after trial also remained a significant risk.

## VIII.  THE PLAN OF ALLOCATION

70.     Pursuant to the Order for Notice and Hearing, and as set forth in the Notice, all Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form, including all required information, postmarked no later than April 26, 2018.  As provided in the Notice, after deduction of Court-awarded attorneys'

fees and expenses, Notice and Administration Expenses, and all applicable Taxes, the balance of the Gross Settlement Fund (the "Net Settlement Fund") will be distributed according to the plan of allocation approved by the Court (the "Plan of Allocation").

71.     The proposed Plan of Allocation, which is set forth in full in the Notice (Ex. 3–B at 10-14), was designed to achieve an equitable and rational distribution of the Net Settlement Fund.   Plaintiffs' Co-Lead Counsel developed the Plan of Allocation in close consultation with the Settlement Class Representatives' damages expert and believe that the plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

72.     In developing the Plan of Allocation, the Settlement Class Representatives' damages expert calculated the estimated amount of artificial inflation in the per share closing prices of ARIAD common stock, which allegedly was proximately caused by Defendants' false and misleading statements and omissions.   In calculating the estimated artificial inflation allegedly caused by those misrepresentations and omissions, the Class Representatives' damages expert considered price changes in ARIAD common stock in reaction to the public disclosure that allegedly corrected the alleged misrepresentations and omissions, adjusting those price changes for factors that were attributable to market or industry forces, and for non-fraud related ARIAD-specific information.

73.     For losses to be compensable damages under the federal securities laws, the disclosure of the allegedly misrepresented information must be the cause of the decline in the price of the securities at issue.   In this case, Settlement Class Representatives allege that Defendants issued false statements and omitted material facts on December 11, 2012 (before

market hours), which artificially inflated the price of ARIAD common stock.  It is alleged that the corrective information released to the market on December 14, 2012 (during market hours, at 11:48 AM EST) impacted the market price of ARIAD common stock throughout the remainder of the day and removed the alleged artificial inflation from ARIAD common stock prices by the close of the market on December 14, 2012.  Accordingly, in order to have a compensable loss in this Settlement, the ARIAD common stock must have been purchased or otherwise acquired during the Settlement Class Period and held through the release of the alleged corrective disclosure at 11:48 AM EST on December 14, 2012.

74.     Epiq, under Plaintiffs' Co-Lead Counsel's direction, will determine each Authorized Claimant's Recognized Claim using the Plan of Allocation.  Calculation of Recognized Claims will depend upon several factors, including when the Authorized Claimant purchased shares during the Class Period and whether these shares were sold during the Class Period, and if so, when.  Authorized Claimants will receive their *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Claim compared to the aggregate Recognized Claims of all Authorized Claimants.

75.     Once the Claims Administrator has processed all submitted claims, distributions will be made to eligible Authorized Claimants.  After an initial distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of initial distribution, Plaintiffs' Co-Lead Counsel will, if feasible and economical, re-distribute the balance among Authorized Claimants who have cashed their checks.  Re-distributions will be repeated until the balance in the Net Settlement Fund is of an amount that is no longer economically feasible to distribute.

At that point, Plaintiffs' Co-Lead Counsel will seek the Court's approval to donate the remainder to one or more non-sectarian, not-for-profit charitable organization(s) serving the public interest.  The remainder will not revert to Defendants.

76.     To date, there have been no objections to the Plan of Allocation.

77.     In sum, the proposed Plan of Allocation, developed in consultation with the Settlement Class Representatives' damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants based upon the damages theory in the case.  Accordingly, Plaintiffs' Co-Lead Counsel respectfully submit that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## IX.    PLAINTIFFS' CO-LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES SHOULD BE APPROVED

### A.    Consideration of Relevant Factors Justifies an Award of a 25% Fee

78.     Plaintiffs' Co-Lead Counsel, on behalf of all Plaintiffs' Counsel are also applying to the Court for an award of attorneys' fees and expenses in connection with the services rendered in the litigation.  Plaintiffs' Counsel includes, in addition to Milberg, Labaton, Bernstein Litowitz, and liaison counsel Berman Tabacco (formerly Berman DeValerio), Motley Rice LLC, the Fisher Law Offices, and Robbins Geller Rudman & Dowd LLP.  These additional firms will be compensated from the attorneys' fee awarded by the Court.  Specifically, Plaintiffs' Co-Lead Counsel seek a fee award of 25% of the Cash Settlement Amount, which would total $875,000, and an award of $288,846.02 in litigation expenses, plus interest on both amounts at the same rate and for the same time as that earned on the Gross Settlement Fund.  Plaintiffs' Co-Lead Counsel are also seeking $61,450.00 in

total for the Settlement Class Representatives, pursuant to the PSLRA, for the time they dedicated to representing the class.

79.     Based on an analysis of each of the relevant factors considered within the First Circuit, as further discussed below and in the accompanying Memorandum of Law in Support of Plaintiffs' Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses (the "Fee Memorandum"), we respectfully submit that Plaintiffs' Co-Lead Counsel's requested fee should be granted.

### 1.     The Requested Fee of 25% of the Cash Settlement Amount Would Be Fair and Reasonable

80.     Plaintiffs' Co-Lead Counsel, as compensation for their extensive and effective efforts in obtaining a favorable recovery for the Settlement Class, are applying for an award of 25% of the Cash Settlement Amount.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery in class actions because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interests of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances.  The percentage method is supported by public policy, has been recognized as appropriate by the United States Supreme Court for cases of this nature, and has certain structural advantages, including ease of administration.

81.     Plaintiffs' Co-Lead Counsel submit that a 25% fee award is justified in view of the result achieved for the Settlement Class, the extent and quality of work performed by Plaintiffs' Counsel, the substantial risks of the litigation and the contingent nature of the representation. As discussed in the Fee Memorandum, a 25% fee is fair and reasonable for attorneys' fees in common fund cases such as this, and is within the range of percentages

typically awarded in securities class actions in this Circuit. The Settlement Class Representatives support Plaintiffs' Co-Lead Counsel's fee request. *See* Ex. 1 ¶1, 6-7; Ex. 2 ¶¶1, 4.

### 2.    The Time and Labor of Plaintiffs' Counsel

82.    The investigation, prosecution, and settlement of the claims asserted in the Action required extensive and diligent efforts on the part of Plaintiffs' Counsel, given the complexity of the legal and factual issues raised by plaintiffs' claims and the vigorous defense mounted by Defendants. The many tasks undertaken by Plaintiffs' Counsel in this case are detailed above (*see, e.g.*, §§III-V).

83.    As also more fully set forth above, the Action was prosecuted for more than three and a half years and settled only after Plaintiffs' Counsel overcame multiple legal and factual challenges, including an appeal to the First Circuit. Among other efforts, Plaintiffs' Counsel conducted a comprehensive investigation into the class's claims; researched and prepared a detailed Complaint; briefed a thorough opposition to defendants' motions to dismiss; appealed the Court's order on defendants' motions to dismiss; moved for class certification; opposed Defendants' motion for Judgment on the Pleadings; began discovery including obtaining and analyzing documents produced by Defendants; and engaged in a hard-fought settlement process with experienced defense counsel.

84.    At all times throughout the pendency of the Action, Plaintiffs' Co-Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the Settlement Class.

85.     Attached hereto are declarations from Plaintiffs' Counsel, which are submitted in support of the request for an award of attorneys' fees and payment of litigation expenses. *See* Declaration on Behalf of Labaton Sucharow (Ex. 4); Declaration on Behalf of Bernstein Litowitz (Ex. 5); Declaration on Behalf of Milberg (Ex. 6); and Declaration on Behalf of Berman Tabacco (Ex. 7).

86.     Included with these declarations are schedules that summarize the time of each firm, as well as each firm's litigation expenses by category (the "Fee and Expense Schedules").[7]  The attached declarations and the Fee and Expense Schedules report the amount of time spent by Plaintiffs' Counsel's attorneys and professional support staff and the "lodestar" calculations, *i.e.*, their hours multiplied by their current hourly rates.  As explained in each declaration, they were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.

87.     The hourly rates of Plaintiffs' Counsel here range from $550 to $1250 for partners; $575 to $925 for of counsels/senior counsels; and $450 to $675 for associates.  *See* Exs. 4 - 7.  It is respectfully submitted that the hourly rates for attorneys and professional staff included in these schedules are reasonable for this type of complex commercial litigation. Exhibit 9, attached hereto, is a table of hourly rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings

---

[7] Attached hereto as Exhibit 8 is a summary table of the lodestars and expenses of Plaintiffs' Counsel.

in 2017.  The analysis shows that across all types of attorneys, Plaintiffs' Counsel's rates are consistent with, or lower than, the firms surveyed.

88.     Plaintiffs' Counsel have collectively expended 7,842.00 hours prosecuting the Action.  *See* Exs. 4 – 7.  The resulting collective lodestar is $4,839,983.75.  Ex. 8  The requested fee of 25% of the Cash Settlement Amount ($875,000 before interest) results in a fractional or negative "multiplier" of .18 on the lodestar.

### 3.     The Skill Required and Quality of the Work

89.     Plaintiffs' Co-Lead Counsel Labaton Sucharow, Bernstein Litowitz, and Milberg are among the most experienced and skilled securities litigation law firms in this practice area.  The expertise and experience of their attorneys are described in Exhibits 4 through 6 annexed hereto.  Since the passage of the PSLRA, Plaintiffs' Co-Lead Counsel have been approved by courts to serve as lead counsel in numerous securities class actions throughout the United States, and in several of the most significant federal securities class actions in history.

90.     Labaton has also served as lead counsel in a number of high profile matters, for example: *In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1500 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and

reaching settlements of more than $600 million); *In re Schering-Plough Corp. / ENHANCE Sec. Litig.*, Civil Action No. 08-397 (DMC) (JAD) (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million). *See* Ex. 4-C.

91.     Bernstein Litowitz has served as lead counsel in a number of high profile matters, for example:  *In re WorldCom, Inc. Sec. Litig.*, No. 02-3288 (S.D.N.Y.) (representing the New York State Common Retirement Fund and reaching settlements totaling $6.12 billion); *In re Cendant Corp. Litig.*, No. 98-1664 (D.N.J.) (representing the California Public Employees' Retirement System, the New York State Common Retirement Fund, and the New York City Pension Funds and recovering more than $3.3 billion); *In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, No. 09-2058 (S.D.N.Y.) (representing the State Teachers Retirement System of Ohio, the Ohio Public Employees Retirement System, and the Teacher Retirement System of Texas and reaching a settlement of $2.425 billion in cash and corporate governance reforms); and *In re Merck & Co., Inc. Sec. Litig.*, No. 05-1151 (D.N.J.) (representing the Public Employees' Retirement System of Mississippi and reaching a settlement of $1.06 billion).  *See* Ex. 5-C.

92.     Milberg has served as lead or co-lead counsel in many high-profile class actions, and has recovered billions of dollars for investors.  *See, e.g., In re Tyco Int'l Ltd., Sec. Litig.*, MDL No. 02-1335-B (D.N.H.) ($3.2 billion); *In re Nortel Networks Corp., Sec. Litig.*, No. 01-CV-1855 (S.D.N.Y.) (settlement for cash and stock valued at $1.142 billion); *In re Lucent Techs., Inc., Sec. Litig.*, No. 00-CV-621 (D.N.J.) ($600 million settlement); *In re Raytheon Sec. Litig.*, No. 99-CV-12142 (D. Mass.) ($460 million settlement); *In re Sears,*

*Roebuck & Co. Sec. Litig.*, No. 02-CV-7527 (N.D. Ill.) ($215 million settlement); *In re Initial Public Offering Sec. Litig.*, No. 21-92 (S.D.N.Y.) ($586 million settlement); *In re Merck & Co., Inc. Securities Litigation*, Nos. 05-1151 and 05-2367 (D.N.J.) ($1.062 billion settlement); *In re Vivendi Universal, S.A. Securities Litigation*, No. 02-5571 (S.D.N.Y.) (jury verdict for plaintiff class in January 2010); *In re Biovail Corp. Sec. Litig.*, No. 03-8917 (S.D.N.Y.) (a $138 million settlement for the class, and company agreed to institute significant corporate governance changes); *In re Nortel Networks Corp. Sec. Litig.*, No. 01-1855 (S.D.N.Y.) (settlement valued at $1.142 billion); *In re CMS Energy Corp. Sec. Litig.*, No. 02-72004 (E.D. Mich.) (settlement of more than $200 million); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-9475 (S.D.N.Y.) ($120 million cash settlement); *In re Oppenheimer Rochester Funds Group Sec. Litig.*, No. 09-md-02063-JLK-KMT (MDL Docket No. 2063) (D. Colo.) (settlements totaling $89.5 million in cash for the six separate classes). *See* Ex. 6-C.

### 4. Risks of the Litigation and the Contingent Nature of the Fee

93.     This Action presented substantial challenges from the outset of the case. The specific risks the Settlement Class Representatives faced in proving Defendants' liability and damages are detailed in paragraphs 56 to 69, above. These case-specific risks are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws and was undertaken on a contingent basis.

94.     From the outset, Plaintiffs' Co-Lead Counsel understood that they were embarking on a complex and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that

responsibility, Plaintiffs' Co-Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires. With an average time of several years for these cases to conclude (and this case has been no different), the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Plaintiffs' Co-Lead Counsel received no compensation during the course of the Action but have incurred 7,842 hours of time for a total lodestar of $4,839,983.75 and have incurred $288,846.02 in expenses in prosecuting the Action for the benefit of the Settlement Class.

95.     Plaintiffs' Co-Lead Counsel also bore the risk that no recovery would be achieved. Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.

96.     Plaintiffs' Co-Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

97.     Plaintiffs' Co-Lead Counsel is aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

98.     Federal Circuit court cases include numerous opinions affirming dismissals with prejudice in securities cases.  The many appellate decisions affirming summary judgments and directed verdicts for defendants show that surviving a motion to dismiss is not a guarantee of recovery.  *See, e.g.*, *In re Smith & Wesson Holding Corp. Sec. Litig*, 669 F.3d 68 (1st Cir. 2012); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Scientific-Atlanta, Inc.*, 489 F. App'x. 339 (11th Cir. 2012); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Digi Int'l Inc. Sec. Litig.*, 14 F. App'x. 714 (8th Cir. 2001).

99.     Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial.  While only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), litigated by Labaton Sucharow, or substantially lost as to the main case, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

100.    Even plaintiffs who succeed at trial may find their verdict overturned on appeal. *See, e.g.*, *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Grp, Inc. v. First Derivative Traders*, 131

S.Ct. 2296 (2011)); *Robbins v. Koger Props., Inc*., 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice).  And, the path to maintaining a favorable jury verdict can be arduous and time consuming.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, Case No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court rejecting unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id*.) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 562 U.S. 1270 (2011)).

101.    As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages.  The Settlement Class Representatives' success was by no means assured.  Defendants disputed whether the Settlement Class Representatives could establish the falsity of the statements as well as scienter and would no doubt contend, as the case proceeded to trial, that even if liability existed, the amount of damages was substantially lower than the Settlement Class Representatives alleged.  Were this Settlement not achieved, and even if the Settlement Class Representatives prevailed at trial, the Settlement Class Representatives and Plaintiffs' Co-Lead Counsel faced potentially years of costly and risky trial and appellate litigation against Defendants, with ultimate success far from certain and the prospect of no recovery significant.  Plaintiffs' Co-Lead Counsel respectfully submit that based upon the considerable risk factors present, this case involved a very substantial contingency risk to counsel.

### 5.    The Size of the Fund

102.    Here, the $3,500,000 Settlement, representing 33.3% of maximum damages of approximately $10.5 million, is a very favorable result, particularly when considered in view of the substantial risks and obstacles to recovery if the Action were to continue through class certification, summary judgment, to trial, and through likely post-trial motions and appeals. *See, e.g., Medoff v. CVS Caremark Corp.*, No. 09-cv-554-JNL, 2016 U.S. Dist. LEXIS 19135, at *18-19 (D.R.I. Feb. 17, 2016) (court approved $48 million settlement representing approximately 5.33% of estimated recoverable damages and noting that this is "well above the median percentage of settlement recoveries in comparable securities class action cases"); *Int'l Bd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*, No. 3:09-cv-00419-MMD-WGC, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving $12.5 million settlement recovering about 3.5% of the maximum damages that plaintiffs believe could be recovered at trial and noting that the amount is within the median recovery in securities class actions settled in the last few years); *In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (court approved $40.3 million settlement representing approximately 6.25% of estimated damages and noting that this is at the "higher end of the range of reasonableness of recovery in class actions securities litigation"); *In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) ($13.75 million settlement yielding 6% of potential damages was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements").

103.    The substantial recovery was the result of very thorough and robust prosecutorial and investigative efforts, contentious and complicated motion practice, and

extensive settlement negotiations.  As a result of this Settlement, hundreds of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.

**B.     Request for Litigation Expenses**

104.    Plaintiffs' Co-Lead Counsel seek payment from the Gross Settlement Fund of $288,846.02 in litigation expenses reasonably and necessarily incurred by Plaintiffs' Counsel in connection with commencing and prosecuting the claims against Defendants.

105.    From the beginning of the case, Plaintiffs' Co-Lead Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Thus, Plaintiffs' Co-Lead Counsel were motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case.   Certain of the expenses were paid out of a joint litigation fund created and maintained by Milberg (the "Litigation Expense Fund").   Plaintiffs' Co-Lead Counsel made contributions into the Litigation Expense Fund and those contributions were used to pay the joint expenses.   A description of the expenses paid from the Litigation Expense Fund, organized by category, is included as Exhibit D to the individual firm declaration submitted on behalf of Milberg.  *See* Milberg Decl., Ex. 6-D  Each firm is also seeking reimbursement for its contributions, and those contributions are listed in their individual firm declarations.  *See* Labaton Decl., Ex. 4-B; Bernstein Decl., Ex. 5-B; Milberg Decl., Ex. 6-B.

106.    As set forth in the Fee and Expense Schedules and the Summary Table of Lodestars and Expenses, Plaintiffs' Counsel's litigation expenses in connection with the prosecution of the Action total $288,846.02.  *See* Exs. 4 - 8.  As attested to, these expenses are

reflected on the books and records maintained by each firm.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of counsel's expenses.  These expenses are set forth in detail in Plaintiffs' Counsel's declarations, which identify the specific category of expense—*e.g*., experts' fees, travel costs, online/computer research, and photocopying.

107.    Of the total amount of expenses, $151,003.00 or approximately 52% of total expenses, was expended on experts in the fields of damages, loss causation, insider trading, and the pharmaceutical industry.  These experts were valuable for Plaintiffs' Co-Lead Counsel's analysis and development of the claims, discovery efforts, and mediation.

108.    The other expenses for which Plaintiffs' Co-Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation.  These expenses include, among others, on line legal and factual research, out of town travel costs, filing fees, work-related transportation, out-of-office working meals, duplicating costs, and court reporting services.

109.    All of the litigation expenses, which total $288,846.02, were necessary to the successful prosecution and resolution of the claims against Defendants.

## X.    REIMBURSEMENT OF THE SETTLEMENT CLASS REPRESENTATIVES' EXPENSES IS FAIR AND REASONABLE

110.    Additionally, in accordance with 15 U.S.C. §78u-4(a)(4), the Settlement Class Representatives seek reimbursement of their reasonable costs and expenses (including lost wages) incurred in connection with their work representing the Settlement Class in the aggregate amount of $61,450.  The amount of time devoted to this Action by each of the Settlement Class Representatives is detailed in the accompanying Declarations of William A. Gaul and Lynn Wenguer, attached hereto as Exhibits 1 and 2.  Plaintiffs' Co-Lead Counsel

respectfully submit that the amounts requested by the Settlement Class Representatives are consistent with Congress's intent, as expressed in the PSLRA, of encouraging large investors to take an active role in commencing and supervising private securities litigation.

111.   As discussed in the Fee Memorandum and in the Settlement Class Representatives' supporting declarations, the Settlement Class Representatives have fulfilled their duties related to their representation of the Settlement Class.  *See generally* Ex. 1 and Ex. 2.  In particular, Dr. Gaul engaged in discovery efforts to gather documents and information responsive to Defendants' discovery requests and also attended the mediation in the Action. Ex. 1 ¶3.

112.   The efforts expended by the Settlement Class Representatives during the course of the Action are precisely the types of activities courts have found to support reimbursement to class representatives, and support the Settlement Class Representatives' request for reimbursement.

## XI.   THE REACTION OF THE SETTLEMENT CLASS TO THE FEE AND EXPENSE APPLICATION

113.   As mentioned above, consistent with the Order for Notice and Hearing, a total of 7,675 Notices have been mailed to potential Settlement Class Members advising them that Plaintiffs' Co-Lead Counsel would seek an award of attorneys' fees not to exceed 30% of the Settlement Fund, and payment of expenses in an amount not greater than $450,000.  *See* Ex. 3 ¶11.  Additionally, the Publication Notice was published in *Investor's Business Daily*, and disseminated over *PR Newswire*.  *Id*. ¶13.  The Notice and the Stipulation have also been

available on the settlement website maintained by the Claims Administrator. *Id.* ¶18.[8]  While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date no objections have been received.  Plaintiffs' Co-Lead Counsel will respond to any objections received in their reply papers, which are due on May 3, 2018.

## XII.  MISCELLANEOUS EXHIBITS

114.    Attached hereto as Exhibit 10 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee Memorandum.

## XIII.  CONCLUSION

115.    In view of the significant recovery to the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, the Settlement Class Representatives and Plaintiff's Co-Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  In view of the significant recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Plaintiff's Co-Lead Counsel, as described above and in the accompanying memorandum of law, Plaintiffs' Co-Lead Counsel respectfully submit that a fee in the amount of 25% of the Gross Settlement Fund be awarded and that litigation expenses be paid in full.

---

[8] The Settlement Class Representatives' motion for approval of the Settlement and Plaintiffs' Co-Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement website.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 5th day of April, 2018.

|                                         |
| --------------------------------------- |
| */s/Sanford P. Dumain*                  |
| SANFORD P. DUMAIN                       |

|                                         |
| --------------------------------------- |
| */s/John C. Browne*                     |
| JOHN C. BROWNE                          |

|                                         |
| --------------------------------------- |
| */s/Jonathan Gardner*                   |
| JONATHAN GARDNER                        |

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of April, 2018, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Sanford P. Dumain*
Sanford P. Dumain